**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 09-cv-00200-PAB-CBS

(Consolidated with Civil Action Nos. 09-cv-00215-PAB-CBS; 09-cv-00296-PAB-CBS and
09-cv-00606-PAB-CBS)

In re LEVEL 3 COMMUNICATIONS, INC. SECURITIES LITIGATION

---

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' COMBINED MOTION TO DISMISS
PLAINTIFF'S AMENDED CONSOLIDATED COMPLAINT**

---

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION AND BACKGROUND TO DEFENDANTS' FRAUD ...................... 1

II.   STANDARD ON A MOTION TO DISMISS .................................................................. 4

III.   DEFENDANTS' FALSE STATEMENTS ARE ACTIONABLE UNDER §10(b)
OF THE EXCHANGE ACT AND RULE 10b-5 ............................................................. 5

    A.   The Complaint Pleads with Particularity that Defendants' Statements
About the Integration of the Acquired Companies Were False and
Misleading When Made ......................................................................................... 5

        1.   Defendants' False Statements About Level 3's Integration of
WilTel .......................................................................................................... 6

        2.   Additional Sources to Have Been Pleaded with More than
Adequate Particularity Support the Falsity of Defendants'
Statements About the WilTel Integration ................................................... 8

        3.   Defendants' False Statements About Level 3's Integration of the
Metro Companies ...................................................................................... 10

        4.   Defendants' False Statements About Level 3's Ability to Provision
Customer Orders ...................................................................................... 11

        5.   Defendants' Post-Class Period Admissions Support Plaintiff's
Allegations that Defendants' Class Period Statements Were False
and Misleading When Made ..................................................................... 12

    B.   Defendants' Statements Were Material ............................................................. 13

    C.   Defendants Neither Disclosed that the WilTel Integration Was Ongoing
nor Adequately Warned Via Risk Disclosures ................................................. 14

IV.   PLAINTIFF ADEQUATELY PLEADS DEFENDANTS' SCIENTER ........................... 16

    A.   Plaintiff Sufficiently Alleges Defendants' Knowledge of the Undisclosed
Facts as Well as Their Direct Access to Those Facts ............................................ 16

    B.   Defendants' Top Positions at Level 3 Support a Strong Inference of
Scienter ............................................................................................................. 19

**Page**

C.     Scienter Is Further Supported by Defendants' Motivation to Artificially Inflate Level 3's Stock Price to Consummate the Broadwing Acquisition and to Refinance Debt..........................................................................20

D.     The Fact that Crowe, O'Hara, Patel and Miller's Compensation Was Directly Tied to Level 3's Success in Integrating the Acquired Businesses Supports a Strong Inference of Scienter ...............................................21

E.     Defendants' Unlawful Class Period Insider Trading Supports a Strong Inference of Scienter .........................................................................22

V.      PLAINTIFF ADEQUATELY PLEADS LOSS CAUSATION .......................................23

VI.    THE COMPLAINT ADEQUATELY ALLEGES CLAIMS FOR §20(a) ........................24

VII.   CONCLUSION..............................................................................................................25

520766_1

# TABLE OF AUTHORITIES

**Page**

## CASES

*Adams v. Kinder-Morgan, Inc.*,
   340 F.3d 1083, 1095 (10th Cir. 2003) ..........................................................5, 8, 18

*Angres v. Smallworldwide PLC*,
   94 F. Supp. 2d 1167 (D. Colo. 2000)..........................................................11

*Anixter v. Home-Stake Prod. Co.*,
   77 F.3d 1215 (10th Cir. 1996) ..........................................................16

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..........................................................5

*City of Phila. v. Fleming Cos.*,
   264 F.3d 1245 (10th Cir. 2001) ..........................................................5

*Croker v. Carrier Access Corp.*,
   No. 05-cv-01011-LTB-OES, 2006 U.S. Dist. LEXIS 48603
   (D. Colo. July 18, 2006)........................................................... *passim*

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)..........................................................4, 23

*Halperin v. eBanker USA.COM, Inc.*,
   295 F.3d 352 (2d Cir. 2002)..........................................................15

*Helwig v. Vencor, Inc.*,
   251 F.3d 540 (6th Cir. 2001) ..........................................................14, 18

*In re Aetna Inc. Sec. Litig.*,
   34 F. Supp. 2d 935 (E.D. Pa. 1999) ..........................................................13

*In re BISYS Sec. Litig.*,
   397 F. Supp. 2d 430 (S.D.N.Y. 2005)..........................................................16

*In re Countrywide Fin. Corp. Derivative Litig.*,
   554 F. Supp. 2d 1044 (C.D. Cal. 2008) ..........................................................22

*In re Countrywide Fin. Corp. Sec. Litig.*,
   588 F. Supp. 2d 1132 (C.D. Cal. 2008) ..........................................................20

**Page**

*In re FX Energy, Inc.*,
  No. 2:07-CV-874, 2009 U.S. Dist. LEXIS 54551
  (D. Utah June 25, 2009)................................................................9, 15

*In re Guilford Mills, Inc. Sec. Litig.*,
  No. 98 Civ. 7739 (CLB), 1999 U.S. Dist. LEXIS 21690
  (S.D.N.Y. July 21, 1999) ......................................................................21

*In re Honeywell Int'l Sec. Litig.*,
  182 F. Supp. 2d 414 (D.N.J. 2002) ......................................................13

*In re ICG Communications Sec. Litig*
  No. 00-RB-1864 (BNB), 2006 U.S. Dist. LEXIS 6695
  (D. Colo. Feb. 7, 2006). ......................................................................19

*In re JPMorgan Chase & Co. Sec. Litig.*,
  MDL No. 1783, 2007 U.S. Dist. LEXIS 93877
  (N.D. Ill. Dec. 18, 2007) ......................................................................21

*In re Merck & Co. Sec. Litig.*,
  432 F.3d 261 (3d Cir. 2005)....................................................................3

*In re Motorola Sec. Litig.*,
  505 F. Supp. 2d 501 (N.D. Ill. 2007) ..................................................24

*In re Nash Finch Co. Sec. Litig.*,
  502 F. Supp. 2d 861 (D. Minn. 2007)..............................................13, 15

*In re QLT Sec. Litig.*,
  312 F. Supp. 2d 526 (S.D.N.Y. 2004)..........................................16, 17, 18

*In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*,
  387 F. Supp. 2d 1130 (D. Colo. 2005)..........................................16, 22, 23

*In re Qwest Communications International, Inc. Sec. Litig.*,
  396 F. Supp. 2d 1178 (D. Colo. 2004)..............................................22, 23

*In re Rhythms Sec. Litig.*,
  300 F. Supp. 2d 1081 (D. Colo. 2004)..................................................6, 9

- iv -

**Page**

*In re Secure Computing Corp.*,
    184 F. Supp. 2d 980 (N.D. Cal. 2001) ..................................................................23

*In re Storage Tech. Corp. Sec. Litig.*,
    147 F.R.D. 232 (D. Colo. 1993) ..........................................................................25

*In re Williams Sec. Litig. – WCG Subclass*,
    558 F.3d 1130 (10th Cir. 2009) ......................................................................4, 23

*Institutional Investors Group v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009) ................................................................................12

*Maher v. Durango Metals*,
    144 F.3d 1302 (10th Cir. 1998) ....................................................................24, 25

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
    513 F.3d 702 (7th Cir. 2008) ..............................................................................19

*McDonald v. Kinder-Morgan, Inc.*,
    287 F.3d 992 (10th Cir. 2002) ..............................................................................4

*N.J. v. Sprint Corp.*,
    314 F. Supp. 2d 1119 (D. Kan. 2004) .................................................................16

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ........................................................................6, 23

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000) ................................................................................13

*Pirraglia v. Novell, Inc.*,
    339 F.3d 1182 (10th Cir. 2003) ..........................................................................23

*Queen Uno Ltd. P'ship v. Coeur D'Alene Mines Corp.*,
    2 F. Supp. 2d 1345 (D. Colo. 1998) ................................................................4, 20

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ...............................................................................15

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ........................................................................22, 23

520766_1

**Page**

*S. Ferry LP #2 v. Killinger*,
   399 F. Supp. 2d 1121 (W.D. Wash. 2005)..........................................................................2, 14

*Schaffer v. Evolving Sys., Inc.*,
   29 F. Supp. 2d 1213 (D. Colo. 1998)......................................................................................11

*Schwartz v. Celestial Seasonings*,
   124 F.3d 1246 (10th Cir. 1997) ................................................................................................5

*Sorkin, LLC v. Fischer Imaging Corp.*,
   No. 03-CV-00631-RPM, 2005 WL 1459735
   (D. Colo. June 21, 2005)...............................................................................................8, 9, 10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)................................................................................................................16

*The Sorkin, LLC v. Fischer Imaging Corp.*,
   No. 03-cv-00631-RPM, 2005 U.S. Dist. LEXIS 19934
   (D. Colo. June 21, 2005)......................................................................................................9, 22

*W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*,
   No. 05-cv-01265-WDM-MEH, 2008 U.S. Dist. LEXIS 47748
   (D. Colo. Mar. 28, 2008)......................................................................................................9, 15

*W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*,
   No. 05-cv-01265-WDM-MEH, 2008 U.S. Dist. LEXIS 90278
   (D. Colo. Nov. 6, 2008) ..........................................................................................................23

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
   §78u-4(b)(1)(B)........................................................................................................................5
   §78u-4(b)(2)............................................................................................................................16

Federal Rules of Civil Procedure
   Rule 9(b) ...................................................................................................................................6
   Rule 12(b)(6)........................................................................................................................4, 19
   Rule 15(a)................................................................................................................................25

17 C.F.R.
   §240.10b-5............................................................................................................. 5, 13, 14, 24

## I.     INTRODUCTION AND BACKGROUND TO DEFENDANTS' FRAUD

From October 17, 2006 through October 23, 2007 (the "Class Period"), defendants repeatedly assured the market Level 3 Communications, Inc.'s ("Level 3" or the "Company") integration of WilTel was complete, on schedule and under budget (¶¶54, 57-58, 64, 72), while concealing from investors that the crucial work of building the transport interconnects and route integration, the primary components of the physical network integration, was far from complete.  ¶¶107, 136-140.[1] Defendants' statements about the WilTel integration were critically important because they misled the market into believing Level 3 was capable of successfully integrating Broadwing, another major long haul provider like WilTel, immediately after its acquisition in January 2007.  Despite stunning and detailed new facts, corroborating confidential witness ("CW") accounts and specific allegations from named internal Company reports, defendants still insist the AC lacks particularity.  Defendants are wrong.

Defendants' motion to dismiss ("MTD") ignores the detailed "True Facts" section of the AC (¶¶107-146), which establishes both falsity and scienter.  The AC pleads with specificity why defendants' Class Period statements – such as ***"We continue to run ahead of plan and have now completed the majority of integration efforts from WilTel, and we have completed these activities under budget"*** (¶54); ***"You are right on WilTel, we have generally done, substantially done, by that I mean 85%, 90% done with those efforts"*** (¶64); and ***"Most of the physical integration of WilTel is now complete"*** (¶72) – were false and how defendants knew their statements were false

---

[1]     Plaintiff obtained leave to file the Consolidated Class Action Complaint for Violations of the Federal Securities Laws and Jury Demand ("AC") which was deemed filed on March 8, 2010.  All references to the AC shall be "¶___" or "¶¶___".

when made.[2]  Although defendants may have chosen to ignore these allegations, they have done so at their own peril because the true facts, corroborating witness accounts and details of internal reports all show defendants' Class Period statements are actionable pursuant to federal securities laws.

Defendants' weak assertions that the CW and internal report allegations do not support falsity or scienter, and that they fully disclosed the WilTel integration was ongoing should be rejected. MTD at 8-10.  Defendants' reliance on October 17, October 24 and December 4, 2006 conference call statements for asserting they disclosed the ongoing WilTel integration is misplaced.  *See* MTD at 9.  The October 17 statement that integration would take 18 months was referring to Broadwing, while the October 24 and December 4 statements were referring to the metro ring acquisitions, ***not*** WilTel.  By referencing the wrong statements, defendants either miss the point or are trying to mislead the Court.  The focus of this case is defendants' false statements assuring investors the WilTel network integration was complete to justify the acquisition of another long haul provider, Broadwing.

Defendants' repeated assertions that the false statements about the WilTel integration are immaterial ignores their own Class Period statements to the contrary, such as:  "I do know this [integration] is an important matter to many of our investors," and integration work at Level 3 is "job #1."  ¶¶55, 80.  When taken in context, the newly alleged false statements that Level 3 had "proven integration experience" and was a "logical consolidator" are also material and actionable.  ¶¶65-67, 71, 74-75, 82.  *See S. Ferry LP #2 v. Killinger*, 399 F. Supp. 2d 1121, 1130 (W.D. Wash. 2005),

---

[2]      Unless otherwise noted, all emphasis is added and all internal citations are omitted.

520766_1

*vacated and dismissed in part, on other grounds*, 542 F.3d 776 (9th Cir. 2008), 2009 U.S. Dist. LEXIS 91174 (W.D. Wash. 2009) (defendants' statement "'[o]ur past systems integration experience in acquisitions will be put to good use as we tackle the complexities of this [integration]'" was false). The AC alleges defendants made specific material assurances to investors, which caused Level 3's stock price to be artificially inflated throughout the Class Period. Between July and October 2007, when the market learned these statements were false, Level 3 lost billions of dollars in market capitalization. ¶¶89, 103, 207-208. This massive correction in Level 3's share price alone shows defendants' misleading Class Period statements were material. *In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 269 (3d Cir. 2005).

In moving to dismiss the AC, defendants wrongly argue plaintiff has failed to establish scienter. The CWs identified, the internal reports described, combined with the true facts alleged in the AC, more than adequately plead scienter by explaining: (a) how defendants monitored the WilTel integration status; (b) what meetings they attended; (c) what reports were circulated to monitor the integration status; and (d) how, based on this information, defendants knew their statements regarding the WilTel network integration being virtually complete were false when made. ¶¶17, 107-146, 180-183. For example, the AC provides details from internal reports prepared for defendants showing that as of January 2007, just after defendants told the market the WilTel integration was 85%-90% complete and under budget, Level 3 had not committed enough capital to complete the physical network integration of WilTel. ¶¶136-137, 164(a). These particularized allegations are indicative of both falsity and scienter.

Plaintiff's allegations of motive and opportunity only bolster a strong inference of defendants' scienter. ¶¶189-202. For instance, defendants' false and misleading Class Period

statements succeeded in artificially inflating Level 3's stock price for use as currency to acquire Broadwing, improve the Company's credit rating and refinance billions of dollars in debt. ¶¶189-191.  Whether defendants like it or not, these allegations are probative of scienter. *See Queen Uno Ltd. P'ship v. Coeur D'Alene Mines Corp.*, 2 F. Supp. 2d 1345, 1359-60 (D. Colo. 1998) (false statements designed to inflate a company's stock price to execute acquisitions based on artificially inflated prices are actionable and probative of scienter).

The AC also establishes loss causation by explaining how defendants' false statements affected Level 3's stock price during the Class Period and how Level 3's stock price declined when the market became aware of the true facts regarding the failed integrations. ¶¶203-209.  Level 3 suffered massive losses in market capitalization in July and October 2007 when defendants disclosed significant delays in fulfilling customer orders and the Company was forced to revise downward revenue and earnings guidance for 4Q07 and FY08. ¶¶87-89, 96-103, 207-208.  Because the AC explains how plaintiff's loss was causally connected to the alleged misrepresentations, loss causation has been adequately pleaded. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005); *In re Williams Sec. Litig. – WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009).

Accordingly, the Court should deny defendants' motion to dismiss in its entirety.

## II.     STANDARD ON A MOTION TO DISMISS

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the complaint's allegations must be taken as true and construed in the light most favorable to plaintiff. *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 997 (10th Cir. 2002).  The Supreme Court further instructs, "when a complaint adequately states a claim, it may not be dismissed based on a district court's assessment

520766_1

that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007).

## III.   DEFENDANTS' FALSE STATEMENTS ARE ACTIONABLE UNDER §10(b) OF THE EXCHANGE ACT AND RULE 10b-5

### A.   The Complaint Pleads with Particularity that Defendants' Statements About the Integration of the Acquired Companies Were False and Misleading When Made

Defendants ignore numerous allegations directly contradicting their Class Period statements about the status of Level 3's integration of WilTel and the metro companies.  The AC satisfies Private Securities Litigation Reform Act of 1995 ("PSLRA") pleading requirements because it "specif[ies] each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. §78u-4(b)(1)(B); *see also City of Phila. v. Fleming Cos.*, 264 F.3d 1245, 1258 (10th Cir. 2001).[3]  It also sets forth "'the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof,'" and, therefore, contains the requisite particularity.  *Schwartz v. Celestial Seasonings*, 124 F.3d 1246, 1252 (10th Cir. 1997).

---

[3]   To state a claim for securities fraud under Rule 10b-5, plaintiff must plead the following elements: (1) defendants made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the false or misleading statements were made in connection with the purchase or sale of securities; (3) the defendants acted with scienter, meaning with the intent to defraud or recklessness; (4) plaintiff relied on the misleading statements; and (5) plaintiff suffered damages as a result of his reliance.  *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003).  Contrary to defendants' unfounded assertions, to plead a claim for securities fraud under Rule 10b-5, plaintiff need not allege defendants issued false financial statements.  *See* MTD at 6-7.

- 5 -

While defendants erroneously suggest plaintiff must present undisputed *evidence* of falsity at the motion to dismiss stage (*see, e.g.*, MTD at 11, 13), the AC's particularized, corroborating allegations establishing falsity undoubtedly meet PSLRA *pleading* standards.[4]  *Croker v. Carrier Access Corp.*, No. 05-cv-01011-LTB-OES, 2006 U.S. Dist. LEXIS 48603, at *33 (D. Colo. July 18, 2006) (neither Rule 9(b) nor the PSLRA requires plaintiff plead evidence in the complaint).

1.    **Defendants' False Statements About Level 3's Integration of WilTel**

On October 17, 2006, O'Hara told investors during a conference call that Level 3 had "completed the majority of integration efforts from WilTel [ahead of schedule and] under budget." ¶54; *see also* ¶¶57-58.  On December 4, 2006, Patel reiterated at the Bank of America Credit Conference that Level 3 was "85%, 90% done" with the WilTel integration.  ¶64.  On February 8, 2007, O'Hara reassured investors: "Most of the physical integration of WilTel is now complete." ¶72.  The AC explains in detail why these statements were false when made and describes the truth that defendants were legally obligated to convey to investors.

CW1 knew first-hand the WilTel integration was significantly behind schedule from November 2006 through the end of the Class Period.  ¶164(a)-(e).  According to CW1, as of November 2006, when CW1 was working as Senior Director of Network Integration, Level 3 was

---

[4]    Lead Plaintiff has standing to assert claims based on statements made throughout the Class Period, including those made after July 26, 2007. *In re Rhythms Sec. Litig.*, 300 F. Supp. 2d 1081, 1085-86 (D. Colo. 2004).  Also, defendants are liable for analyst statements where it is clear the statements originated from defendants. *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1234-35 (9th Cir. 2004).  Here, the Complaint alleges certain analyst reports published during the Class Period containing false statements that are clearly attributable to defendants.  ¶¶57, 60-61, 81.

- 6 -

still in the earliest stages of integrating WilTel's network – the most time intensive and difficult step of the network integration process – and was still building network interconnects and capacity. ¶164(b). CW1 also confirms WilTel's network inventory data was so inaccurate as of November 2006 that the physical network analysis (in which network circuits were physically located and examined) and the major task of building network interconnects and capacity were far behind schedule, and remained so throughout the Class Period.  ¶164(c).

Although CW1 alone establishes the falsity of defendants' statements that the WilTel integration was virtually complete and under budget, internal Company reports further corroborate CW1's account.  A Network Integration 2007-2009 CAPEX Costs and Synergies Projections report shows that as of December 2006, Level 3 had spent less than half of the capital it had devoted to completing critical transport interconnects and route integration – specifically, $12.8 million out of $30.2 million – while at the same time had determined the budgeted $30.2 million would not cover the cost of these major tasks and additional capital would be required to complete the WilTel network integration *even into 2008*.  ¶¶69(a), 135-136, 164(a).  A Network Integration Capex & Synergy Review prepared for the Company's senior executives in mid-January 2007 reveals defendants had not committed enough capital to achieve the physical network integration of WilTel and that major work on transport interconnects and route integration remained unfinished.[5]  ¶¶137, 164(a).  This report shows Level 3 had increased the capital devoted to the critical WilTel physical

---

[5]     This report shows the increase in capital was needed, in part, to complete the WilTel transport interconnects in Las Vegas, Stamford, Hartford, and San Luis Obispo markets, as well as to integrate major WilTel routes from Cleveland to New York, Jacksonville to Miami, Chicago to Minneapolis, and Omaha to Dayton.  ¶137.

network integration tasks of completing transport interconnects and route integration to $4 million

and $7 million for 2007, respectively – an increase of over $4.3 million from December 2007, just

one month earlier.  ¶137.  Critically, as of early April 2007, a Network Integration Weekly

Operations Review shows Level 3 had *still* yet to complete transport interconnects in 17 major

WilTel markets and had integrated less than one-fifth of WilTel route into Level 3's network.

¶¶138-139.  These facts directly contradict defendants' Class Period statements concerning the

WilTel network integration.[6]

### 2. Additional Sources to Have Been Pleaded with More than Adequate Particularity Support the Falsity of Defendants' Statements About the WilTel Integration

Defendants' attack on plaintiff's allegations based on first-hand knowledge of former Level 3

employees and internal documents is unfounded.  MTD at 11, 15.  In addition to CW1, plaintiff has

adequately alleged falsity by identifying 15 other corroborating confidential witnesses.  Plaintiff has

described in great detail the confidential witnesses' positions at Level 3, when they were employed,

their roles in the integration process, the source of their knowledge and the meetings they attended

with defendants.  *See* ¶¶164-79; *Adams*, 340 F.3d at 1102 (source allegations aid the court in

distinguishing "rumor and speculation" from "concrete information"); *Sorkin, LLC v. Fischer

Imaging Corp.*, No. 03-CV-00631-RPM, 2005 WL 1459735, at *6 (D. Colo. June 21, 2005) (the

---

[6]     The Complaint specifies which statements are false and why, and thus any argument that it is puzzle pleading should be rejected.  *Croker*, 2006 U.S. Dist. LEXIS 48603, at *16.

- 8 -

weight given to a complaint's allegations depends on the level of specificity and factors such as the source of the information, whether the sources are disclosed, and their reliability).[7]

Like CW1, other reliable CW accounts directly contradict defendants' statements between October 2006 and February 2007 that the integration of WilTel was virtually complete. According to CW2, CW3, CW6, CW13 and CW14, shortly after Level 3 acquired WilTel, defendants terminated virtually all WilTel employees capable of accurately mapping the acquired companies' network inventory and familiar with the functioning of WilTel's inventory control and provisioning systems. ¶¶110, 112-113, 126, 165(a)-(e), 166(b), 169(a)-(b), 176(a). As a result, Level 3 could not determine which portions of the WilTel networks were available to fulfill customer orders, and failed to integrate WilTel's networks and data with Level 3's prior to the end of 2008. ¶¶113, 169(b)-(c). As a result, according to CW6, Level 3 did not even initiate the transfer of network inventory data until 2Q07, and by May 2008 – six months after the end of the Class Period – the Company had still not commenced the migration of data from WilTel's networks to Level 3's. *Id.*

Finally, according to CW3, CW7, CW10, and CW15, as of October 2006 and throughout the Class Period, Level 3 was utilizing multiple network inventory and provisioning systems acquired

---

[7]     Courts have repeatedly rejected arguments with respect to confidential witnesses similar to those advanced by defendants here. *See W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*, No. 05-cv-01265-WDM-MEH, 2008 U.S. Dist. LEXIS 47748, at *45 (D. Colo. Mar. 28, 2008) (scienter adequately alleged based in part on confidential witness account because plaintiff alleged a basis for crediting the witness's assertions); *Rhythms*, 300 F. Supp. 2d at 1089 (allegations providing confidential witnesses' titles were sufficiently particularized). Defendants mistakenly cite *In re FX Energy, Inc.*, No. 2:07-CV-874, 2009 U.S. Dist. LEXIS 54551 (D. Utah June 25, 2009), and *The Sorkin, LLC v. Fischer Imaging Corp.*, No. 03-cv-00631-RPM, 2005 U.S. Dist. LEXIS 19934 (D. Colo. June 21, 2005). In both *FX Energy* and *Sorkin*, the allegations of the confidential witnesses were conclusory and devoid of sufficient details as to warrant consideration.

- 9 -

from WilTel (and the metro businesses, as discussed below) to fulfill customer orders.  ¶¶116, 123-124, 127, 166(c), 170(b), 173(a), (c), 178(a)-(d).  Given that Level 3 was unaware of what WilTel networks were available, and had yet to migrate crucial circuit inventory data onto Level 3's platforms during the Class Period, defendants misled the market by saying the integration was virtually complete.

> ### 3.     Defendants' False Statements About Level 3's Integration of the Metro Companies

Defendants also misled the market about Level 3's integration of the metro companies. During a conference call on February 8, 2007, O'Hara stated:  "The integration of **all** of the acquired companies is progressing well . . . ."  ¶72.  During April and July 2007 calls, O'Hara again assured investors: "We made significant progress on the integration of **all** acquisitions."  ¶¶79, 87.  These statements were false because according to CW7 and CW8, as of July 2007, no progress had been made on integrating TelCove, which was acquired in July 2006 yet literally operated as a separate company throughout the Class Period.  ¶¶123, 178(h), 171(a)-(c).

Further, according to CW2, CW7, CW13 and CW14, Level 3 terminated nearly every subject matter expert capable of integrating the metro companies' network inventory data prior to meaningful progress being made on the integrations.  ¶¶110-113, 116, 118-121, 123-127, 129-131, 165(a)-(c), 170(a)-(b), 176(a), 177(a).  Accordingly, these mass firings materially delayed the integration of the acquired companies' networks.  *Id.*  According to CW7 and CW9, this led to Level 3 senior circuit designers' inability to ascertain which Progress, Looking Glass and ICG network inventory existed throughout 2007, essentially halting the network integration of these companies during the Class Period.  ¶¶121, 170(a)-(i).

520766_1

4.      **Defendants' False Statements About Level 3's Ability to Provision Customer Orders**

On February 8, 2007, defendants falsely assured investors Level 3 had "already begun cross selling all products and capabilities to all of our targeted customers." ¶72. On April 26, 2007, O'Hara again emphasized to investors the "overall customer experience is still positive." ¶79. Defendants failed to disclose, however, that the dismal state of Level 3's integration of the acquired companies had already resulted in significant delays in provisioning customer orders – the primary source of Level 3's revenue – and caused an increased order backlog, a significant portion of which was never provisioned. ¶¶110-113, 116, 118-121, 123-127, 129-131, 150. Once defendants chose to speak about the status of the Company's integration of WilTel and the metro companies, customer satisfaction with Level 3's services and the level of customer order backlog, they were obligated to disclose all material adverse facts qualifying those statements. *Schaffer v. Evolving Sys., Inc.*, 29 F. Supp. 2d 1213, 1221 (D. Colo. 1998) (duty to speak the full truth is triggered when defendant chooses to discuss a topic); *see also Angres v. Smallworldwide PLC*, 94 F. Supp. 2d 1167, 1173-75 (D. Colo. 2000) (same). Here, defendants failed to do so.

According to CW2, CW3, CW7, CW9, CW10, CW11, CW12, and CW15, customer complaints escalated throughout the Class Period due to the Company's persistent inability to fulfill customer orders on a timely basis, if at all. ¶¶112, 121, 128-130, 144, 165(c), 166(a)-(d), 170(g), 172(a)-(b), 173(a)-(c), 174(c)-(d), 175(a)-(c), 178(a)-(d). Throughout the Class Period, CW2, CW3, CW9, CW10, CW15 and CW16 confirmed Level 3 was simultaneously using the acquired companies' multiple network inventory and provisioning systems, causing significant delays in provisioning customer orders. ¶¶111-113, 116, 121, 123-124, 126-127, 130-131, 144, 165(c), 166(c), 172(a)-(b), 173(a)-(c), 178(a)-(d), 179(b). Furthermore, according to CW11 and CW12,

- 11 -

AT&T, a major Level 3 customer, suffered from service outages throughout the Class Period due to
the Company's failure to have a common order tracking and customer management system in place,
and AT&T cancelled some of its business due to repeated service outages.   ¶¶129, 174(c)-(d),
175(a)-(b).

<blockquote>

**5.      Defendants' Post-Class Period Admissions Support Plaintiff's
Allegations that Defendants' Class Period Statements Were
False and Misleading When Made**

</blockquote>

Contrary to defendants' position (MTD at 14-15), post-Class Period admissions are
indicative of falsity and scienter. *See Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 249
(3d Cir. 2009) (post-class period information is relevant to whether class period statements were
false or misleading) (citing *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001)).
Defendants admitted after the Class Period that as a result of Level 3's failure to integrate the
acquired companies: (i) service delivery and quality deteriorated significantly in the first half of
2007; (ii) Level 3 had to stop selling products because Level 3 did not even know what products
were available from the acquired companies; (iii) toward the end of the Class Period, defendants
intentionally constrained customer orders to the level the Company could provision because of
problems with the integrations; (iv) the Company was still relying on the acquired companies'
legacy systems as of 2008; (v) by the end of the Class Period, the Company had lost 40% of its order
backlog because of provisioning failures; and (vi) defendants "could and should have prevented"
Level 3's failure to provision customer orders during the Class Period.   ¶¶148-151, 153, 155-161.
Defendants cannot reconcile these stunning admissions with their inconsistent Class Period
statements.

### B.  Defendants' Statements Were Material

Defendants' arguments concerning materiality are likewise unavailing.  MTD at 6-8. Defendants' statements, such as the integration is "now complete[d]," "85%, 90% done" and "has been completed ahead of schedule and under budget," are material, actionable statements under Rule 10b-5.  *In re Honeywell Int'l Sec. Litig.*, 182 F. Supp. 2d 414, 417, 423 (D.N.J. 2002) (statements that "the integration . . . was going very well" and "ahead of schedule" were actionable); *In re Nash Finch Co. Sec. Litig.*, 502 F. Supp. 2d 861, 867-68 (D. Minn. 2007) (statements that integration is proceeding "'according to plan'" and "'on schedule'" were actionable); *In re Aetna Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 944-945 (E.D. Pa. 1999) (statement that integration was "successful" was material and actionable because it was "tied to the very issue about which Plaintiffs complain").[8]

Materiality can also be measured *post hoc* by looking at the drop in stock price immediately following the alleged disclosure.  *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000).  Tellingly, after defendants' July 26, 2007 partial disclosure of "increase[s] in service activation times" for its product and services, Level 3's stock price dropped over 10%.  ¶207.  Likewise, following defendants' October 15, 2007 disclosure that Level 3 was lowering guidance for FY 2007 and 2008 due to difficulties "provisioning orders for its services," its stock dropped another 10%.  ¶208.

Materiality is further supported by defendants' own Class Period admissions and conduct. The status of the integrations was a major topic during conference calls with investors, and often the

---

[8]     Unlike the statements at issue in the cases cited by defendants (MTD at 7-8), statements that the WilTel integration was 85% to 90% complete, a majority of the network interconnections were complete, and Level 3 was cross selling all the acquired businesses' products are assertions of verifiable fact, not opinion, and were made in the context of integrating five separate companies to justify the acquisition of a sixth company (Broadwing).  ¶¶58, 64, 72.

- 13 -

first item defendants discussed. *See* Declaration of Brian Hoffman In Support of Defendants'

Combined Motion and Brief to Dismiss Plaintiff's Amended Complaint ("Hoffman Decl."), Exs. D,

K, L. Indeed, Crowe acknowledged the materiality of the statements at issue: "I'm going to add one

more comment [about integration], because I do know this is an important matter to many of our

investors."[9] ¶55.

Additionally, defendants' statements that Level 3 was "a logical consolidator with proven

integration experience" are material and actionable under Rule 10b-5. *See, e.g.*, *S. Ferry*, 399 F.

Supp. 2d at 1130 (the statement "'[o]ur past systems integration experience in acquisitions will be

put to good use as we tackle the complexities of this [integration]'" was actionable).

**C.     Defendants Neither Disclosed that the WilTel Integration Was Ongoing nor Adequately Warned Via Risk Disclosures**

Defendants' assertion that they fully disclosed ongoing integration "system work" and "IT"

development through 2007 and 2008 is misleading and ignores the Complaint's detailed allegations

about the network integration process. ¶¶107-109; MTD at 8-10; Hoffman Decl., Exs. B, E, H, K

and L. For instance, defendants mischaracterize their conference call statements to argue they

disclosed the WilTel physical network integration was ongoing. MTD at 8-10. Contrary to

defendants' representations, however, their October 17, 2006 comments concerned Broadwing, ***not***

WilTel. *See* MTD at 9; Hoffman Decl., Ex. D at 7, 8. Defendants also mischaracterize the October

24, 2006 conference call (Hoffman Decl., Ex. E at 5), which they argue disclosed the integration of

---

[9]     To further emphasize the importance of the integrations – and thus the materiality of
statements on the topic – defendants repeatedly told investors that the integrations were "job #1" and
so "carefully" monitored because they were "top priority" during the Class Period. ¶¶64, 79, 80, 83;
*Helwig v. Vencor, Inc.*, 251 F.3d 540, 555 (6th Cir. 2001).

- 14 -

WilTel "'will take some time.'" MTD at 9. Here again, defendants stand silent regarding the AC's specific allegations that defendants falsely informed investors the WilTel physical network integration was running ahead of plan, under budget and that a majority of the "network interconnections" were complete. Hoffman Decl., Ex. E at 5.

Defendants also erroneously reference statements during the December 4, 2006 conference call to suggest work on the integration of WilTel's "'provisioning systems'" continued during the Class Period. MTD at 9; ¶64. Those statements, however, have nothing to do with the status of the WilTel physical network integration. *See* ¶64. Defendants, therefore, conflate the two in order to avoid addressing the fact they falsely informed investors that WilTel's network integration was "85%, 90%, done" on December 4, 2006.[10] ¶64.

Defendants are not insulated from liability based on purported risk disclosures in Level 3's SEC filings. MTD at 10. Defendants' disclosures were too vague to be meaningful and, in any event, cannot be used to warn of risks that have already occurred or where they have actual knowledge the statements were false when made. *See Startek*, 2008 U.S. Dist LEXIS 47748, at *49-*51 (rejecting risk disclosures as vague); *Nash Finch*, 502 F. Supp. 2d at 873 (a warning cannot be meaningful if defendants know the risks have already materialized); *Rombach v. Chang*, 355 F.3d

---

[10]     Defendants incorrectly rely on *Halperin v. eBanker USA.COM, Inc.*, 295 F.3d 352, 361 (2d Cir. 2002) for the proposition that no liability exists when a company discloses alleged omitted information. MTD at 8. Defendants are wrong. *Halperin* addresses an entirely different defense: the adequacy of defendants' risk disclosures and cautionary language contained in public filings. Likewise, defendants' reliance on *FX Energy*, 2009 U.S. Dist. LEXIS 54551 is misplaced because, unlike the case here, defendants' statements were not actionable under §10(b) because they did not involve direct misrepresentations of existing fact. *Id*. at *26-*27; MTD at 10.

- 15 -

164, 173 (2d Cir. 2004) (The safe-harbor provides no protection to one who warns "'there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.'").[11]

## IV.    PLAINTIFF ADEQUATELY PLEADS DEFENDANTS' SCIENTER

The AC clearly alleges facts "giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. §78u-4(b)(2). Considering the allegations collectively, as is required by *Tellabs*, the AC sufficiently raises the inference that defendants knew, or recklessly disregarded, their statements were false when made. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). Courts in the Tenth Circuit recognize that where a complaint sufficiently establishes a defendant's reckless disregard for the truth, the "strong inference" standard is satisfied. *See Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1232 (10th Cir. 1996).

### A.    Plaintiff Sufficiently Alleges Defendants' Knowledge of the Undisclosed Facts as Well as Their Direct Access to Those Facts

The AC's detailed allegations of fact, supported by both confidential witnesses and documentary sources, are more than enough to establish scienter. *In re QLT Sec. Litig.*, 312 F. Supp.

---

[11]    Defendants Scott and Miller are liable under the group pleading doctrine for the false statement regarding the WilTel integration contained in Level 3's 3Q06 SEC Form 10-Q. ¶63. Courts in the District of Colorado have recognized the validity of the group pleading doctrine post-PSLRA. *See In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 387 F. Supp. 2d 1130, 1145 (D. Colo. 2005) ("the group publication doctrine was not abrogated by the PSLRA," citing *Schaffer*, 29 F. Supp. 2d at 1225). Other courts are in accord. *See In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 438-40 (S.D.N.Y. 2005) (holding the PSLRA did not impact the validity of the group pleading doctrine). Plaintiff has alleged a strong inference defendants Scott and Miller were aware of the falsity of Level 3's statements, and thus they are liable for false statements published by Level 3. *Qwest*, 387 F. Supp. 2d at 1145; ¶¶33-34, 37-41, 141, 180-181, 189-191. Defendant Miller is also liable for the false statements regarding WilTel made during Level 3's October 17, 2006 conference call because he was present and failed to correct the false statements made by defendant O'Hara. *See N.J. v. Sprint Corp.*, 314 F. Supp. 2d 1119, 1128 (D. Kan. 2004).

- 16 -

2d 526, 534 (S.D.N.Y. 2004) (where plaintiff alleges defendants knew of information contrary to their public statements, the falsity and scienter inquiries are the same). Defendants ignore plaintiff's corroborated allegations of defendants' direct participation in the integration process, meetings they attended, reports they received and customer complaints they were aware of during the Class Period, all of which show they knew the WilTel integration was not complete or "85%, 90% done." ¶¶64, 135, 146, 180-184. According to CW1, who worked on the WilTel network integration – which was directly managed by O'Hara – both O'Hara and Crowe were aware of severe order provisioning problems by November 2006. ¶¶164(d), (f). CW1 confirms O'Hara was the person responsible for setting, measuring and monitoring the work performed by Level 3's network integration team, and that both CW1 and O'Hara participated in regularly held integration status review meetings during the Class Period where integration delays and provisioning problems were discussed. ¶164(f), (h). O'Hara was also a member of the Integration Steering Committee that met regularly to discuss integration status and scheduling.[12]  ¶¶141, 181. CW1 confirmed that during the Class Period, O'Hara reported integration status directly to Crowe, Miller and Scott on a regular basis. *Id.*

Additionally, Crowe, Miller, Scott and Patel, as well as O'Hara, closely monitored the network integration status via numerous reports that were specifically prepared for them and set forth multiple specific metrics about the progress of the physical network integration and related

---

[12]    CW4, a former Customer Project Manager, further corroborates that O'Hara attended a meeting at a former Broadwing office in Chicago in 2007, during which O'Hara informed Level 3 employees that management recognized the problems of increased order processing intervals in the new provisioning system. ¶167.

- 17 -

expenditures and budgets.[13]  ¶¶17, 138-140, 142, 146, 180.  The Complaint provides the name of each report, how frequently it was distributed and what the reports showed defendants.  *Id.*

These reports show that during the Class Period defendants knew WilTel's physical network integration was incomplete.  As of January 2007, defendants had not committed enough capital to achieve WilTel's physical network integration and critical transport interconnects and route integrations remained unfinished.  ¶¶137, 164(a).  The reports further show that by April 2007, defendants knew Level 3 had not completed transport interconnects in at least 17 major WilTel markets and WilTel alone had over 20,000 miles of route integration yet to complete.  ¶¶138-139. These allegations are more than sufficient to support a strong inference of scienter.[14]  *Adams*, 340 F.3d at 1105-07 (high-level executive positions of the CEO and CFO, together with allegations of their access to information and involvement in producing the underlying misrepresentations, satisfied the pleading requirements).

---

[13]    The reports prepared for defendants include Level 3 Integrations Weekly Executive Reports, Weekly Integration Status Reports, Network Integration Weekly Operations Review reports, Executive Integration Bi-Weekly Update, Network Integration Program Review, Major Integration Project Schedules, Network Integration Overview reports, and Operational Overview Deck reports. ¶¶17, 138-140, 142, 146, 180.  Defendants also monitored capital expenditures and budgets for the physical integrations via several regularly distributed reports which show the WilTel integration was not complete.  ¶¶17, 136-137, 180.

[14]    Defendants' post-Class Period admissions further support scienter.  ¶¶147-61.  Crowe's July 24, 2008 admission that Level 3 continued to utilize the same provisioning processes and systems of all the acquired companies throughout the Class Period directly contradicts defendants' Class Period statements that the WilTel acquisition was virtually complete.  ¶¶54, 58, 72, 159; *Helwig*, 251 F.3d at 558 ("'A defendant who asserts a fact as of his own knowledge or so positively as to imply that he has knowledge, under the circumstances when he is aware that he will be so understood when he knows that he does not in fact know whether what he says is true, is found to have intent to deceive.'").

- 18 -

Defendants ignore the AC's specific examples showing defendants' knowledge of widespread customer dissatisfaction with significant delays in the fulfillment of their orders during the Class Period. Throughout 2007, three major Level 3 customers complained directly to O'Hara and Crowe about delays in Level 3's fulfillment of their orders. ¶¶85(c), 184. O'Hara even conducted daily meetings regarding customer complaints due to provisioning problems. ¶164(h). Remarkably similar allegations have survived a Rule 12(b)(6) motion in this district. *In re ICG Communications Sec. Litig.* involved investors' §10(b) claims based on defendants' failure to disclose "serious and continuing problems with ICG's communications network and customer service." No. 00-RB-1864 (BNB), 2006 U.S. Dist. LEXIS 6695, at *8, *18-*20 (D. Colo. Feb. 7, 2006). The *ICG* court found allegations that an executive defendant learned of network problems and delays from the transcript of a day-long meeting with employees, and flew to a customer's headquarters to "'patch up'" relations as a result of network problems, established a strong inference of scienter. *Id.* at *35-*36; *see also Croker*, 2006 U.S. Dist. LEXIS 48603, at *19 (scienter sufficiently plead by alleging defendants had personal knowledge of the fraud).

**B.    Defendants' Top Positions at Level 3 Support a Strong Inference of Scienter**

Crowe, Patel and O'Hara, all top Level 3 executives with decades of experience who controlled the Company, repeatedly held themselves out to investors as the persons most knowledgeable about the status of the integration of the acquired companies, stating: "all of the [integration] issues . . . are under our control"; "I do know this is an important matter to many of our investors"; and "[w]hen you do these many acquisitions in such a short period of time . . . we spend a lot of time worrying a lot and monitoring things quite carefully." ¶¶30-34, 55, 64, 88; *see, e.g., Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 711 (7th Cir. 2008) ("Is it conceivable

- 19 -

that he was unaware of the problems of his company's two major products and merely repeating lies fed to him by other executives of the company? It is conceivable, yes, but it is exceedingly unlikely."). The AC couples these statements with the undisclosed facts known to defendants at the same time they were making the statements. ¶¶110-132. *See, e.g.*, *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1190-91 (C.D. Cal. 2008) (it would be "'absurd'" to conclude defendants did not know of such crucial business information under the circumstances).

C.    **Scienter Is Further Supported by Defendants' Motivation to Artificially Inflate Level 3's Stock Price to Consummate the Broadwing Acquisition and to Refinance Debt**

Defendants were motivated to inflate Level 3's stock price during the Class Period to: (1) acquire Broadwing in a January 2007 cash-and-stock transaction for $1.4 billion; and (2) refinance $1.4 billion in debt – Level 3's largest credit facility at the time – on more favorable terms. ¶¶189-191. These allegations of motive are unique to Level 3 and defendants' alleged fraud and thus support a finding of scienter. In *Queen Uno*, investors alleged defendants had motive to execute several transactions utilizing an artificially inflated stock price. 2 F. Supp. 2d at 1359. Because "[n]one of these transactions would have been possible" but for the effect defendants' fraud had on the company's stock price, Judge Brimmer held these allegations supported a strong inference of scienter. *Id.* at 1359-60; *see also Croker*, 2006 U.S. Dist. LEXIS 48603, at *28 (defendants' motive to execute an acquisition via artificially inflated stock supports strong inference of scienter).

Defendants' argument that the Broadwing merger cannot provide motive because its price was set before the Class Period ignores that the merger required Broadwing shareholder approval. MTD at 22. Had defendants' failure to integrate WilTel's physical networks been disclosed on

- 20 -

October 17, 2006, rather than defendants stating it was virtually complete, the acquisition price would have cost millions of dollars more and Broadwing shareholders undoubtedly would have considered a deflated Level 3 stock price critical in approving the merger.  Equally unavailing is defendants' claim that their misrepresentations did not improve the terms of Level 3's $1.4 billion debt.  *Id.*  Plaintiff alleges the acquisitions created "the false perception" the Company would generate positive cash flow, which enabled Level 3 to improve its credit rating and refinance its outstanding debt on more favorable terms.  ¶20.

> **D.** **The Fact that Crowe, O'Hara, Patel and Miller's Compensation Was Directly Tied to Level 3's Success in Integrating the Acquired Businesses Supports a Strong Inference of Scienter**

Between 2006 and 2007, while deceiving the public about the very performance measures used to determine their bonuses, Crowe, O'Hara, Patel and Miller received more than $38 million in salary and incentive-based compensation.  ¶¶192-193.  According to Level 3's 2007 SEC filings, the executive bonus program explicitly referred to "[e]ffective[] manage[ment of] WilTel acquisition integration activities" as a performance measure.  Hoffman Decl., Ex. J at 15; *see also* ¶192.  In 2006, these defendants received nearly $10 million in cash bonuses for their purported expertise and ability to integrate WilTel and the acquired businesses on time and under budget.  ¶192.  Notably, defendants received no bonus in 2007 because the integration of WilTel and the other acquired businesses were failures.  ¶194.  These allegations are probative of defendants' motive to defraud for personal gain.  *See, e.g.*, *In re JPMorgan Chase & Co. Sec. Litig.*, MDL No. 1783, 2007 U.S. Dist. LEXIS 93877, at *23-*26 (N.D. Ill. Dec. 18, 2007) (executive compensation relevant to scienter inquiry where defendant used compensation to "guild his reputation" as a "'superstar'" with analysts); *In re Guilford Mills, Inc. Sec. Litig.*, No. 98 Civ. 7739 (CLB), 1999 U.S. Dist. LEXIS

- 21 -

21690, at *10-*11 (S.D.N.Y. July 21, 1999) (holding that a CEO's compensation is relevant to the scienter inquiry where compensation was dependent upon the profitability of an acquired company).

### E.      Defendants' Unlawful Class Period Insider Trading Supports a Strong Inference of Scienter

Crowe, O'Hara, Patel and Miller's Class Period insider trading gives rise to a strong inference of scienter for three reasons. *See Sorkin*, 2005 U.S. Dist. LEXIS 19934, at *30. First, they sold not a single share of stock in the 22 months prior to the Class Period. ¶201. Second, the fact that defendants sold no stock in 2006 refutes the assertion that Class Period trades were "automatic." MTD at 19; *see also In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1069 (C.D. Cal. 2008) (existence of pre-determined stock plan not determinative because defendant could cause plan to increase number of shares available for sale under plan). Third, the final trades occurred on October 2, 2007, ***shortly before*** the two precipitous stock price declines on October 15 and 23, 2007. ¶199. Accordingly, these allegations support a strong inference of scienter.

Arguing the contrary, defendants rely on *In re Qwest Communications International, Inc. Sec. Litig.*, 396 F. Supp. 2d 1178, 1195 (D. Colo. 2004), and *Ronconi v. Larkin*, 253 F.3d 423, 436 (9th Cir. 2001). The *Qwest* court held that the scienter allegations were sufficient against a defendant who sold only 1.89% of her stock. Judge Blackburn reasoned that defendant, as senior vice president of finance, "was in a particularly good position to understand the alleged . . . misrepresentations. This fact, combined with the scope and magnitude of the alleged . . . misrepresentations," as well as the "relatively small stock sale [were] sufficient to support a strong

- 22 -

inference of scienter." *Qwest*, 396 F. Supp. 2d at 1198.[15] Thus, *Qwest* supports plaintiff's position.

As does *Ronconi*. There, the court refused to draw an inference of scienter based on insider stock

sales not only because the sales were normal in amount and timing, but also because plaintiffs failed

to allege sufficient trading history. *Ronconi*, 253 F.3d at 436. In contrast, plaintiff here alleges

defendants' suspicious and unusual Class Period trading as well as defendants' trading history for a

full 22-month period prior to the Class Period.[16] ¶¶198-201.

## V.   PLAINTIFF ADEQUATELY PLEADS LOSS CAUSATION

To adequately plead loss causation, the Complaint need only provide defendants "with some

indication of the loss and the causal connection that the plaintiff has in mind."[17] *Dura Pharms.*, 544

U.S. at 347. Loss causation can be established by pleading corrective disclosures. "To be

corrective, the disclosure need not precisely mirror the earlier misrepresentation," rather it need only

relate back "to the revelation of fraud." *Williams*, 558 F.3d at 1140. The AC satisfies these

requirements.

---

[15]     *See also Oracle*, 380 F. 3d at 1232 (finding a strong inference of scienter when defendant only sold 2.1% of his holdings during the class period); *In re Secure Computing Corp.*, 184 F. Supp. 2d 980, 989-90 (N.D. Cal. 2001) (finding stock sales suspicious even though "the percentage of shares sold compared to total holdings" was not "unique and suspicious").

[16]     Regardless, the absence of suspicious insider trading does not preclude a finding of scienter. *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1191 n.12 (10th Cir. 2003).

[17]     Defendants contend loss causation is not well pleaded because risks that materialized were previously disclosed. *See* MTD at 24. This argument has been rejected in this district based upon a similar set of facts. *See W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*, No. 05-cv-01265-WDM-MEH, 2008 U.S. Dist. LEXIS 90278, at *21 (D. Colo. Nov. 6, 2008) (loss causation is adequately alleged because defendants' previous disclosure regarding a new tiered-pricing contract did not disclose the true extent of known, adverse facts).

520766_1

On July 26, 2007, defendants partially revealed that Level 3's failure to integrate the acquired companies' provisioning systems led to "the average period of time it takes to convert certain new service orders into revenue [extending] by up to 50 to 75%," due to "continue[d] . . . use [of] multiple order entry and provisioning processes and systems that were operated by the acquired companies."  ¶¶21, 87, 207.  This disclosure conflicts with defendants' fraudulent Class Period statements regarding the status of the integrations.  Defendants' Class Period-ending disclosure on October 23, 2007 contradicts defendants' Class Period statements and revealed Level 3's failure to timely provision orders during the Class Period – due in part to terminating legacy subject matter experts capable of consolidating the provisioning systems and network inventory data of the acquired companies with Level 3's – caused a drop in revenue growth.  ¶¶96-103, 208.

Defendants' post-Class Period statements that Level 3 was forced to downwardly revise its 2007 and 2008 financial guidance due to its failure to integrate the acquired businesses further support loss causation.  *In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 542-43 (N.D. Ill. 2007).  *See, e.g.*, ¶148 (on November 16, 2007, defendants admitted that guidance reduced because installation capabilities were "constrained" by failure to complete integrations); *see also* ¶¶150-51.

## VI.   THE COMPLAINT ADEQUATELY ALLEGES CLAIMS FOR §20(a)

To plead a control-person claim, plaintiff must, in addition to pleading a primary violation, allege defendant had "'possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person.'"  *Maher v. Durango Metals*, 144 F.3d 1302, 1305 (10th Cir. 1998).  The Complaint sufficiently pleads violations of §10(b) and Rule 10b-5 and shows

- 24 -

Individual Defendants participated in the planning, orchestration and day-to-day management of Level 3's acquisitions and integrations.[18]   ¶¶30-41.

## VII.   CONCLUSION

For the foregoing reasons, the Complaint alleges well-founded securities law claims against defendants.  Defendants' motion to dismiss should be rejected and the Complaint upheld.[19]

DATED:  May 3, 2010                    Respectfully submitted,

                                       ROBBINS GELLER RUDMAN
                                         & DOWD LLP
                                       HENRY ROSEN
                                       TRIG R. SMITH
                                       LAURIE L. LARGENT
                                       JULIE A. KEARNS


                                              s/ HENRY ROSEN
                                       _____
                                              HENRY ROSEN

                                       655 West Broadway, Suite 1900
                                       San Diego, CA  92101
                                       Telephone:  619/231-1058
                                       619/231-7423 (fax)

---

[18]     With regard to defendants Scott and Miller, the Complaint adequately pleads the circumstances of the control relationship with particularity.  ¶¶30-34; *Maher*, 144 F.3d at 1305.  *See also In re Storage Tech. Corp. Sec. Litig.*, 147 F.R.D. 232, 236 (D. Colo. 1993) ("Plaintiffs need not allege the specific instances of actual control exercised by the individual defendants.").

[19]     The allegations in the complaint should be upheld.  If for any reason the Court finds plaintiff's allegations lacking, plaintiff respectfully requests leave to amend.  *See* Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so requires.").

- 25 -

JOHNSON BOTTINI, LLP
FRANCIS A. BOTTINI, JR.
501 West Broadway, Suite 1720
San Diego, CA  92101
Telephone:  619/233-5535
619/238-0622 (fax)

Co-Lead Counsel for Plaintiffs

DYER & BERENS LLP
ROBERT J. DYER
JEFFREY A. BERENS
303 East 17th Avenue, Suite 300
Denver, CO  80203
Telephone:  303/861-1764
303/395-0393 (fax)
bob@dyerberens.com
jeff@dyerberens.com

Liaison Counsel

- 26 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 3, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 3, 2010.

<div style="margin-left: 45%;">

s/ HENRY ROSEN
—————————————————————
HENRY ROSEN

ROBBINS GELLER RUDMAN
    & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  henryr@rgrdlaw.com

</div>

# Mailing Information for a Case 1:09-cv-00200-PAB-CBS

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jeffrey Allen Berens**
  jeffreyberens@comcast.net,jeff@dyerberens.com

- **Francis A. Bottini , Jr**
  frankb@johnsonbottini.com,paralegal@johnsonbottini.com

- **Albert Y. Chang**
  albertc@johnsonbottini.com,paralegal@johnsonbottini.com

- **Robert J. Dyer , III**
  bob@dyerberens.com

- **Jordan D. Eth**
  jeth@mofo.com,bfaust@mofo.com,nurbina@mofo.com

- **Rusty Evan Glenn**
  rusty@shumanlawfirm.com

- **David P. Hersh**
  dhersh@burgsimpson.com,dnordstrom@burgsimpson.com,agoes@burgsimpson.com

- **Brian Neil Hoffman**
  bhoffman@mofo.com,bfaust@mofo.com

- **Seth Alan Katz**
  skatz@burgsimpson.com,bgeorge@burgsimpson.com

- **Steven M. Kaufmann**
  skaufmann@mofo.com,tsthilaire@mofo.com

- **Julie A. Kearns**
  jkearns@rgrdlaw.com,E_File_SD@rgrdlaw.com

- **Laurie L. Largent**
  llargent@rgrdlaw.com,E_File_SD@rgrdlaw.com

- **Lon Angelo Licata**
  lon.licata@level3.com,lonamy@comcast.net

- **Kristin A. Martinez**
  kristin@dyerberens.com

- **Henry Rosen**

henryr@rgrdlaw.com,stremblay@rgrdlaw.com,dianah@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Kip Brian Shuman**
  kip@shumanlawfirm.com,rusty@shumanlawfirm.com

- **Trig Randall Smith**
  trigs@rgrdlaw.com,e_file_sd@rgrdlaw.com,asharbutt@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)