# EXHIBIT A

| **From:** | Diana Houck |
| **To:** | skaufmann@mofo.com; bhoffman@mofo.com; |
| **cc:** | Henry Rosen; Trig Smith; Laurie Largent; Julie Kearns; |
| | Jeff Berens; |
| **Subject:** | Redline of the Amended Consolidated Complaint - LEVEL 3 |
| **Date:** | Tuesday, March 23, 2010 4:35:11 PM |
| **Attachments:** | Redline Amended Complaint.pdf |

See attached from Henry Rosen

Diana L. Houck-| Coughlin Stoia Geller Rudman & Robbins LLP

Secretary to Henry Rosen, Chris Collins & Tricia McCormick
655 West Broadway, Suite 1900, San Diego, CA  92101
(p) 619-231-1058 | (f) 619-231-7423 | (dd) 619-338-4527 | www.csgrr.com
<http://www.csgrr.com/>

P Please consider the environment before printing this e-mail

NOTICE: This email message is for the sole use of the intended
recipient(s) and may contain information that is confidential and
protected from disclosure by the attorney-client privilege, as
attorney work product, or by other applicable privileges.  Any
unauthorized review, use, disclosure or distribution is prohibited.
If you are not the intended recipient, please contact the sender
by reply email and destroy all copies of the original message.

No virus found in this incoming message.
Checked by AVG - www.avg.com
Version: 9.0.830 / Virus Database: 271.1.1/2990 - Release Date: 07/09/10
00:36:00

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 09-cv-00200-PAB-CBS

(Consolidated with Civil Action Nos. 09-cv-00215-PAB-CBS; 09-cv-00296-PAB-CBS and 09-cv-00606-PAB-CBS)

In re LEVEL 3 COMMUNICATIONS, INC. SECURITIES LITIGATION

ADAM SKAGGS, et al., Individually and On Behalf of All Others Similarly Situated,

Plaintiffs,

v.

LEVEL 3 COMMUNICATIONS, INC.,
JAMES Q. CROWE,
KEVIN O'HARA,
SUNIT S. PATEL,
WALTER SCOTT, JR., and
CHARLES "BUDDY" C. MILLER, III,

---

**DEFENDANTS.[PROPOSED] AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND JURY DEMAND**

---

507036_1

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................1

    Collapse of the Indefeasible Right of Use Era....................................................1

    The Wiltel Acquisition.......................................................................................3

    Defendants' Knowledge of the Botched WilTel and Metro Ring Acquisitions ...............12

JURISDICTION AND VENUE ...............................................................................19

PARTIES ...............................................................................................................19

PRE-CLASS PERIOD EVENTS AND MISSTATEMENTS....................................43

CLASS PERIOD EVENTS, CONDUCT AND MISSTATEMENTS .........................47

DEFENDANTS DISCLOSE THAT THE COMPANY IS LOWERING GUIDANCE
    FOR 4Q07 AND FY08 DUE TO ITS INABILITY TO PROVISION ORDERS ............72

TRUE FACTS.......................................................................................................79

    The Network Integration Process.....................................................................79

    Interaction Between NI and IT Integration During the Class Period.................81

    The Reality on the Ground:  WilTel and the "Metro Business" Integration
        Efforts Are an Unmitigated Disaster..................................................82

    The Botched Integration of WilTel and the Metro Ring Companies
        Is Compounded by the Broadwing Acquisition...................................92

    Internal Company Reports Showed Defendants Knew Their Class Period
        Statements Were False When Made ...................................................94

    Status of the Integrations of the Acquired Businesses Was Directly
        Monitored by Defendants ...................................................................96

POST-CLASS PERIOD REVELATIONS AND ADMISSIONS..............................99

- i -

**Page**

CONFIDENTIAL WITNESSES ...................................................................................107

ADDITIONAL ALLEGATIONS OF SCIENTER.......................................................125

 Defendants' Knowledge of the Fraud Through Internal Reports and Meetings..............125

 Customer Complaints......................................................................................130

 Defendants as Self-Proclaimed Integration Specialists ..................................131

 Admissions of Knowledge at the End of the Class Period and After the Class Period ....................................................................................................132

 Broadwing Acquisition and Credit Facilities.................................................134

 Executive Compensation ...............................................................................135

 Insider Trading..............................................................................................138

PROXIMATE LOSS CAUSATION/ECONOMIC LOSS .......................................141

NO SAFE HARBOR ..................................................................................................146

FRAUD-ON-THE-MARKET PRESUMPTION.......................................................147

CLASS ALLEGATIONS ...........................................................................................148

COUNT I .....................................................................................................................150

 Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants ..................................................150

COUNT II ....................................................................................................................154

 Violation of §20(a) of the Exchange Act Against All Defendants .................154

PRAYER FOR RELIEF .............................................................................................155

JURY TRIAL DEMANDED......................................................................................156

- ii -

## INTRODUCTION

1.       Lead Plaintiff has alleged the following based upon the investigation of Lead Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Level 3 Communications, Inc. ("Level 3" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, ~~interviews of former Level 3 employees and~~ media reports about the Company and information provided by former Level 3 employees. Lead Plaintiff further believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

2.       This is a securities class action on behalf of purchasers or acquirers of the securities of Level 3 between October 17, 2006 and October 23, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

**Collapse of the Indefeasible Right of Use Era**

3.       During the late 1990's and through 2002, businesses in Level 3's industry made massive investments in Internet backbone and network infrastructure around the globe.  These investments were made largely on the promise of Moore's law, *i.e.*, that customer traffic and usage of Internet infrastructure would double every 2 years.  Accordingly, by this theory, companies in the industry invested heavily in capacity to meet waves of ever-increasing anticipated demand.  During the dot-com bubble, Level 3's stock rose to over $100 per share.  Unfortunately, this "build it and they will come" network capacity management philosophy ended up in disaster.  As several major carriers learned, such as Qwest, Enron, Global Crossing and Cable & Wireless, the assumptions underlying Moore's law proved to be fundamentally flawed.  The anticipated demand for huge

507036_1

amounts of fiber optic ~~bandwith~~ bandwidth did not materialize.  Accordingly, many companies in the industry were forced to "swap" large swaths of under-utilized assets with each other for the purpose of rationalizing huge accumulations of Internet infrastructure inventory.  Shortly thereafter, many of these companies found themselves the target of criminal and civil investigations for their improper accounting for sales of this excess network capacity.  Consequently, the market prices of Internet ~~bandwith~~ bandwidth collapsed.

      4.     Further, the manner in which telecommunications companies accounted for an indefeasible right of use ("IRU") underwent a significant change.  An IRU is a contract under which a company that owned a significant fiber optic network would lease space on that network to another provider of such services so that company could complete its network and provide services in other areas.  Rather than recognizing 100% of revenue "up front" for the sale of IRUs, companies engaged in such transactions were required to recognize the same revenue "ratably" (*i.e.*, over the course of the life of the IRU contract), typically 20 years or more.  Naturally, instead of recognizing 100% revenue on, for example, a $20 million IRU on the day the contract was signed, companies were forced to recognize $1.0 million per year over the course of 20 years.  This had a dramatic impact on the apparent profitability of the affected companies, including Level 3.  Combined with the vast excess capacity built by too many players in this industry, this accounting change had a tremendous impact on Level 3's and its competitors' ability to grow.  Significant amounts of unused capacity further decreased the value of the inventory.  ~~Thus~~ Following the dot-com bust, like every company in the broadband industry, Level 3's stock price collapsed.

~~Level 3 as the "Logical Consolidator"-flow positive via acquisition.  During the dot-com bubble, dozens of companies competed in Level 3's industry.  Following the acquisitions~~

~~that precede the Class Period, less than ten companies are legitimate competitors of Level 3.~~

5.       ~~and other~~Thereafter, the companies ~~in~~ that did survive the ~~industry~~ dot-com bust and the IRU accounting scandals were forced to radically change their business model.  In 2004 and 2005, new life was breathed into the industry as excitement was generated via speculation that industry players such as Level 3 could achieve revenue growth and hopefully become cash flow positive as the demand to carry memory intensive content such as video over the Internet increased. Level 3 wanted to show ~~Prior to and during the Class Period, based on Level 3's supposed superior operating margins and capital efficiencies, defendants repeatedly positioned the Company with investors as the "logical consolidator" with "proven" integration experience.  Beginning in 2005, Level 3 commenced a massive acquisition spree to eliminate competitors in this asset-saturated industry.  Furthermore, Level 3 conditioned~~ investors that it would continue to acquire additional capacity to accommodate growing amounts of video traffic on the Internet, *e.g.*, YouTube, sports channel and other media content providers.

**The Wiltel Acquisition**

6.       Level 3 was desperate to take advantage of this new source of growth and remain a major player in the industry.  To accomplish this, Level 3 went on an acquisition spree beginning in 2005 to eliminate competitors in this asset-saturated industry.  Level 3's first acquisition was of a long-haul company WilTel Communications Group, LLC ("WilTel"), a direct competitor. Defendants assured investors that before acquiring any business, Level 3 ~~would first make a determination~~ determined that traffic could be efficiently and profitably migrated to Level 3's network and the Company would achieve significant synergies by massive cost reductions.  Level 3's growth through acquisition strategy was premised on defendants' belief that for each additional

- 3 -

dollar of traffic that the Company placed on its network, the Company's operational leverage would increase and future profitability would be secured.  The other businesses Level 3 acquired that are relevant to this action are WilTel Communications Group LLC ("WilTel"), along with WilTel include Progress Telecom ("Progress"), ICG Communications, Inc. ("ICG"), TelCove, Inc. ("TelCove"), Looking Glass Networks Holdings Co., Inc. ("Looking Glass"), and Broadwing Corporation ("Broadwing") (collectively, the "acquired businesses"[1]).  Set forth below is a slide the Individual Defendants (as defined herein) used at securities analyst and investor conferences throughout the Class Period to assure investors that Level 3 was the "logical consolidator with proven integration experience." or "acquired companies").

7.     Two critical The two acquisitions most relevant to defendants' scheme alleged herein are WilTel and Broadwing.  Defendants were motivated to mislead the market about the successful integration of WilTel to artificially inflate Level 3's stock price, which made the acquisition of Broadwing less expensive.  In contrast to Level 3's acquisitions of Progress, ICG, Looking Glass and Telcove, where the Company purchased assets to expand its "metropolitan" or "metro"

---

[1]      Defendants used the following slide, or a substantially similar slide, to falsely portray Level 3 as a logical consolidator with proven integration experience at the following investor conferences: (1) Bank of America 2006 Credit Conference on 12/4/06 (Sunit Patel, CFO presenting); (2) Credit Suisse 8th Annual Media and Telecom Conference on 12/6/06 (Robin Grey, Senior Vice President and Treasurer presenting); (3) 34th Annual Global Media and Communications Conference on 12/7/06 (Kevin O'Hara, President and COO presenting); (4) Citigroup EMT Conference on 1/11/07 (Kevin O'Hara, President and COO presenting); (5) Level 3's Analyst and Investor Conference on 3/14/07 (Kevin O'Hara, President and COO presenting); (6) Lehman Brothers 2007 High Yield Bond and Syndicated Loan Conference on 3/26/07 (Robin Grey, Senior Vice President and Treasurer presenting); and (7) UBS 2007 Leveraged Finance Conference on 5/10/07 (Sunit Patel, CFO presenting).  Defendants also falsely characterized Level 3 as a successful industry consolidator during the Company's presentations at:  (1) Lehman Brothers Worldwide Wireline and Wireless Conference on 5/30/07 (Sunit Patel, CFO presenting); and (2) Bear Stearns 18th Annual Technology/ Communications/Internet Conference on 6/11/07 (Kevin O'Hara, President and COO presenting).

networks, the The Company's January 2007 acquisition of Broadwing was analogous to the acquisition of WilTel in that the deals involved the purchase of long-haul network.  In addition, the The WilTel and Broadwing deals cost Level 3 over $776 million and $1.4 billion, respectively, and nearly 50% of the total cost of each acquisition was financed through the use of Level 3's stock.

8.      To artificially inflate Level 3's stock price and to falsely convince investors that acquiring another long-haul company like Broadwing made sense, the Individual Defendants, throughout the Class Period, falsely assured the market that the WilTel integration was virtually complete.  10. 9.      Had defendants disclosed to investors prior to the purchase of Broadwing in January 2007 that the WilTel integration was, in fact, a disaster—abysmally behind schedule, over-budget and causing severe operational problems—Broadwing investors would have likely rejected the proposed transaction based on the fact that Level 3 was neither a logical consolidator nor a successful integrator.  Furthermore, without their false statements about the WilTel and metro ring integrations, Level 3's stock price would not have been inflated and the Broadwing acquisition would have been much more expensive or impossible as a stock transaction.Level 3 and the Individual Defendants achieved the façade that Level 3 was well- positioned to exploit the next great service over the Internet—video and other large package content—by blatantly misrepresenting the progress of the integration of the acquired businesses.  Indeed, over the course of a year, defendants falsely and misleadingly informed investors that they were "***complete***" and "***on plan***" with the integration of the acquired businesses.  As defendants knew, admitting the WilTel acquisition integration was materially behind schedule in October 2006, would have been received, and rightfully so, by investors and analysts as a sign that Level 3 was unable to effectively integrate the operations of a large $1.4 billion Internet backbone provider like Broadwing.Rather than revealing

~~Level 3's business performance was being severely impacted by the botched integration of the acquired businesses, which was materially behind schedule and riddled with complications, defendants publicly reported great success in the assimilation of the acquired businesses.~~ Defendants' false and misleading Class Period statements include: "***We . . . have now completed the majority of integration efforts from WilTel, and we have completed these activities under budget***"; "***We continue to run ahead of plan on the WilTel integration . . . . This work has been completed ahead of schedule and under budget***"; "***You are right on WilTel, we have generally done, substantially done, by that I mean 85%, 90% done with those efforts***"; and "***Most of the physical integration of WilTel is now complete***." ~~¶¶88, 92, 98, 100~~¶¶54, 58, 64, 72. Analysts covering Level 3 repeated defendants' false and misleading statements and espoused the importance of timely integrating the acquired businesses.  For instance, on October 20, 2006, JP Morgan issued an analyst report emphasizing how important the successful WilTel integration was to moving forward with the Broadwing acquisition: "***Management stated that it had completed the integration of Wiltel (which closed in December, 2005), well ahead of the initial target of completing integration in 15-18 months.  We assumed this opened the door for another long-haul deal (no kidding)***." ¶57.  In November 2006, an equity analyst reported to investors after meeting with defendants that "***[o]ur meeting reinforced our confidence level in LVLT's ability to rapidly integrate [Broadwing] in 2007, setting the stage for a likely strong 2008***."  ~~In May 2007, after meeting with Level 3 executives, Bear Stearns reported the Company was on track with no surprises, stating "***product integration is done [and that the] physical network integration [is] largely done . . . except Broadwing, which should be complete within [the] next two months***."~~

9. Defendants' own statements and those made to and repeated by securities analysts that the WilTel integration was complete, on schedule and under budget were blatantly false and misleading when made. Rather, Level 3's business performance was being severely impacted by the botched integration of the acquired businesses, which was materially behind schedule and riddled with complications. With regard to the network integration of WilTel, in November 2006, Level 3 was at the earliest stages of building interconnects, completing route integration and building capacity – by far the most difficult, expensive and time consuming network integration task. In fact, by mid-December Level 3 had only spent $16 million of the $39.1 million budgeted for WilTel's network integration. Therefore, claiming that they were 85% to 90% done with the task was false. Moreover, by the end of 2006, defendants knew that the physical integration of WilTel, a task they said was complete, was delayed because Level 3 had underestimated the interconnect requirements when they performed due diligence to acquire WilTel. Thus, statements that the integration was on schedule were also lies. In addition, also by the end of 2006, defendants were planning on devoting $15.2 million of the $39.1 million budget to completing the WilTel integration in 2007. Defendants further knew that additional funds beyond the amounts allocated in the due diligence budget would be required to complete the WilTel integration in 2007-2009! Therefore, their statements that the WilTel integration was under budget were also false and misleading.

10. or was otherwise ahead or on plan with the other integrations were outright lieWith regard to the IT integration of WilTel, the situation was far more dire. In reality, the "middle-office" integration of network inventory and provisioning systems — the "heavy lifting" of the integration process — for each of the acquired businesses was in a state of chaos and had neither been mapped, initiated nor completed by defendants throughout the Class Period. And, as Defendants later

- 7 -

~~admitted by defendants,~~ <u>conceded that</u> these integration processes still remained materially unfinished as of December 2008.

11.     <u>In addition to misleading investors that the WilTel integration was on time and under budget, defendants also repeated false statements throughout the Class Period that Level 3 was the "logical consolidator with proven integration experience" at the same time the integration of the acquired companies was a total disaster.  Set forth below is a slide the Individual Defendants (as defined herein) used at securities analyst and investor conferences throughout the Class Period to assure investors.  Not only was this statement absolutely false, but each time defendants made the statement during the Class Period, it triggered their duty to fully disclose that the integrations of the acquired businesses were behind schedule, over budget and in a such state of chaos to cause materially increased provisioning times for Level 3's products and services.</u>



12.     The Individual Defendants were so eager to acquire the revenue generated by WilTel and the metro ring companies, and at the same time show the market Level 3 was achieving

synergies by slashing costs and reducing head count, they ended up firing the wrong legacy employees from the acquired businesses.  The Individual Defendants' cost-cutting measures backfired as Level 3 terminated the most knowledgeable legacy employees from the acquired companies.  At each of the acquired businesses acquired, Level 3 quickly terminated nearly every "subject matter expert" that had come to Level 3 with the acquired companies – *i.e.*, the individuals with the most knowledge of the acquired businesses' legacy systems – which had the direct effect of materially delaying the process of transferring accurate network inventory and provisioning data and systems, as well as integrating common network elements on the physical network.  Subject matter experts were necessary to determine what portions of the legacy networks were redundant and could therefore be decommissioned, how to effectively migrate network systems data, and the extent to which customer data became inaccurate before it was taken from the acquired companies' legacy network systems and put onto Level 3's systems.  The Individual Defendants also overzealously terminated the legacy companies acquired businesses' sales force most familiar with those companies' products.

        13.    The Individual Defendants also failed to mitigate their overzealous efforts to cut costs by terminating the most knowledgeable legacy employees and by also failing to provide adequate training to the remaining Level 3 employees.  As a result, the remaining employees were unable to actually sell, provision and activate customer service orders – the three steps necessary for new orders to start generating revenue.  In short, disaster ensued because Level 3 did not even know what products and services were available on the legacy networks.  Further, although Level 3 initially continued to sell customer orders it could not fulfill them.  Because the Individual Defendants botched the integrations of WilTel and the metro ring companies in 2006 and compounded their

integration mistakes in 2007 with Broadwing, product availability problems, provisioning time and "going live" delays became unbearable for Level 3's customers.  Because customer dissatisfaction became such a huge problem, Level 3 was forced to completely stop selling certain products. Consequently, Level 3's customers were forced to turn to the Company's competitors, a problem which is still adversely impacting the Company's sales to this day.

14.     Had defendants disclosed to investors prior to the purchase of Broadwing in January 2007 that the WilTel integration was, in fact, a disaster – abysmally behind schedule, over-budget and causing severe operational problems – Broadwing investors would have likely rejected the proposed transaction based on the fact that Level 3 was neither a logical consolidator nor a successful integrator.  Furthermore, without their false statements about the WilTel and metro ring integrations, Level 3's stock price would not have been inflated and the Broadwing acquisition would have been much more expensive or impossible as a stock transaction.  Defendants' scheme to defraud did not end with deceiving the market about the status of the integration of the acquired businesses.

15.     Throughout the Class Period, defendants also misled investors about the size and readiness of the Company's consolidated sales force and its ability to provision the full suite of products and services obtained from the acquired businesses.  Defendants' false and misleading statements and omissions were contained in the Company's SEC filings and press releases, confirmed during Level 3 conference calls with investors and analysts, and repeated by securities analysts and news reporters in publicly disseminated reports and articles.  For example, throughout the Class Period, defendants falsely represented during securities analyst conferences that Level 3

offered a complete set of Infrastructure, Transport, IP Services, Voice, Video and Switched products.

The slide set forth below was used throughout the Class Period:[32]



---

[32]     Defendants used the following slide, or a substantially similar slide, to falsely portray Level 3 as a logical consolidator with proven integration experience at the following investor conferences: (1) Bank of America 2006 Credit Conference on 12/4/06 (Sunit Patel, CFO presenting); (2) Credit Suisse 8th Annual Media and Telecom Conference on 12/6/06 (Robin Grey, Senior Vice President and Treasurer presenting); (3) 34th Annual Global Media and Communications Conference on 12/7/06 (Kevin O'Hara, President and COO presenting); (4) Citigroup EMT Conference on 1/11/07 (Kevin O'Hara, President and COO presenting); (5) Level 3's Analyst and Investor Conference on 3/14/07 (Kevin O'Hara, President and COO presenting); (6) Lehman Brothers 2007 High Yield Bond and Syndicated Loan Conference on 3/26/07 (Robin Grey, Senior Vice President and Treasurer presenting); (7) UBS 2007 Leveraged Finance Conference on 5/10/07 (Sunit Patel, CFO presenting); (8) Lehman Brothers Worldwide Wireline and Wireless Conference on 5/30/07 (Sunit Patel, CFO presenting); and (9) Bear Stearns 18th Annual Technology/Communications/Internet Conference on 6/11/07 (Kevin O'Hara, President and COO presenting).

This slide falsely represented that Level 3 was still able to offer all products despite sales of certain products being suspended because of the botched integration.

**Defendants' Knowledge of the Botched WilTel and Metro Ring Acquisitions**

16.     ~~15.~~Throughout the Class Period, defendants repeatedly assured investors that they were fully aware of all aspects of the integration of the acquired businesses. ~~¶¶93, 105, 109, 112, 147~~¶¶59, 80, 88, 185.  Defendants cannot deny their knowledge of the true but undisclosed facts. For instance, as admitted by Crowe during the Class Period: "*We understand that this . . . is job #1 [at Level 3]*"; "*We are confident . . . because all of the issues . . . are under our control.  All of us. Sunit, Kevin, [and] myself* . . . ." ~~¶105.~~¶¶80, 88.

17.     16.~~The Level 3 integration process was broken up into four "silos" or sub-tasks – the integration of: (a) people; (b) processes; (c) networks; and (d) systems.  While Level 3 had made some progress in integrating the people, processes and networks of the acquired businesses during the Class Period, defendants failed to disclose that the network systems integration of the acquired businesses was an abysmal failure.~~Level 3 was a metrics driven business, and the Individual Defendants continuously monitored every aspect of integrating the acquired companies leading up to, during, and beyond the Class Period.  The Individual Defendants tracked the operational status of the transport interconnects and route integration, as well as the capital expenditures and budget for each component of the integration.  The Individual Defendants monitored the network integration of the acquired companies on a weekly basis in "Level 3 Integrations Weekly Executive Report[s]," Weekly Integration Status Reports, and "Network Integration Weekly Operations Review" reports; on a bi-weekly basis via "Executive Integration Bi-weekly Update" reports; and on a recurring basis through "Network Integration Program Review" reports, "Major Integration Project Schedule[s],"

- 12 -

and "Network Integration Overview" reports.  The Individual Defendants tracked which aspects of the network integration were most critical in recurring "Network Integration Prioritization Recommendation" reports.  They monitored the capital expenditures and budgets for each component of the physical integration of the acquired companies on a monthly basis via "Network Integration Monthly Budget Update[s]" and "Monthly and Cumulative CAPEX Approvals by Program" reports; and on a recurring basis through "Network Integration CAPEX & Synergy Review," "Integration CAPEX Approval Tracker," "Integration CAPEX by Program Code," and "Integration CAPEX by Program" reports.

18.  20.19. 17.  During the Class Period, the Company's senior management approached the network systems integration in three steps: (a) front-end; (b) middle; and (c) back-end.  This segmented approach is analogous to the floor plan of a store that sells goods to customers who physically visit the store.  Front-end sub-systems, like the front counter in a shop, include the "customer facing" functions of order entry, quoting tools and sales opportunity management.  Back-end sub-systems, like the back room of the store,  include utilities such as customer support, billing and shipping.  While the defendants suffered some delays and implementation issues in the front-end and back-end sub-systems, during the Class Period the Company suffered massive and undisclosed failures in the integration of the middle sub-systems of the acquired businesses.  The integration of the middle sub-system was far more complicated than the front-end and back-end sub-systems because the middle sub-system included the key processes and infrastructure of Level 3 — *i.e.*, network services provisioning, activation, testing and inventory control.  The goal of this stage of integration focused on the consolidation of network elements onto a unified inventory control system, which was necessary to logically activate transport services and, thus, to provision such

- 13 -

services.  As detailed herein, the Company's integration of the acquired businesses' middle sub-systems was not complete as of the date this Complaint was filed, let alone during the Class Period.In order to facilitate and oversee the smooth integration of the acquired businesses as outlined above, Level 3's senior management, including the Individual Defendants, created "Project Unity." The purpose of Project Unity was to create a single and comprehensive order entry and provisioning system to be utilized throughout Level 3, including the acquired businesses.  Specifically, the purpose of Project Unity was to manage the integration of the acquired businesses' numerous and disparate systems onto Level 3's unified front, middle, and back-end systems: Siebel Order Management; PBM Savvion; and Granite Inventory Management.  Throughout the Class Period, Project Unity was also a failure.Level 3's senior management, including the Individual Defendants, directly supervised and guided the activities of the various functional groups that made up Project Unity.  The guidance and supervisory roles were handled by the Integration Steering Committee.  At all relevant times, defendant O'Hara was a senior member of the Integration Steering Committee. Further, O'Hara's direct report, Level 3's Chief Information Officer Kevin Hart ("Hart"), was responsible for Project Unity and reported the progress and status of Project Unity directly to defendant O'Hara.  The Integration Steering Committee reviewed and approved all projects related to the integration of the acquired businesses.  The Integration Steering Committee further tracked and monitored the progress of Project Unity goals and objectives and reported this information directly to defendants Crowe, O'Hara and Miller via oral and written reports throughout the Class Period.  It was through these reporting processes that the Individual Defendants obtained direct knowledge that the integration of the acquired businesses was a disaster.  Yet throughout the Class Period, the Individual Defendants failed to share this material information with investors.

19.   ~~21.~~Indeed, defendants' fraud succeeded, at the expense of Lead Plaintiff and other purchasers and acquirers of Level 3 stock, including acquirers via the Broadwing acquisition, in artificially inflating the Company's stock price and delaying the truth about Level 3's ~~inability to succeed as the~~ supposed "~~logical consolidator~~proven integration experience" in an industry swamped with excess global supply of network inventory.  As demonstrated in the stock chart attached below, for over a year, defendants' misrepresentations and omissions allowed Level 3's stock price to trade at artificially inflated levels:



507036_1

20.   ~~22.~~Defendants took full advantage of the artificial inflation in Level 3's stock price during the Class Period.  Notably, defendants utilized Level 3's inflated stock price to make numerous corporate acquisitions, and in particular, the $1.4 billion acquisition of Broadwing. Likewise, defendants used the Company's improved credit rating based on the false perception the Company would achieve positive cash flow via the integrated acquisitions in 2008 to refinance billions of dollars in debt during the Class Period, thus lowering the Company's debt expense and extending the debt terms.   ¶¶~~151-153~~¶¶189-191.   Level 3 insiders, including the Individual Defendants, made $3.9 million in insider trading proceeds while collecting an additional $38 million in compensation tied directly to the purported success of the integration of the acquired businesses. ¶¶~~154-163~~¶¶192-202.

21.   ~~23.~~In July 2007, defendants' fraudulent scheme began to unwind.  At that time, defendants admitted Level 3 was suffering from increased service activation times for its products and services as a result of "continue[d] . . . use [of] multiple order entry and provisioning processes and systems that were operated by the acquired companies."  Next, in October 2007, defendants admitted the Company was forced to revise 4Q07[33] and 2008 revenue and earnings guidance because it was unable to timely provision products and services to its customers due to its failure to integrate the acquired businesses.  Investors were stunned as they learned Level 3 was not the "logical consolidator with proven integration experience" defendants had painted it out to be ~~and that~~because the integration of the acquired businesses, in fact, had been an unmitigated disaster during the Class

---

[33]    Hereinafter, this document will refer to Level 3's fiscal qurters as 1Q__, 2Q__, 3Q__ and 4Q__, as well as to the Company's fiscal year as FY____.

Period.  Between July 2007 and September 2007, Level 3's stock price dropped from $5.72 per share to $3.18 per share.

22.   ~~24.~~With over 1.5 billion shares outstanding, and given defendants' false statements that the integrations were complete and on track, analysts and investors were rightfully concerned when defendants revealed the fraud.  For instance, a Morgan Stanley analyst asked during the October 23, 2007 conference call:  "*I hope you guys don't interpret this as a grave dancing exercise, but . . . your market cap is down about* ~~$~~*[$]1.2 billion in the last half hour, can you give us some idea of what actions you've taken to . . . terminate some of the executives that were directly responsible for the logjam?*"

23.   ~~25.~~Following the Class Period, the Individual Defendants made a series of stunning admissions that their statements regarding the successful integration of the acquired companies were false.  During Level 3's 3Q07 earnings conference call on October 23, 2007, Crowe stated:  "

> As part of realizing synergies, we then laid off people familiar with each of these individual order entry systems, inventory, provisioning and other systems, before we had assured we could meet our provisioning ~~targets.  And while we paid close attention to sales and integration cost targets, we did not monitor detailed operational metrics as closely as we should have.~~ . . . targets. . . .  we took our eye off the detailed essential work of end to end provisioning that is critical to provisioning success.

~~"~~On a February 7, 2008 conference call hosted by Level 3, O'Hara admitted the Company's "service quality and management . . . and service delivery, the process of taking a customer order and then activating the service . . . deteriorated through the first half of 2007."  During that call, O'Hara also admitted the "[s]ales of some products were suspended if the level of product readiness was deemed to be a source of significant operational challenges."  During an April 23, 2008 conference call with analysts and investors, Crowe admitted:  "As we have said repeatedly, our problem was not caused by market demand, pricing or our inability to market and sell our services,

but, rather to bottlenecks in our service activation processes, which we could and should have prevented."

## JURISDICTION AND VENUE

24.     ~~26.~~The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

25.     ~~27.~~This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

26.     ~~28.~~Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

27.     ~~29.~~In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

28.     ~~30.~~By Court Order dated May 4, 2009, William A. Poppo was appointed as Lead Plaintiff in this action.  As set forth in the ~~attached~~ Certification of William A. Poppo, filed in connection with his motion to be appointed Lead Plaintiff, he purchased Level 3 securities during the Class Period, and, as a result of defendants' conduct alleged herein, suffered damages in connection with the purchase of Level 3 securities.

29.     ~~31.~~Defendant Level 3 is primarily engaged in the communications business in North America and Europe with additional operations in coal mining.  Beginning with the filing of its Form

10-Q for 3Q06, Level 3 reported its revenues to investors based on four different customer groups. The first category was sales attributable to the Company's Wholesale Marketing Group ("WMG"), which generally accounted for approximately 50% of Level 3's total sales.  WMG provided services for large national and global communication service providers, including national and international carriers, cable companies, wireless companies, and voice service providers.  The second grouping was based on sales attributable to the Company's Business Marketing Group ("BMG"), which generally accounted for approximately 25% of Level 3's total sales.  BMG customers were generally small, medium and large companies, as well as local and regional carriers.  The Content Markets Group and European Markets Group made up the remaining 25% of the Company's total sales. Level 3's businesses throughout the Class Period were managed by a small number of key executive officers, particularly James Q. Crowe, Kevin J. O'Hara and Charles C. Miller.

30.    32.Defendant James Q. Crowe ("Crowe") served as Chief Executive Officer ("CEO" of Level 3 throughout the Class Period.  At all relevant times, Crowe was a member of the Board of Directors (the "Board") of the Company.  As part of his duties as CEO and director, Crowe was responsible for monitoring and reporting to investors and the market the status of Level 3's financial performance and outlook, including the status of the Company's integration of the acquired businesses.

(a)    During the Class Period, and pursuant to Level 3's Code of Ethics, Crowe was charged with determining whether to disclose information that would likely affect the Company's stock price, including the status of the Company's integration of acquired businesses into Level 3's operations.  In addition, Level 3's Code of Ethics required that Crowe keep himself informed of all events that would likely affect the Company's stock price;

(b)     During the Class Period, Crowe participated in the issuance of false and misleading statements and failed to disclose that the integration of the acquired businesses was behind schedule and would materially impact the Company's ability to provision and sell core network products and services.  In addition to issuing statements throughout the Class Period, Crowe repeatedly had the opportunity to correct any misstatements or omissions made by any other defendant or on behalf of Level 3; and

(c)     In conjunction with Level 3's public financial statements filed with the SEC during the Class Period, Crowe signed a certification pursuant to §302 of the Sarbanes-Oxley Act of 2002, attesting that he reviewed the contents of the filing to confirm the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  To assure that the certification was not simply a hollow gesture, Crowe was required to and did further confirm that he, along with the Company's principal financial officer, was responsible for establishing and maintaining Level 3's disclosure controls and procedures, had designed such controls to assure that material information relating to Level 3's business was promptly made known to Crowe and the Company's senior executives, and had routinely evaluated the effectiveness of the Company's policies with regard to assuring that he and other executives were made aware of material information.  At no time during the Class Period did Crowe or any other defendant assert they were not aware of the status of the integration of acquired businesses.

31.     ~~33.~~ Defendant Kevin J. O'Hara ("O'Hara") served as Chief Operating Officer ("COO") and President of Level 3 throughout the Class Period.  At all relevant times, O'Hara served

as a member of the Company's Integration Steering Committee.  As part of his duties as COO and President, O'Hara was responsible for monitoring and reporting to investors and the market the status of Level 3's financial performance and outlook, including the status of the Company's integration of the acquired businesses.  O'Hara had previously been a senior executive at Looking Glass, which was ultimately acquired by Level 3 in August 2006.

(a)     During the Class Period, and pursuant to Level 3's Code of Ethics, O'Hara was charged with determining whether to disclose information that would likely affect the Company's stock price, including the status of the Company's integration of the acquired businesses into Level 3's operations.  In addition, Level 3's Code of Ethics required that O'Hara keep himself informed of all events that would likely affect the Company's stock price;

(b)     During the Class Period, O'Hara participated in the issuance of false and misleading statements and failed to disclose that the integration of the acquired businesses was behind schedule and would materially impact the Company's ability to provision and sell core network products and services.  In addition to issuing statements throughout the Class Period, O'Hara repeatedly had the opportunity to correct any misstatements or omissions made by any other defendant or on behalf of Level 3; and

(c)     Throughout the Class Period, O'Hara reported directly to defendant Crowe. On or about March 10, 2008, Level 3 terminated O'Hara as COO due to the Company's failure to integrate the acquired businesses and for failing to complete "Project Unity" on time as promised to investors.

32.     ~~34.~~Defendant Sunit S. Patel ("Patel") served as Chief Financial Officer ("CFO") and Group Vice President of Level 3 throughout the Class Period.  As part of his duties as CFO and

- 22 -

Group Vice President, Patel was responsible for monitoring and reporting to investors and the market the status of Level 3's financial performance and outlook, including the status of the Company's integration of the acquired businesses. Patel was a founder of Looking Glass, and had previously served as CFO of Looking Glass, which was ultimately acquired by Level 3 in August 2006.

(a)     During the Class Period, and pursuant to Level 3's Code of Ethics, Patel was charged with determining whether to disclose information that would likely affect the Company's stock price, including the status of the Company's integration of the acquired businesses into Level 3's operations. In addition, Level 3's Code of Ethics required that Patel keep himself informed of all events that would likely affect the Company's stock price;

(b)     During the Class Period, Patel participated in the issuance of false and misleading statements and failed to disclose that the integration of the acquired businesses was behind schedule and would materially impact the Company's ability to provision and sell core network products and services. In addition to issuing statements throughout the Class Period, Patel repeatedly had the opportunity to correct any misstatements or omissions made by any other defendant or on behalf of Level 3;

(c)     In conjunction with Level 3's public financial statements filed with the SEC during the Class Period, Patel signed a certification pursuant to §302 of the Sarbanes-Oxley Act of 2002, attesting that he reviewed the contents of the filing to confirm the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." To assure that the certification was not simply a hollow

- 23 -

gesture, Patel was required to and did further confirm that he, along with the Company's CEO, was responsible for establishing and maintaining Level 3's disclosure controls and procedures, had designed such controls to assure that material information relating to Level 3's business was promptly made known to Patel and the Company's senior executives, and had routinely evaluated the effectiveness of the Company's policies with regard to assuring that he and other executives were made aware of material information.  At no time during the Class Period did Patel or any other defendant assert that they were not aware of the status of the integration of the acquired businesses; and

        (d)      Throughout the Class Period, Patel reported directly to defendant Crowe.

    33.    ~~35.~~ Defendant Walter Scott, Jr. ("Scott") served as Chairman of the Board of Level 3 throughout the Class Period.  As part of his duties as Chairman of the Board, Scott was responsible for monitoring and reporting to investors and the market the status of Level 3's financial performance and outlook, including the status of the Company's integration of the acquired businesses.

        (a)      During the Class Period, and pursuant to Level 3's Code of Ethics, Scott was charged with determining whether to disclose information that would likely affect the Company's stock price, including the status of the Company's integration of the acquired businesses into Level 3's operations.  In addition, Level 3's Code of Ethics required that Scott keep himself informed of all events that would likely affect the Company's stock price; and

        (b)      During the Class Period, Scott participated in the issuance of false and misleading statements and failed to disclose that the integration of the acquired businesses was behind schedule and would materially impact the Company's ability to provision and sell core

network products and services.  In addition to issuing statements throughout the Class Period, Scott repeatedly had the opportunity to correct any misstatements or omissions made by any other defendant or on behalf of Level 3.  As Chairman of Level 3, Scott actively participated in the planning, orchestration and approval of the acquisition of each of the acquired businesses.

34.   36. Defendant Charles "Buddy" C. Miller, III ("Miller") served as Vice Chairman of the Board and Executive Vice President of Level 3 throughout the Class Period.  As part of his duties as Vice Chairman of the Board and Executive Vice President, Miller was responsible for monitoring and reporting to investors and the market the status of Level 3's financial performance and outlook, including the status of the Company's integration of the acquired businesses.

(a)   During the Class Period, and pursuant to Level 3's Code of Ethics, Miller was charged with determining whether to disclose information that would likely affect the Company's stock price, including the status of the Company's integration of the acquired businesses into Level 3's operations.  In addition, Level 3's Code of Ethics required that Miller keep himself informed of all events that would likely affect the Company's stock price;

(b)   During the Class Period, Miller participated in the issuance of false and misleading statements and failed to disclose that the integration of the acquired businesses was behind schedule and would materially impact the Company's ability to provision and sell core network products and services.  In addition to issuing statements throughout the Class Period, Miller repeatedly had the opportunity to correct any misstatements or omissions made by any other defendant or on behalf of Level 3; and

(c)      Throughout the Class Period, Miller reported directly to defendants Crowe and Scott.  As Vice Chairman of Level 3, Miller actively participated in the planning, orchestration and approval of the acquisition of each of the acquired businesses.

35.      ~~37.~~Defendants Crowe, O'Hara, Patel, Scott and Miller are collectively referred to herein as the "Individual Defendants."

36.      ~~38.~~By virtue of the Individual Defendants' positions with the Company, they had access to adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets, present and future business prospects, and integration efforts via internal corporate documents (including the Company's operating plans, budgets, forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, and via reports and other information provided to them in connection therewith.

37.      ~~39.~~It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications, as alleged herein, are the collective actions of the narrowly-defined group of defendants identified above.  Each of the above officers of Level 3, by virtue of their high level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company and was privy to confidential proprietary information concerning the Company and its business, the status of the integration of the acquired businesses, Level 3's operations, growth, financial statements and financial condition, as alleged herein.  The defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information

alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

38.   40.As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ National Market System ("NASDAQ"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly accurate and truthful information with respect to the Company's integration of the acquired businesses, financial condition and performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

39.   41.The Individual Defendants participated in the drafting, preparation and/or approval of the various public, shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their Board membership or executive and managerial positions with Level 3, each of the Individual Defendants had access to the adverse undisclosed information about the integration status of the acquired businesses as particularized herein and knew, or recklessly disregarded, that these adverse

facts rendered the positive representations made by or about Level 3 and its business materially false and misleading.

40.   ~~42.~~ The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  As such, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

41.   ~~43.~~ Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers or acquirers of Level 3 common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Level 3's business, operations, management and the intrinsic value of Level 3 common stock; (ii) enabled Level 3 insiders to sell more than 726,000 shares of their personally-held Level 3 common stock, generating proceeds of more than $3.9 million; (iii) enabled the Individual Defendants to obtain in excess of $38 million of compensation, much of which was tied directly to the Company's progress in integrating the acquired businesses; and (iv) caused Lead Plaintiff and other members of the Class to purchase Level 3 common stock at artificially inflated prices.

**TRUE FACTS**

**The Reality on the Ground:  WilTel and the "Metro Business" Integration Efforts Are an Unmitigated Disaster**

44.     Defendants deliberately misled the market regarding Level 3's successful integration of WilTel (a large fiber optic backbone company like Broadwing) and the metro ring acquisitions so as to falsely convince the market that Level 3 was capable of successfully acquiring and integrating Broadwing.  Defendants' statements that the WilTel integration was complete and the metro ring acquisitions were on track were blatantly false and were purposefully designed to mislead the market into believing Level 3 was a successful integrator of both backbone and metro ring companies.  The Individual Defendants were so eager to acquire the revenue generated by WilTel and the metro ring companies, and at the same time show the market Level 3 was achieving synergies by slashing costs and reducing head count, they ended up firing the wrong legacy employees from the acquired businesses.  The Individual Defendants' cost-cutting measures backfired as Level 3 terminated the most knowledgeable legacy employees from the acquired companies.  At each of the businesses acquired, Level 3 quickly terminated nearly every "subject matter expert" — *i.e.*, the individuals with the most knowledge of the acquired businesses' legacy systems — which had the direct effect of materially delaying the process of integrating critical network inventory and provisioning systems.  Further, subject matter experts were necessary to determine what portions of the legacy networks were redundant and could therefore be decommissioned, how to effectively map and migrate network systems data to Level 3's system and the extent to which customer data became inaccurate before it was taken from the acquired companies' legacy network systems and transferred to Level 3's systems.

45.     For instance, during the Progress integration, which began shortly after March 2006, Level 3 IT management encountered major difficulties in understanding the functionality of the Progress MetaSolve provisioning system because most, if not all, of Progress' provisioning employees had been terminated by Level 3 after the acquisition but prior to the Class Period. Similarly, prior to the acquisition of Looking Glass by Level 3 in 2006, Looking Glass was able to provision its on-network customers with their network circuits within 48 to 72 hours.  Throughout 2007, as a result of defendants' premature termination of the target businesses' subject matter experts, the remaining Level 3 provisioners worked in a state of "chaos," having to work with disparate provisioning systems causing most customer order fulfillment times to extend to three weeks versus the three day provisioning time Level 3 customers enjoyed before the acquisitions.

46.     The Individual Defendants exacerbated the problems caused by their overzealous efforts to terminate the legacy employees most knowledgeable about the acquired businesses' operations and by also failing to provide adequate training to the remaining Level 3 employees. As a result, the remaining employees were unable to actually sell, provision and activate customer service orders—the three steps necessary for new orders to start generating revenue.  In short, disaster ensued because although Level 3 initially continued to sell customer orders, it could not fulfill them. Because the Individual Defendants—who, according to their statements, were in charge of, closely monitored and were quite good at integrating acquired companies—botched the integrations of WilTel and the metro ring companies in 2006 and compounded their integration mistakes in 2007 with Broadwing, provisioning and activation delays became unbearable for Level 3's customers. Because customer dissatisfaction became such a huge problem, Level 3 was forced to completely

- 30 -

stop selling certain products. Consequently, Level 3's customers were forced to turn to the Company's competitors, a problem which is still adversely impacting Level 3's sales to this day.

47. The adverse ramifications of firing the most knowledgeable subject matter experts were felt by Level 3 with the first acquisition, WilTel. Because Level 3 terminated virtually all WilTel employees familiar with how WilTel's legacy inventory control and provisioning systems functioned, the Company failed to complete the integration process of WilTel's data and network onto Level 3's systems prior to the end of calendar year 2008. WilTel's network inventory control and provisioning system, known as "openCI," was to be migrated over to Level 3's network inventory control and provisioning systems, known as "Network Engineer" and "Granite." Contrary to defendants' Class Period statements that the WilTel integration was virtually complete, the original plan to migrate the openCI data onto Network Engineer was not scheduled to be finished until *the end of 2007*. Indeed, Level 3 did not even initiate this transfer process until 2Q07. Shockingly, by May 2008, the data mapping portion of the inventory control and provisioning integration had been completed, but Level 3 had still not commenced the migration of the actual data from openCI to Network Engineer or Granite. As a direct result of Level 3's failure to begin the physical integration of WilTel's inventory control and provisioning systems until the end of 2008, the amount of time it took for Level 3 to provision services to many of its wholesale transport customers during the Class Period increased by 50% to 75%.

48. In late 2005, defendants launched a plan—coined "Project Unity" (or "Unity") to manage the integration of the acquired businesses by transferring all the complex business systems utilized by the acquired businesses (referred to as "legacy" systems) onto a common operating platform. According to Level 3's original plan, Project Unity was to be complete by the end of

- 31 -

2007. Although Level 3 initiated Project Unity in 2005 and the platform was to be complete by the end of 2007, the data migration from the acquired businesses' legacy systems, other than WilTel, onto the Unity platform did not even begin until 2008.

49.     Like many other objectives, prior to and during the Class Period, Project Unity milestones were missed by a wide margin. For instance, in 2006, Level 3 ran a small-scale pilot of a single component of the Unity platform – the "front-end" quoting function for transport services – which was a success. The next step, however, was to actually build the unified quoting and order management platform to deal directly with actual and potential sales orders. This step took defendants the entire first half of calendar year 2007 to complete. Immediately after its completion, Level 3 management realized the platform had been designed with severe defects, which precluded the possibility of adding quoting tools for other key Level 3 products and services such as high-speed Internet and colocation services. As a result, Level 3 decided to scrap the entire Unity platform around June 2007 and rebuild it from scratch. Notably, Level 3's attempt to create a new and different design for the quoting tool portion of Unity did not recommence until the end of 2007. Likewise, this build resulted in a design that was barely operational. It took numerous members of the Unity integration team, including Hart, considerable time and effort to work through the remaining problems. In fact, the preliminary components of the Unity operations platform were not complete until March 2008.

50.     By March 2006, the order fulfillment and provisioning issues that plagued Level 3 shortly after the WilTel acquisition made it impossible for Level 3 to provision certain transport products and services, including "optical waves" or "lit IRUs" in a timely fashion. Beginning in March 2006, legacy WilTel product managers experienced at least a doubling of provisioning times

- 32 -

for lit IRUs, from 30 days to at least 2 months, because the product managers were forced to work with multiple legacy systems instead of a unified network inventory control and provisioning system. During the Class Period, Customer Project Managers found that it took twice as long to provision customer orders because, in addition to tracking order status on multiple software systems, the orders also had to be provisioned on multiple legacy systems. Furthermore, "network grooms," the part of the provisioning process where network circuits are moved and/or re-designed according to customer specifications, took twice the time to complete immediately after the WilTel acquisition.

51. The integration of the WilTel call center, from St. Louis, Missouri to Tulsa, Oklahoma, was also an abysmal failure. This portion of the WilTel integration was commenced in late 2006. While the call center integration was supposedly complete by February 2007, so many core and experienced WilTel voice technicians had been terminated that customer assistance waiting times — *i.e.*, the amount of time Level 3's customers waiting to have their complaints responded to by Level 3 customer service representatives — increased from an average of 3 minutes to 20 minutes, or nearly a 700% increase.

52. The Company's experience with many of the other acquisitions, including the metro ring businesses, fared no better and in many ways was worse. In early 2006, when Level 3 began its acquisitions of the metro ring businesses — *i.e.*, Progress, ICG, TelCove and Looking Glass — the Company had limited experience in providing metropolitan access-related services. Level 3 had primarily been a long-haul network provider. For this reason it was unreasonable and irresponsible for Level 3 to create a final integration plan for the metro businesses' inventory and provisioning systems onto Unity without first having a strong understanding of the operations processes or, at

minimum, consulting with the legacy employees working for the businesses before terminating their employment.

53.     In fall 2006, Level 3 sent several senior Looking Glass employees, including circuit designers, to participate and oversee the integration of both the Progress and Looking Glass network inventory control and provisioning systems onto Level 3's platform.  The critical "middle" stage — *i.e.*, the "heavy lifting" — of this integration work was the migration of network inventory data for Progress and Looking Glass onto Level 3's supposedly superior Granite inventory management system.  Defendants' original plan called for this work to be complete by July to September 2007.

54.     Before this crucial network system integration work could proceed, however, it was necessary for Level 3 to ensure that network inventory data was complete and accurate.  In other words, Level 3 had to ensure that it knew what network elements actually existed on the Looking Glass and Progress networks.  Likewise, Level 3 had to ensure it knew which network elements that actually existed were being utilized by Looking Glass and Progress.

55.     Critically, Level 3 senior circuit designers were fully aware they could not determine what Looking Glass and Progress inventory existed or which elements or portions of elements were already in use.  Nonetheless, Level 3 transferred the flawed and inaccurate circuit data onto the Granite system in July 2007.  As a consequence, Level 3's inventory data became infected with inaccuracies.  Further, and also as a direct consequence, Level 3 experienced material delays in fulfilling orders for major customers because the Granite system now contained data regarding network elements that did not exist.  In particular, throughout 2007, integration failures led to horrific customer provisioning delays for Level 3's largest customers such as Verizon Wireless and NuVox.  Likewise, by July 2007, Level 3 had failed to integrate the network inventory systems of

- 34 -

ICG onto the Granite system.  By the end of calendar year 2008, Level 3 still had not completed this critical work.

56.     As of July 2007, Level 3 began to constrain customer orders to meet its capacity to provision and fulfill orders.  This strategy had the effect of Level 3 appearing to have stabilized customer order backlogs.

57.     Contrary to defendants' assurances that integration efforts were on schedule, TelCove literally operated as a separate company from Level 3 throughout the Class Period.  In fact, Level 3 failed to migrate TelCove's inventory management systems by the end of 2008, in large part because Level 3's senior provisioners and circuit designers found TelCove's existing inventory control systems data to be unmanageable at the time of the acquisition.  TelCove's legacy provisioning platform, called Access Request, was also plagued with problems.  Although Level 3 began planning for the integration of Access Request onto Level 3's Unity system in early 2007, circuit design engineers continued to utilize only the Access Request system through calendar year 2008 because of migration problems.  These migration difficulties, in combination with the abysmal state of TelCove's network inventory management system, caused a four-fold increase in service times to new and existing customers.  Prior to the TelCove and Level 3 merger in July 2006, TelCove customer orders were typically filled in ten days.  After the merger and throughout the Class Period, however, most orders took a minimum of 45 days to install.

58.     Notably, during the Class Period, Level 3 Customer Project Managers witnessed first hand how the Company's failure to integrate the acquired businesses' legacy network systems into its own caused severe delays in provisioning and filling customers' orders.  Customer Project Managers served as intermediaries between Level 3's provisioners and its customers.  Certain

Customer Project Managers, prior to January 2007, coordinated the fulfillment of five to six orders a month.  After January 2007, one Customer Project Manager handled only eight orders in an entire year because to fulfill a customer order, several legacy network systems of the different acquired businesses had to be utilized because they had not been integrated by Level 3.  Beginning in January 2007 and throughout the remainder of the Class Period, as a direct result of the lack of cohesion among the acquired businesses' and Level 3's network systems, average order installation times ballooned from 30 days to at least 90 days.

59.     Also beginning in January 2007, and continuing through and after the Class Period, the failed integration caused Customer Project Managers to continuously encounter network inquiry problems because they could not determine what portions of the network still existed.  Because inventory previously held by the acquired businesses had not yet been accurately identified and accounted for, provisioners were unable to fulfill or provision customers' orders for services using transport circuits that appeared to be available in the provisioning sub-systems.  In reality these network circuits were non-existent or had been decommissioned.

60.     Similarly, provisioners were unable to fulfill customer orders because certain circuits that were supposed to be provisioned according to customer specifications were on network circuits slated to be decommissioned.  Provisioners, in creating the design to fulfill a customer's order, were unaware which portions of the fiber network planned to be decommissioned because the legacy systems of the acquired companies did not accurately display the availability of all network capacity.  Even when an order was able to be provisioned, field technicians and circuit designers encountered problems when attempting to actually connect the circuits.  Compounding these problems, Level 3

also failed to adequately train its Customer Project Managers to work within the numerous order tracking and provisioning systems that were now used at Level 3 to fill a customer's order.

61.     The most problematic orders — resulting in the delay or inability to provision customer orders — were those that required utilization of various legacy Level 3 or acquired companies' network systems.  These are known as "hybrid" orders.  Shortly after the Broadwing acquisition in January 2007, it took at least twice as long to get customers' orders ready for delivery because the provisioning process for these orders had to go through multiple "cross network" systems.  First, orders had to be entered into the order tracking systems of both Level 3 and the acquired businesses.  If fulfilling an order required Broadwing network inventory, throughout the Class Period, Customer Project Managers were forced to enter the order on Clarify, Level 3's system, and IQONS, Broadwing's order tracking system.  Then, circuit designers and provisioners were forced to design the circuit in Broadwing's Circuit Vision provisioning system and then in Level 3's Fusion system.  Before Level 3 acquired Broadwing, these orders were completely filled at Broadwing in approximately 12 days.  However, following the acquisition, it took 24 days to provision the order, including the time it took to initially enter the order into the system, as well as the time it took to get the order installed in the field.  As a result, not a single IRU circuit was installed on time during the Class Period.

62.     Beginning in summer 2006, one of Level 3's customers, British Telecom, put a freeze on ordering new IP data services.  British Telecom halted all new orders because Level 3 was wholly unable to install its orders for various optical services, including a "10 gig back-boom," in summer 2006.  Further, the Company informed British Telecom that the installation would not be completed for another six months.  As a consequence, Level 3 was forced to offer cost concessions just to retain

- 37 -

British Telecom as a customer.  Provisioning systems problems became so pervasive at Level 3 that by September 2007, the Company was forced to stop selling certain intercity Ethernet services because the Company could not fix the network.

63.     During the Class Period, major Level 3 customers experienced voice and data outages as a result of Level 3's haphazard decommissioning and consolidation of its networks during the integration of network inventory control and provisioning systems.  During this process, networks and customers, including AT&T, lost telephone and data services because Level 3's order tracking and customer management systems could not accurately determine which customers had service on which networks.  Because of the poor order tracking and customer management systems, Level 3 was decommissioning networks that still had active customers, resulting in service outages.

64.     One particular customer order that was delayed as a result of Level 3's failure to adequately integrate its legacy systems was placed in late August 2007.  At that time, the Collier County School District in Florida placed a $20,000 order that had to be filled and installed by early December 2007, prior to the holiday break, so that it could "go live" when school was back in session in January 2008.  Because sales engineers attempting to fill the order were unable to discern which legacy network (among Level 3 and the acquired companies) had to be accessed to provision the order, the school district's order was delayed beyond the original installation date promised by Level 3.   The school district was so angered with the delay that it placed a call to senior management, including Crowe, to express its frustration.

65.     Level 3's order "backlog" represented the value of various customer orders that had been placed but had not been provisioned.   During the Class Period, the Company's backlog materially increased because of defendants' failure to integrate the acquired businesses' provisioning

- 38 -

systems throughout 2006 and 2007. As an illustration, Level 3's Vice President of Sales, Jeff Bettaker, spoke to Level 3 employees, including sales engineers, about the Company's order backlog at a sales conference in Dallas in February 2007. Mr. Bettaker acknowledged this backlog was a major problem at Level 3, and promised conference attendees that Level 3 would hire more Customer Project Managers to deal with the problem.

**The Botched Integration of WilTel and the Metro Ring Companies Is Compounded by the Broadwing Acquisition**

66. Defendants' failure to integrate WilTel and the metro ring companies during 2006 made it impossible for Level 3 to successfully integrate Broadwing. In fact, the Individual Defendants compounded their mistakes made during the botched integrations during 2006 when Level 3 acquired Broadwing. Immediately following the Broadwing acquisition in January 2007, Level 3 dismantled Broadwing's entire IT department and transferred its functions to contractors overseas. Following the termination of this department, no technical support existed for Broadwing's systems. Between February 2007 and May 2007, Level 3 began the process of attempting to integrate Broadwing's physical network onto Level 3's. One significant objective was to decommission Broadwing's network fiber that overlapped with or was duplicative of Level 3's fiber holdings. Level 3 operations employees were required to analyze Broadwing's legacy order-tracking, customer management and circuit identification computer systems to determine where Broadwing had customers on specific network elements. Because most Broadwing subject matter experts on these systems had been terminated by Level 3, the customer data resident in these systems had become inaccurate and Level 3 employees did not know how to make network inquiries. As a result, when Level 3 began decommissioning network elements, they discovered current customers still employed the decommissioned networks.

- 39 -

67. The integration of the Broadwing legacy billing systems onto a system called "Kenan" had been scheduled to be completed by October 2007. However, by April 2007, this integration had not yet begun. As such, and as a result of the combined effects of massive integration delays at Level 3, the billing system integration was not complete by October 2008. This integration program suffered delays in part because of the enormous data that had to be transferred. The delay in the billing system integration further compounded delays in Level 3's ability to earn revenue from new orders. The billing system integration project status was reported to senior management, including the Individual Defendants, on at least monthly and at times a bi-weekly basis.

68. In addition, Level 3 failed to integrate or convert any of the legacy Broadwing network systems into the Level 3 Unity systems prior to end of the Class Period. By October 2007, Level 3 was just beginning to identify Broadwing legacy system requirements for the purposes of mapping the data transfer onto Unity.

**Status of the Integrations of the Acquired Businesses Was Directly Monitored by Defendants**

69. Defendants closely monitored the integration status and were intimately aware of and involved in attempts to resolve customer complaints. At the same time Project Unity was launched, Level 3 established the Integration Steering Committee to govern and oversee all Unity-related projects. With its inception, defendants vested the Integration Steering Committee with final approval authority for all Unity-related tasks and objectives. At all relevant times, the Integration Steering Committee was comprised of Level 3 executive level managers, including O'Hara and Level 3's Chief Information Officer ("CIO") Kevin Hart ("Hart"). Prior to and throughout the Class Period, the Integration Steering Committee met on a regular basis to discuss the status and

- 40 -

scheduling of Unity projects.  Hart was responsible for the day-to-day management of Project Unity. At all relevant times, Hart reported directly to O'Hara the status of Project Unity objectives and milestones.   Throughout the Class Period, O'Hara directly reported the status of all the acquired businesses' integrations to Level 3's senior management, including defendants Crowe, Miller and Scott.

70.     The Integration Steering Committee supervised the various integration teams responsible for transferring the acquired businesses to Level 3's systems.  Each of these integration teams created  was responsible for preparing weekly Integration Status Reports that were provided to Level 3 IT Project Managers.  As one example, on the Looking Glass project, IT Project Managers Eric Olsen and Andy Jacobs were responsible for "rolling up" the Integration Status Reports to the Project Management Office and Level 3 senior management, including O'Hara and Hart.  Other IT Project Managers responsible for each of the acquired businesses also prepared Integration Status Reports, all of which were published weekly on Level 3's "Dashboard."   The integration reports utilized a "red-yellow-green" or "RYG" format to inform management of the progress toward order fulfillment completion, meaning integration tasks currently running on time were "green" and those already passed the deadline were displayed as "red."   Individual Defendants accessed the Dashboard and these RYG integration reports via Level 3's intranet.

71.     Throughout the Class Period, order fulfillment delays, customer complaints, customer trouble tickets, and service quality problems that arose as a function of the botched integration of the acquired businesses were regularly reported by Product Managers to Level 3's President of Wholesale Markets, Suneet Choksi ("Choksi").   Choksi, in turn, directly reported these matters to O'Hara and Crowe during regular meetings.

- 41 -

72.     During the Class Period, Choksi, O'Hara and Crowe met with Level 3's "high-revenue" customers in response to complaints from new and existing customers who ordered new services from Level 3.   The Company's failure to integrate WilTel's inventory control and provisioning systems, almost immediately following that company's acquisition by Level 3, caused a cascading series of problems which made it much more difficult for the Company to figure out what network and other services were even available for sale.   The failure of this integration caused massive increases in order provisioning times because orders had to be inserted on multiple systems. The failed integration also led to widespread customer service problems and service outages, in part because the Company incorrectly decommissioned networks believed to be redundant but that were still being used to deliver service to existing customers.   Defendants O'Hara and Crowe were personally involved in meetings with senior executives from Level 3's largest customers and often traveled to the customers' locations for those meetings.   Specifically, O'Hara met directly with NuVox and XO Communications to help resolve their complaints about Level 3's service.   Also, Crowe received complaint calls directly from high level executives at Level 3's customers, including Verizon Wireless, during the Class Period.

73.     In 2007, during the Broadwing integration, O'Hara met with the business's legacy employees at a former Broadwing office in Chicago.   During the meeting, O'Hara informed Level 3 employees that the Company's executive management recognized and was aware of the problems the Chicago team was experiencing—namely increased order processing intervals due to having to utilize different provisioning systems.   Although O'Hara promised to provide additional training, from the time of Broadwing's acquisition through the end of the Class Period, legacy Broadwing

~~employees were not given adequate training to use the several new order and provisioning network systems in a remotely efficient manner.~~

~~74.    Level 3's Service Delivery Group, part of defendant O'Hara's operations organization, was responsible for the fulfillment of customer orders in terms of processing, provisioning, installing and testing.  From January 2007 through the end of the Class Period, the quantity of customer orders placed with Level 3 sales personnel far exceeded the available network capacity, which inevitably resulted in a significant percentage of orders being delayed.  The Service Delivery Group reported their performance, including their inability to provision orders due to a lack of network capacity, to Level 3 executives, including the Individual Defendants, on a weekly basis via what was known as the Operational Overview Deck report.~~

## PRE-CLASS PERIOD EVENTS AND MISSTATEMENTS

42.    ~~75.~~On December 23, 2005, Level 3 completed the acquisition of WilTel, a provider of optical network communication services including voice, data, video and IP services.  The acquisition included a multi-year contract with SBC as well as WilTel's Vyvx video transmission business.  Level 3 announced the combined networks of the two companies would reach 50 new markets and include ~~,~~3,000 new route miles.  Level 3 paid total consideration of 115 million shares of common stock, valued at approximately $313 million, and $463 million in cash to acquire WilTel. In the press release announcing the completion of the acquisition, defendant Patel stated that the acquisition would add $1.5-$1.6 billion in revenue in 2006.

43.    ~~76.~~In the same December 23, 2005 press release, defendant O'Hara discussed the integration of WilTel:  "We commenced integration planning immediately after signing the

- 43 -

definitive agreement in October [2005], and we believe we are well positioned for a smooth integration process in keeping with our projected schedule."

44.     Thereafter, on February ~~17~~7, 2006, O'Hara again extolled the virtues of the WilTel acquisition:

> *We were happy to complete the closing of the WilTel acquisition earlier than expected and we're already making progress on the integration front*. Shortly after closing, we migrated to critical corporate systems and have already completed the financial system migration. . . .  We have largely completed the rationalization of all products and should be in a position to have final account management assignments and product and pricing decisions rolled out to the field within a few weeks. . . .  *[W]e can now begin to offer customers services which benefit from the scale and quality of the combined infrastructure*.

45.     ~~78.~~On March 20, 2006, Level 3 completed the acquisition of Progress, a regional wholesale network services company based in St. Petersburg, Florida.  At the time of the acquisition, Progress' assets consisted of 9,000 miles of network, including 29 metropolitan networks and connections to international cable landings in South Florida and 31 mobile switching centers in the southeast, and the Company served 200 customers with a significant concentration of international and wireless carrier customers.  Level 3 paid total consideration of $66 million in shares of its common stock and $68.5 million cash to acquire Progress.  In the press release announcing the acquisition, defendant O'Hara assured investors that integration of Progress' networks would begin "once we have realized additional scale and efficiency through the integration of WilTel, which we acquired in late 2005."

46.     ~~79.~~On May 31, 2006, Level 3 completed the acquisition of ICG, a provider of transport, IP and voice services to wireline and wireless carriers, Internet service providers and enterprise customers.  At the time of the acquisition, ICG's network included over 2,000 metro and regional fiber miles in Colorado and Ohio with more than 1,600 customers.  Level 3 paid total

consideration of $131 million in shares of its common stock and $45 million cash to acquire ICG.  In an April 17, 2006 press release announcing the signing of the deal, defendant Patel stated that ICG was expected to improve Level 3 cash flow "to approximately $30 to $40 million once we have completed integration, which is expected to begin later this year."

47.     80.On July 24, 2006, Level 3 completed the acquisition of TelCove, a privately held facilities-based provider of metropolitan and regional communications services, including transport, Internet access and voice services.  At the time of the acquisition, TelCove's network included over 22,000 local and long haul route miles serving 70 markets across the eastern United States with 4,000 buildings on net.  Level 3 paid total consideration of $623 million in its common stock, $446 million cash and $145 million in TelCove liabilities to acquire TelCove.  In the May 1, 2006 press release announcing the deal, defendant O'Hara stated:

> *We will immediately begin integration planning . . . .  With our experience and expertise in integration activities, we believe that we are well positioned for a smooth integration process*.

48.     81.In the same press release, O'Hara talked about the benefits of the deal, stating: "[T]he primary drivers of value are opportunities to reduce Level 3's network related expenses and to increase sales to existing and new customers."

49.     82.On May 19, 2006, Level 3 filed a registration statement on Form S-4 with the SEC to register the shares of Level 3 stock that were to be used as currency to TelCove shareholders in connection with the TelCove acquisition and merger.  Defendants Scott, Crowe and Patel signed the Form S-4.

50.     83.On July 25, 2006, defendants hosted a conference call with analysts and investors to announce and discuss Level 3's 2Q06 earnings.  During the call, defendant O'Hara assured

investors that the WilTel acquisition was ahead of schedule, stating:  "The integration of WilTel continues to be ahead of schedule and below budget."  Defendant O'Hara further stated:

> Like any complex activity, the value derived from this integration follows an 80/20 rule and we have gotten through most of the activities that generate a disproportionate amount of the value.  The vast majority of workforce reductions have been completed.  All sales and products have been consolidated.  Network interconnections for voice, IP and transport networks are nearing completion.  The access networks have been consolidated and exit circuit grooming is underway.

51.     84. On August 2, 2006, Level 3 completed the acquisition of Looking Glass, a privately held facilities based provider of metropolitan transport services, including SONET/SDH, Wavelength and Ethernet, as well as dark fiber and carrier neutral colocation.  At the time of the acquisition, Looking Glass' network included approximately 2,000 route miles serving 14 major metro areas, with lit fiber connectivity to approximately 215 buildings and dark fiber connectivity to approximately 250 additional buildings.  Level 3 paid total consideration of $84 million in shares of its common stock, $13 million cash, and repaid $67 million of outstanding Looking Glass debt.  In the press release announcing the acquisition, defendant O'Hara stated: "Completing this acquisition is another milestone for Level 3 in the expansion of our capabilities to offer more services in more markets."

52.     85. On October 16, 2006, Level 3 issued a press release announcing that it entered into an agreement to acquire Broadwing, a publicly held provider of optical network communications services including data, voice and media services.  At the time of the announcement, Broadwing owned 19,000 miles of intercity fiber network, with half of its revenue derived from the wholesale market and the other half from business customers.  Level 3 paid total cash consideration of $753 million, and approximately 123 million shares of its common stock, then valued at $688 million, to

acquire Broadwing.  On January 3, 2007, Level 3 completed the acquisition at a total cost of $1.4 billion.

~~86.     On November 6, 2006, Level 3 filed a registration statement on Form S-4 with the SEC to register the shares of Level 3 stock that were to be used as currency to Broadwing shareholders in connection with the Broadwing acquisition and merger.  Defendants Scott, Crowe and Patel signed the Form S-4.~~

53.     ~~87.~~The statements made by defendants as set forth in ¶¶~~76-86~~ ¶¶42-52 were alive and reflected in the market price of Level 3's stock at the beginning of the Class Period.

### CLASS PERIOD EVENTS, CONDUCT AND MISSTATEMENTS

54.     ~~88.~~**False Statement**:  The Class Period commences on October 17, 2006.  On that date, defendants hosted a conference call with analysts and investors to announce and discuss Level 3's acquisition of Broadwing.  Defendants Crowe, Miller, Patel and O'Hara participated on the call and had the opportunity to address analysts' and investors' questions and concerns about the Broadwing acquisition and the status of Level 3's integration of the acquired businesses.  During the call, O'Hara stated:

> In our second quarter call we noted we were ahead on the WilTel integration. **We continue to run ahead of plan and have now completed the majority of integration efforts from WilTel, and we have completed these activities under budget**.

With regard to the rest of the acquired businesses, O'Hara assured investors that the integration activities were also on plan.

55.     ~~89.~~***False Statement***:  During the October 17, 2006 conference call, Crowe emphasized the importance of defendants fully understanding the planning, procedure and progress of the integration of the acquired companies and assured investors that:

I'm going to add one more comment, because ***I do know this is an important matter to many of our investors***.  I would say that we enter into any discussion about acquisitions fully aware that more than half of all acquisitions destroy value for the acquiring company's shareholders – more than half.  ***That is because, at least in our view, people – either the companies either overpay or don't plan the integration properly, or both***.

*        *        *

We, I think through the last three or four years demonstrated a healthy concern about any acquisition.  And we have worked very hard . . . it is important to have all ____of____ the questions as well as you can about integration answered before you sign.

56.   ~~90.~~As a result of defendants' false and misleading statements during the October 17, 2006 conference call, Level 3's stock price increased by $0.70, or over 13%, to close at $6.02 per share.

57.   ~~91.~~**False Statement**:  On October 20, 2006, JP Morgan issued an analyst report based on statements made to and repeated by the securities analyst which stated:

**Meetings with Management**

This report details notes from meetings with Kevin O'Hara (COO) and Sunit Patel (CFO) in Colorado.

*        *        *

**WilTel Integration Complete**

***Management stated that it had completed the integration of Wiltel (which closed in December, 2005), well ahead of the initial target of completing integration in 15-18 months.  We assumed this opened the door for another long-haul deal (no kidding)***.  Management commented that the company still had a great deal of heavy lifting ahead ***on integrating Telcove and Looking Glass*** (which both closed in the third quarter), but ***this process was well-planned*** and management expected it to proceed smoothly.

58.   ~~92.~~**False Statement**:  On October 24, 2006, defendants hosted a conference call with analysts and investors to announce and discuss Level 3's 3Q06 earnings.  Defendants Crowe, Patel

- 48 -

and O'Hara participated on the call and had the opportunity to address analysts' and investors' questions and concerns about the Company's 3Q06 results and the status of the integration of the acquired businesses.  During the call, O'Hara stated:

> ***We continue to run ahead of plan on the WilTel integration from both a timing and budget perspective.  A majority of the physical network interconnections are completed, data centers have been consolidated, network expenses have been reduced, and most of the operating expenses run rate savings have been realized.  This work has been completed ahead of schedule and under budget.***

*   *   *

> While we are pleased with the progress to date, much of the heavy lifting for the metro integrations was originally anticipated to occur in 2007.  That was when we anticipated consolidating the network facilities, collapsing the back office systems previously used by all four of the companies on    to    the desired Level 3 systems, and migrating much of the off-net traffic from all of the various companies onto the acquired metro networks.  2007 will still be a busy year for the integration piece companies but we have accelerated certain integration activities into the, excuse me, into the fourth quarter of this year, in order to accelerate the synergy benefits expected in late 2007 and 2008.

59.    ~~93.~~On the October 24, 2006 conference call, Crowe added:

> I . . . asked relevant folks to give me a quick assessment of the estimated number of full-time equivalent employees.  ***We have [been] working on integration tasks and it's well over 200 people, so it's a big effort for us, one we take seriously and one we think we are developing pretty good skills in***.

60.    ~~94.~~***False Statement***:  On October 25, 2006, Jefferies & Company, Inc. issued an analyst report entitled "Level 3 Communications – Progress on Track; Outlook Remains Positive . . . Integration Efforts Accelerated Into 06, from 07."  The report reiterated management's statements during the October 24, 2006 conference call and stated:

> As we highlighted in our preview, LVLT's integration efforts are ahead of plan.  As a result, LVLT will accelerate the integration of its metro assets (network, operations, IT system) into 06, from 07.  We believe this acceleration of costs in 06 will position the company for stronger growth in H2:07 and beyond.

- 49 -

\*       \*       \*

**Integration Efforts Accelerated Into 06 from 07**.  With the completion of a majority of the physical integration of WilTel's network and operations (ahead of plan and under-budget), LVLT has accelerated its efforts to integrate its metro acquisitions (network, operations, IT system).  Much of these efforts had not been anticipated to start until 07.  While this could put some near term pressure on margins, we should begin to see the benefit of these efforts in H2:07.

61.     ~~95.~~*False Statement*:  On October 25, 2006, Merriman Curhan Ford issued an analyst report entitled "Level 3 Communications, Inc. (LVLT) – In-Line 3Q06 Results; Accelerated Integration Clouds Results, But Remains on Target; Maintain Buy."  The report also reiterated management's statements during the October 24, 2006 conference call and stated:

> We continue to believe the integration of the five acquisitions Level 3 has made since last December are going as planned or better than expected in terms of cost and timing, which was confirmed by management comments that margins should continue to improve in 4Q.  Our model now incorporates Broadwing, assuming a January 1, 2007 close, although the company does not expect to provide guidance on Broadwing until its 4Q06 conference call.

62.     On November 6, 2006, Level 3 filed a registration statement on Form S-4 with the SEC to register the shares of Level 3 stock that were to be used as currency to Broadwing shareholders in connection with the Broadwing acquisition and merger.  Defendants Scott, Crowe and Patel signed the Form S-4.

63.     ~~96.~~*False Statement*:  On November 9, 2006, Level 3 filed its Form 10-Q with the SEC, which contained the Company's results for 3Q06.  In the Form 10-Q defendants stated:

> The Company's Core Communications Services revenue increased 158% in the third quarter of 2006 compared to the third quarter of 2005.  The acquisitions of WilTel, Progress Telecom, ICG Communications, TelCove and Looking Glass and growth in the Company's existing products contributed to the increase.  For the three months ended September 30, 2006, Progress Telecom and ICG Communications reported revenue of $37 million and TelCove and Looking Glass reported revenue of $83 million.  ***During 2006, the Company integrated a significant portion of WilTel into the business***.

64.     ~~97.~~ ***False Statement***: On December 4, 2006, defendants hosted the Bank of America

Credit Conference.  During the event, Patel interacted with Ana Goshko, a Bank of America analyst:

Q – Ana Goshko: . . . I think . . . one of the key factors made investors pretty excited about the Level 3 story and this year this year to yet announce, six acquisitions in 10 or 12 months.  And I think one of the things that made investors most nervous this year is that you've announced six acquisitions in 10 or 12 months.  So, there is a lot of integration challenges and I think you know while some hold our breath understanding the complexities of back office operations and telecom putting together sales forces you know hoping this is not going to be an hick-up though.  On the WilTel side, I think you are pretty much through the woods, you said you completed that in about a year, under budget and under schedule.  And we'd like some insights on how it's going particularly on the Metro acquisitions?  Is the challenges there different then what you experience with WilTel and kind of when you think you will be through the woods and get the benefits of those acquisitions hopefully with that hick-ups?

A – Sunit Patel:  Okay, well you are right.  ***When you do these many acquisitions in such a short period of time makes me nervous also, so we spend a lot of time worrying a lot and monitoring things quite carefully.  You are right on WilTel, we have generally done, substantially done, by that I mean 85%, 90% done with those efforts***.  The metro acquisitions were much smaller and I think in the case of WilTel we had a lot more restructuring to do, a lot more overhead reduction to achieve because the level of duplication were so high and the metro acquisitions as I mentioned these are more strategic and extend our footprint.  So the amount of consolidation that had to be done at least on the network side is a lot more limited.  Having said that, we reorganized earlier – late in the summer with the vehicles more for customer-based focus, so we would gone through a lot of that already.  Having said that, we still have to get back-office integrations done like the link systems, financial systems we had largely done with but that's still ongoing.  A lot of the IT and the operating support systems, provisioning systems, order entry systems, all of that is in progress right now, I think will largely be done with the metro acquisition integrations, probably I would say middle of next year.  Then we should realize would be done with those two and then we are broadly coming in the first quarter.  So there is a challenge in the upgrade.  We spend a lot of time before we even buy the company from announcement of closing, planning for that.  We have a dedicated team, probably about 60 people that just spend their time on integrating these companies or this through a lot more people working on it, on any given point in time but there is a challenge and we recognize it's a challenge and therefore we spend a lot of time going about it and we are, we did accelerate some of our integration efforts on the metro transactions into this year and we talked about that in our last quarterly call and with that being coming at we guys informed that we did that and so we spend a lot of time on it.

65.     *False Statement:* During the December 4, 2006 Bank of America Credit Conference, Patel presented a PowerPoint slide that stated "*Level 3 is a logical consolidator with proven integration experience.*"

66.     *False Statement:* During the December 6, 2006 Credit Suisse 8th Annual Media and Telecom Conference, Robin Grey, Level 3's Senior Vice President and Treasurer, presented a PowerPoint slide that stated "*Level 3 is a logical consolidator with proven integration experience*."

67.     *False Statement:* During the December 7, 2006 34th Annual Global Media and Communications Conference, O'Hara presented a PowerPoint slide that stated "*Level 3 is a logical consolidator with proven integration experience.*"

68.     ~~98.~~As a result of defendants' false and misleading statements made between October ~~24~~17, 2006 and December ~~4~~7, 2006, Level 3's securities continued to trade at artificially inflated prices.  Between December 4 and 8, 2006, and while defendants repeatedly touted Level 3 as "a logical consolidator with proven integration experience," Level 3's stock increased 7%, from $5.45 to $5.82 per share.

69.     Defendants' own statements and these made to and repeated by securities analysts between October 17, 2006 and December ~~4~~7, 2006 that the integration of WilTel was ahead of schedule, substantially complete with 85% to 90% of these efforts done and under budget were materially false and misleading when made.  Defendants knew or recklessly disregarded, but failed to disclose the following:

(a)     As detailed in ¶¶135-136 herein, from mid-October 2006 through the end of 2006, it was physically impossible for Level 3 to have completed 85% to 90%, or even a majority, of the WilTel network integration:

(i)     Level 3 internal summaries prepared for senior executives, which tracked each metric of the status of the integrations, including, the completion of each step of the physical integration of the acquired companies' networks and the amount of capital budgeted to each project, demonstrate that by mid-December 2006, the WilTel network integration was behind schedule and over budget.  By December 2006, Level 3 had spent less than half of the capital, that is, $12.8 million out of the $30.2 million, devoted to completing critical transport interconnects and route integration; and

(ii)     In addition, by December 2006, Level 3 determined that $30.2 million was insufficient capital to complete transport interconnect and route integration work because the scope of those projects had been underestimated during the WilTel due diligence.  By December 2006, Level 3 was already projecting that transport interconnect and route integration work would continue for WilTel into 2008 and, therefore, additional capital would be required to complete the WilTel network integration.

(b)     ¶¶44-47, 66,As detailed in ¶¶110-113, by the start of the Class Period defendants had terminated virtually all the trained sales and technical personnel employed by WilTel and the metro acquisitions because defendants were desperate to achieve increased revenue and merger synergies while simultaneously reducing selling, general and administrative costs, and only untrained Level 3 sales and technical personnel were left to operate the acquired businesses' legacy network inventory control and provisioning systems.  By the start of the Class Period, defendants had fired the sales personnel employed by the acquired businesses who were familiar with products and customers as well as the technical experts who had knowledge of and were responsible for provisioning orders and activating services.  As a result of these massive terminations, provisioning

times dramatically expanded during the Class Period because Level 3 had no idea what products were available to sell on the acquired businesses' network or what inventory existed on the networks. ~~¶¶44-47, 50, 52-55, 57-61, 63-65~~¶¶110-113, 116, 118-121, 123-127, 129-131.

(c)     As detailed in ~~¶47~~¶113, early in ~~March~~ 2006, shortly after the WilTel integration, defendants knowingly terminated WilTel employees familiar with how the company's legacy inventory control and provisioning systems functioned. As a result of this lack of technical support and expertise, Level 3 failed to integrate ~~the most crucial~~ an important component of WilTel's operations – its inventory control and provisioning systems known as openCI – onto Level 3's system, Granite, prior to the end of 2008.  Similarly, defendants knew but failed to disclose, in March 2006, after the Progress acquisition, Progress subject matter experts were terminated and only untrained Level 3 employees were left to handle the integration of Progress' MetaSolve provisioning system.  *See* ~~¶45~~¶111.  These remaining Level 3 employees had difficulty understanding the functionality of MetaSolve and were unable to ascertain the inventory that actually existed on Progress' network. *See* ~~¶¶53-55~~¶¶119-121.  Level 3 created the same hurdles for itself in July and August 2006 when it terminated legacy TelCove and Looking Glass subject matter experts.  ***See*** ~~¶¶45, 52-55, 57~~*See* ¶¶111, 118-121, 123.  Compounding these problems was Level 3's failure to adequately train its remaining employees, including Customer Project Managers and provisioners, to work within the numerous order tracking and provisioning systems being used to fill customers' orders.  *See* ¶¶~~46~~¶¶112, ~~59-61~~126.

(d)     ~~(c)~~As detailed in ¶¶~~50, 57, 58, 61,~~¶¶116, 123, 124, 127, as early as March 2006 and continuing throughout the Class Period, Level 3 was simultaneously using multiple network inventory and provisioning systems acquired from WilTel and the metro businesses,

resulting in significant delays in provisioning and fulfilling customer orders.  For instance, beginning in March 2006, following the WilTel acquisition, provisioning times of certain transport products and services, including "optical waves" or "lit IRUs," doubled from 30 days to at least 2 months. *See* ¶50¶116.

      (e)    (d)As detailed in ¶¶46, 55, 62-64, 72, ¶¶112, 121, 128-130, 144, defendants knew but failed to disclose that, before and during the Class Period, customers were complaining to Level 3 about the delays in provisioning and fulfilling orders.  For example, even before the Class Period began, in June 2006, British Telecom halted all new IP data service orders because of installation delays, and Level 3 was forced to grant concessions to retain it as a customer.  *See* ¶62¶128.

      (f)    (e)As detailed in ¶¶44, 60, 66¶¶110, 112-113, 126, 132, because defendants terminated virtually all trained sales personnel and technical experts employed by the acquired businesses, Level 3 had no experienced personnel to accurately map the acquired businesses' networks and inventory control and provisioning systems and as a result Level 3 was therefore unable to determine what portions of the acquired businesses' network elements were redundant with Level 3's or unnecessary for provisioning services to customers.

    70.    Defendants had actual knowledge of or recklessly disregarded the fact that their statements between October and December 2006 informing investors the network integration of WilTel was 85% to 90% complete, ahead of schedule and under budget, and that the Company was a logical consolidator with proven integration experience, were false and misleading when made.  In addition to defendants' own assurances on December 4, 2006, that defendants were "monitoring [the integration of acquisitions] quite carefully," the recurring reports defendants used to track the status

of the network integration monitored the operational status of integrating the acquired companies' physical networks – including transport interconnects and route integration – as well as the capital expenditures and budget set for each network integration task.

71.    *False Statement:* During the Citigroup EMT Conference on January 11, 2007, O'Hara presented a Power Point slide that stated "*Level 3 is a logical consolidator with proven integration experience.*"   Between January 10, 2007 and January 12, 2007, Level 3's stock price increased 9%, from $6.03 to $6.60 per share.

72.    ~~100.~~*False Statement*: On February 8, 2007, defendants hosted a conference call with analysts and investors to announce and discuss Level 3's 4Q06 and FY06 earnings.  Defendants Crowe, Patel and O'Hara participated on the call and had the opportunity to address analysts' and investors' questions and concerns about the Company's 4Q06 and FY06 results and the status of the integration of the acquired businesses.  During the call, O'Hara stated:

> *The integration of all of the acquired companies is progressing well and we're beginning to see the benefits of synergies from those transactions*.

> \*      \*      \*

> On a combined basis, *we now have approximately 525 to 550 quota-bearing salespeople and we expect to further increase the size of our sales force as we go through the year*.

> . . . Our integration activity was very high in the fourth quarter.  *Most of the physical integration of WilTel is now complete*.  The remaining activities for WilTel are primarily tied to ongoing IT system development work. . . .

> A year after closing, we have seen the benefits of combining WilTel with Level 3.  The combined product portfolio has allowed us to grow much faster and is contributing to a significant improvement in adjusted OIBDA. . . .  For the four metro acquisitions, the emphasis during the third and fourth quarter was to get the appropriate organizational structure in place, and develop the detailed integration road maps.  Most of that work has been completed and we decided to accelerate some of the integration-related spending during the quarter. System development

work increased during the quarter because creating a single operating environment is critical to achieving both the expected synergies and growing our business with attractive operating leverage. . . . ***However, we have already begun cross selling all products and capabilities to all of our targeted customers and we have started to see the initial synergies from network and operating expenses***.

73.      ~~101.~~**False Statement**: Crowe told securities analysts during the February 8, 2007

conference call that:

    And Kevin – I would amplify what Kevin said, in the – the several dozen acquisitions that we have made over the last 20 years or so, what we have learned – and this is particularly true for business markets group for selling to enterprises – what is key is starting out with an unfair advantage at the gross margin level. You do that by properly – and Kevin, as I think every quarter earnings call said this – by selling these right services to the right customers in the right locations. Generally that means on-net services of the right type, and then picking customers that you can serve with your own facilities. What that's meant and what we have learned over the year is you lead by rationalizing your product portfolio. Whenever you integrate, the first thing you do is come up with a set of services and you dictate those services very carefully. So Kevin's comment about getting the product portfolio rationalized and common is how you start. That leads to business processes, systems, the right kind of people selling the right services. And we are already well in to that and feel we will be substantially done by the end of the first quarter. That is, our sales force will have a very clear set of services to sell by the end of the first quarter.

74.      ***False Statement:*** During Level 3's Analyst and Investor Conference on March 14, 2007, O'Hara presented a Power Point slide that stated "***Level 3 is a logical consolidator with proven integration experience.***"

75.      ***False Statement:*** During the Lehman Brothers 2007 High Yield Bond and Syndicated Loans Conference on March 26, 2007, Robin Grey, Level 3's Senior Vice President and Treasurer, presented a Power Point slide that stated "***Level 3 is a logical consolidator with proven integration experience.***"

76.     102.As a result of defendants' false and misleading statements on May 9made between January 11, 2007 and February 8March 26, 2007, Level 3's securities continued to trade at artificially inflated prices.

77.     103.Defendants' statements on February 8made between January 11, 2007 and March 26, 2007 that Level 3 had proven integration experience, that the integration of the acquired companies was progressing well, that most of the WilTel integration was complete were materially false and misleading when made.  Defendants knew or recklessly disregarded, but failed to disclose the following:

(a)     As detailed in ¶¶135-137 herein, from January to March 2007, a majority of the WilTel integration was not complete:

(i)     Level 3 internal summaries prepared for senior executives, which tracked each metric of the status of the integrations, including, the completion of each step of the physical integration of the acquired companies' networks and the amount of capital budgeted to each project, demonstrate that by mid-December 2006, the WilTel network integration was behind schedule and over budget.  By December 2006, Level 3 had spent less than half of the capital, that is, $12.8 million out of the $30.2 million, devoted to completing critical transport interconnects and route integration;

(ii)     In addition, by December 2006, Level 3 determined that $30.2 million was insufficient capital to complete transport interconnect and route integration work because the scope of those projects had been underestimated during the WilTel due diligence.  By December 2006, Level 3 was already projecting that transport interconnect and route integration work would

continue for WilTel into 2008 and, therefore, additional capital would be required to complete the WilTel network integration; and

(iii)     Furthermore, by mid-January 2007, the internal network integration review of capital expenditures for the WilTel integration recommended that $4 million and $7 million respectively be devoted to the physical integration steps of transport interconnects and route integration in 2007, an increase of over $4.3 million from just one month earlier in December 2006. Level 3 devoted additional capital to these projects to complete the transport interconnects in the Las Vegas, Stamford, Hartford and San Luis Obisbo markets and to integrate the Cleveland – New York, Jacksonville – Miami, Chicago – Minneapolis – Omaha, and Dayton routes.

(b)     ¶¶50, 57, 61, 68,As detailed in ¶¶116, 123-124, 127, 143, as of February 2007, Level 3 was continuing to use multiple network inventory and provisioning systems acquired from WilTel and the metro businesses, which defendants knew was resulting in significant delays in provisioning and fulfilling customer orders and order backlog.  At a February 2007 Level 3 sales conference in Dallas, the Company's Vice President of Sales, Jeff Bettaker, spoke to Level 3 employees about its customer order backlog, acknowledging this backlog was a major problem at Level 3.  *See* ¶65*See* ¶131.  Furthermore, as of January 2007 and continuing throughout the Class Period, certain Customer Project Managers witnessed average customer order installation times increasing from 30 days to at least 90 days.  *See* ¶58¶124.

(c)     (b)As detailed in ¶¶44-46, 50, 52-55, 57-61, 63-65, ¶¶110-113, 116, 118-121, 123-127, 129-131, Level 3's failure to accurately inventory the available network capacity of the acquired businesses because it had terminated subject matter experts was continuing to result in delayed provisioning and fulfillment of customer orders throughout 2007.  Furthermore, Level 3 did

507036_1

not know what products it had available on its network systems.  *Id.*  Level 3 senior circuit designers were unable to ascertain which Progress and Looking Glass network inventory existed or which elements of the inventory were in use.  *See* ¶¶53-55¶¶119-121.

(d)     As detailed in ¶57¶123, although TelCove was acquired in July 2006, as of January 2007 and throughout the Class Period, TelCove was still operating as a separate company from Level 3 despite defendants' assurances to investors that the integration of the metro acquisitions were on track.  As of early 2007, Level 3 continued to use TelCove's legacy provisioning system – Access Request – because the Company did not have the expertise to migrate the inventory data from Access Request to Level 3's provisioning system, Granite.  *Id.*

(e)     (d)As detailed in ¶¶46, 50, 56, 58-60, ¶¶110, 112-113, 126, 132, because defendants terminated virtually all trained sales personnel and technical experts employed by the acquired businesses prior to the start of the Class Period, Level 3 had no experienced personnel to accurately map the acquired businesses' networks and inventory control and provisioning systems.  As a result, Level 3 experienced adverse service quality problems causing it to lose existing customers and was forced to suspend sales of certain product causing it to lose sales opportunities with new customers.

78.     Defendants had actual knowledge of or recklessly disregarded the fact that their statements between January and March 2007 informing investors that most of the physical network integration of WilTel was complete and that the Company was a logical consolidator with proven integration experience, were false and misleading when made.  In addition to defendants' own assurances that they were carefully monitoring the network integration of the acquired companies, the recurring reports defendants used to track the status of the network integration monitored the

operational status of integrating the acquired companies' physical networks – including transport interconnects and route integration – as well as the capital expenditures and budget set for each network integration task.

79.     104.**False Statement**: On April 26, 2007, defendants hosted a conference call with analysts and investors to announce and discuss Level 3's 1Q07 earnings.  Defendants Crowe, Patel and O'Hara participated on the call and had the opportunity to address analysts' and investors' questions and concerns about the Company's 1Q07 results and the status of the integration of the acquired businesses.  During the call, O'Hara stated:

> Overall the first quarter was a very strong quarter for Level 3.  ***We made significant progress on the integration of all acquisitions*** . . . .
>
> \*          \*          \*
>
> As I mentioned earlier, a key objective during the integration process, is to make sure that we do not compromise our sales momentum.  ***We are equally focused on insuring that the excellent reputation that Level 3 has earned over the years for customer service does not get degraded***.  It is inevitable that as employees from seven companies learn new business processes and systems, that some inefficiency will be incurred during the transition.
>
> ***The overall integration effort is tracking within expectations in this regard, and the overall customer experience is still positive.***  But this is an area that we are monitoring closely.  The sales and product integration efforts are progressing well, and all changes should be completed by the end of the second quarter.
>
> \*          \*          \*
>
> I am confident in our plan and in our people, and will be monitoring our performance in this area closely.

80.     105.During the April 26, 2007 conference call, defendant Crowe reiterated that he and the other defendants fully understood the importance of the planning, procedure and progress of the integration of the acquired companies at all relevant times:

With respect to our progress in integrating the acquisition we have made, Kevin did a good job of explaining our current status in some detail.  I would like to emphasize three points.  ***We understand that this job is our operational challenge and our opportunity and it is job #1, and we are determined to*** ~~ensure~~ **insure** ***that Level 3 ends 2007 with one network platform, one set of business processes, and most importantly, with an organization with one set of common values***.

~~106.     As a result of defendants' false and misleading statements during the April 26, 2007 conference call, Level 3's securities continued to trade at artificially inflated prices.~~

~~107.     On April 27, 2007, Merriman Curhan Ford issued an analyst report covering Level 3. It stated:~~

~~Level 3 completed realigning its sales force, combining all acquired companies.  By doing so, the company should also be able to begin to accelerate sales growth, particularly its business market, which has experienced the most organizational change since merging TelCove and Broadwing.  Worth noting, the company currently has 450-500 quota bearing sales reps and that number is expected to rise throughout the year.~~

81.     ~~108.~~ ***False Statement***: On May 9, 2007, Bear Stearns issued an analyst report based on statements made ~~to and repeated by the securities analyst that stated:~~ by defendants Crowe, Patel and O'Hara during a May 8, 2007 meeting:

Highlights from Management Meetings

- **Meeting With Level 3 Management.** On Tuesday, we met with executives from Level 3, including CEO Jim Crowe, CFO Sunit Patel, and COO Kevin O'Hara.  ***During the meeting, the Individual Defendants informed Bear Stearns that Level 3's integrations were on track with no surprises***.  ~~The report also reflected the Individual Defendants' statement that~~ ***physical network*** Key topics addressed include integration ***[is] done*** progress . . . ~~except Broadwing which should be complete within next two months~~.

- **Integration On Track With No Surprises.** Though Level 3 is engaged in a challenging integration of seven properties, management indicated that integration efforts were proceeding as expected.  The company has 210 full-time equivalents dedicated to the process.  To date, the company has rationalized the product set and completed much of the physical network, though systems integration should be a lengthy process.

82.   ***False Statement:*** During the UBS Leveraged Finance Conference on May 10, 2007, Patel presented a PowerPoint slide that stated "***Level 3 is a logical consolidator with proven integration experience.***"

83.   On May 15, 2007, defendants hosted the Morgan Stanley Communications Conference.  During the event, Patel stated:

> Over the last year and a half we have been very busy on acquisitions._____,
> I think we picked up about 7 companies.  ***So this year is really focused on integration and getting the synergies from all those acquisitions.  So that is really our top priority.***
>
>                      *        *        *
>
> ~~On the other hand, the Broadwing sales force which was primarily in the top tier cities was generally selling off net services because~~ ***~~Broadwing didn't really have much of metro presence as such so challenge in our opportunity was to have you know the entire sales force generally sell more on net services across all these markets with obviously more products across the board.~~*** ~~So, when we consolidated all the sales force as one of the things we look at pretty closely is sales productivity both in terms of you know new sales and also margin performance~~ ***~~so when we did our sales conference in the end of March we spend a lot of time just training all the sales force you know all the seats of product and services we offer~~*** ~~you know you focus on making more often on that sales because we have to assess things like, how far the building might be from your network, I mean what's the time and effort it takes to build so just educating them a little more on all of that so I think that as we access the sales force in the case of broad ling half the revenue was enterprise the other half was carriers.~~

84.   ~~110.~~As a result of defendants' false and misleading statements ~~on May 9~~made between April 26, 2007 and May ~~15~~10, 2007, Level 3's securities continued to trade at artificially inflated prices.

85.   ~~111.~~Defendants' statements made between April 26, 2007 and May ~~15~~10, 2007 that Level 3 made significant progress on the integration of all acquisitions, that the overall customer experience is positive and the Company has proven integration experience were materially false and

misleading when made.  Defendants knew or recklessly disregarded, but failed to disclose the following:

(a)     As detailed in ¶¶135-138 herein, by May 2007, Level 3 did not make significant progess integrating the acquired companies or possess proven integration experience as by that time the Company has still not completed a majority of the WilTel integration.  Level 3 internal summaries prepared for senior executives regarding an operations review of network integration demonstrate that by early April 2007, Level 3 had still not completed the transport interconnects in 17 WilTel markets.  The internal summaries also demonstrate that by early April 2007, less than one-fifth of the WilTel route and been integrated into Level 3's network.

(b)     ¶¶47-49, 55, 57, 6As detailed in ¶¶113-115, 121, 123, 134, defendants knew but failed to disclose the integration of the acquired companies was making little if any progress as of May 2007, as data migration from the legacy systems onto Level 3's Unity platformnetwork had yet to occur and did not even begin until 2008.  As of May 2007, the integration of legacy WilTel inventory control and provisioning systems was not complete.  *See* ¶47¶113.  The metro inventory data from Progress', Looking Glass' and ICG's legacy systems had not been migrated into Level 3's network inventory control and provisioning system Granite.  *See* ¶55¶121.  TelCove was still operating as a separate company.  *See* ¶57¶123.

(c)     (b)As detailed in ¶¶46, 55, 62-64, 72, ¶¶112, 121, 128-130, 144, defendants knew but failed to disclose Level 3 customer complaints were escalating due to the Company's continuing failure to provision and fulfill customer orders on a timely basis.  From January 2007 through the end of the Class Period, the quantity of orders placed with Level 3 sales personnel far exceeded the available network capacity, which resulted in a significant percentage of orders being

delayed.  *See* ¶74¶146.  In particular, throughout 2007, defendants knew at least three of its major customers, Verizon Wireless, NuVox and XO Communications, were complaining about the delay in the fulfillment of their orders.  *See* ¶72¶144.  These complaints were escalated to Level 3's senior management, including the Individual Defendants.  *Id.*  Even worse, customers such as AT&T were suffering service outages because Level 3 was decommissioning live networks due to its failure to have a common order tracking and customer management system in place.  *See* ¶63¶129.

(d)      (c)As detailed in ¶¶45-47, 50, 55, 57-58, 60-62, 64-65, ¶¶111-113, 116, 121, 123-124, 126-127, 130-131, as a direct result of Level 3's failure to integrate the acquired businesses' physical networks and network inventory control and provisioning systems, the Company's provisioning of products and services suffered material delays, in some instances taking up to 50% to 75% longer.  For example, because WilTel's inventory control and provisioning systems were not integrated into Level 3's systems until the end of 2008, the amount of time it took Level 3 to provision services to many of its wholesale transport customers during the Class Period increased by 50%.  *See* ¶47¶113.  Following Level 3's acquisition of Broadwing in January 2007, defendant O'Hara met with legacy Broadwing employees in a former Broadwing office in Chicago and informed them that the Company's executive management was aware of increased order processing intervals due to the utilization of different provisioning systems, resulting in increased customer dissatisfaction.  *See* ¶73¶145.  Additionally, during the same time period, customers attempting to have their complaints regarding order fulfillment delays addressed at the WilTel call center faced nearly a 700% increase in waiting times, from 3 to 20 minutes, because customer service representatives had been terminated.  *See* ¶51¶117.

507036_1

(e)   (d)As detailed in ¶¶50, 57-58, 61, ¶¶116, 123-124, 127, as of May 2007 and throughout the Class Period, Level 3 was continuing to simultaneously use multiple network inventory and provisioning systems inherited from the acquired businesses, resulting in significant delays in provisioning and fulfilling customer orders.  For example, shortly after the Broadwing acquisition in January 2007, it took at least twice as long to get customers' orders ready for delivery because the provisioning process for services had to go through multiple cross network systems, which were referred to as "hybrid" orders.  *See* ¶61¶127.  Before Level 3 acquired Broadwing, it took Broadwing approximately 12 days to fill a customer's order – following the acquisition, it took at least 24 days to provision the order.  *Id.*

(f)   (e)As detailed in ¶¶44-47, 50, 52-55, 57-61, 63-66¶¶110-113, 126-127, 132, Level 3 also was still experiencing the impact of its premature termination of subject matter employees and its failure to adequately train its remaining employees to work within the numerous order tracking and provisioning systems being used to fill customers' orders.

86.   Defendants had actual knowledge of or recklessly disregarded the fact that their statements between April and May 2007 informing investors Level 3 made significant progress on the integration of all acquisitions, that the physical network integration (excluding Broadwing) was complete and that the Company was a logical consolidator with proven integration experience, were false and misleading when made.  In addition to defendants' own assurances during Level 3's April 26, 2007 earnings conference calls and the Morgan Stanley Communications Conference on May 15, 2007, that the Individual Defendants "understand that [integrating acquisitions] is our operational challenge and our opportunity and it is job #1," and were "really focused on integration . . . that is really our top priority," the recurring reports defendants used to track the status of the

network integration monitored the operational status of integrating the acquired companies' physical networks – including transport interconnects and route integration – as well as the capital expenditures and budget set for each network integration task.

87.      ~~112.~~ *False Statement*: On July 26, 2007, defendants hosted a conference call with analysts and investors to announce and discuss Level 3's 2Q07 earnings.  Defendants Crowe, Patel and O'Hara participated on the call and had the opportunity to address analysts' and investors' questions and concerns about the Company's 2Q07 results and the status of the integration of the acquired businesses.  During the call, O'Hara stated:

> *We made significant progress on the integration of all acquisitions*.

*      *      *

> *Moving to integration, this quarter we made good progress on the overall integration front*.  The total head count for the business continued to decrease faster than anticipated and we're on track to complete the great majority of all reductions by the end of the third quarter.  A key objective during the integration process is to make sure that we do not compromise our sales momentum.  We've also been focused on ensuring that the excellent reputation that Level 3 has earned over the years for customer service does not get degraded.  As I've mentioned previously, it's inevitable that as employees from seven companies learn new business processes and systems, that some inefficiency will be incurred during the transition.  During the quarter, we experience some of this inefficiency and as a result, performance in certain operational areas did not meet expectations.  From the outset, we believe that consolidating the processes and systems that support the entire Level 3 business was both a key to successful integration, as well as to driving our SG&A costs down over time.  Also, as I've mentioned in the past, Level 3 was committed to redesigning our operating support systems and processes independent of any acquisition.  As we develop these new processes and systems, we're often working in a hybrid systems environment that has elements of both the legacy Level 3 systems, as well as various systems from the seven acquisitions.  During the interim period of time, where we have consolidated certain organizations and functions, but where we have not fully developed or implemented the end-state processes and systems, our employees are being trained on and need to operate with elements of many of the legacy systems.

> Operating in this interim environment has added operational complexity to certain functions.  *As a result of this complexity, the average period of time it takes*

*to convert certain new service orders into revenue has been extended by up to 50 to 75%.* This challenge has been compounded by the historically high level of sales that we've seen. *The effect of the challenge was a dampening in growth of core revenue during the quarter, particularly in wholesale markets.* This hybrid environment will continue in varying degrees until the development of the end-state systems are completed. We're implementing new systems releases in regular intervals during 2007 and the work will continue through 2008. *While this is the most complex part of the integration, we remain confident in our end-state architecture and will make meaningful progress towards our end-state environment during the balance of 2007.*

\*      \*      \*

In summary, we're pleased with the overall results this quarter. Despite core services growing slightly slower than anticipated, we achieved significant cost savings and an expansion of our EBITDA margin and believe that we're realizing the benefits of the acquisitions. *Our closed sales are strong and the funnel of opportunities is still robust.* While the integrations are progressing well overall, the operational complexities that we're working our way through could cause short-term volatility, but we do not believe they affect [a]ffect our longer-term prospects. Perhaps most importantly, the challenges we're wrestling with are within our control and the customer demand and the pricing environment remain favorable.

88.      113.During the July 26, 2007 conference call, Crowe again stressed that the integration was under the Individual Defendants' direct control.

We are into this a couple of quarters and we are expecting a couple of more quarters of heavy effort. *We are confident, to go right to the point, because all of the issues that we're dealing with are under our control.* All of us. Sunit, Kevin, myself, have been involved with dozens of integrations over the last 20 years and it's certainly been my observation that the problems that are lingering are long-term, occur when you change the problem definition.

89.      114.Despite defendant O'Hara's admission that conversion times increased by 50%-75% and Level 3's stock slid from a closing price of $5.72 per share on July 25, 2007 to $5.03 on July 26, 2007, Level 3 stock still traded at artificially inflated levels.

90.      115.*False Statement*: On September 11, 2007, defendants hosted the Jefferies Communications Conference. During the event, Patel stated:

When we reported on our second quarter results, we did say we had some speed bumps. Our sales are very strong, but we were having difficulties turning those sales into billable revenue. *And I think where we stand today is that we've stabilized the situation. Our backlogs are no longer increasing, which means that our installed levels for turning company services are keeping up with the level of sales activity*.

In fact, Patel's September 11, 2007 statements reassured the Company's investors that acquisition "speed bumps" were in the past.

91. ~~116.~~**False Statement**: On September 18, 2007, Dow Jones Factiva reported that O'Hara had confirmed to investors that Level 3's sales order backlog was improving and that provisioning times were improving as well: "'***The backlog has not gotten worse . . . . It's stabilized****. . . .* We believe we are on track to chip away at that and have it completed . . . by year end.'"

92. ~~117.Defendants' statements made between July 26, 2007 and September 18, 2007 were materially false and misleading when made.~~ As a result of defendants' false and misleading statements ~~on September 11~~<u>between July 26</u>, 2007 and September 18, 2007, Level 3's securities continued to trade at artificially inflated prices.

93. ~~117.~~<u>Defendants' statements made between July 26, 2007 and September 18, 2007 that Level 3 made good progress on the integration front and that the Company's backlog had stabilized, were materially false and misleading when made.</u> Defendants knew or recklessly disregarded, but failed to disclose the following:

(a) <u>By mid-September 2007, Level 3 had not made significant progress on the integration of all acquisitions. In fact, as of mid-October 2007, Level 3 had only completed the route integration for 7% or 3,818 of 54,980 route miles. WilTel alone had over 20,000 unique route miles that needed to be integrated. Therefore, by the end of the Class Period, Level 3 still had not</u>

completed the WilTel integration even though defendants stated that integration was complete by the fall of 2006.

(b)   ~~(a)~~As detailed in ¶¶~~47-49, 55, 57, 68,~~ ¶¶113-115, 121, 123, 134, although defendants made the partial disclosure that Level 3 customers were experiencing order fulfillment delays, defendants knew but failed to disclose the integration of the acquired companies was making little if any progress as of July 2007.  In June 2007, Level 3 had decided to scrap the entire Unity platform and rebuild it from scratch.  *See* ¶~~49~~¶115.  Moreover, although defendants planned to have the "heavy lifting" portion of the Progress and Looking Glass integration complete by the July through September 2007 time frame, defendants knew but did not disclose Level 3 failed to meet this deadline.  *See* ¶¶~~53-55~~¶¶118-121.  Significant progress on the integration of acquisitions did not occur until 2008.

(c)   ~~(b)~~As detailed in ¶¶~~46, 55, 62-64, 72,~~ ¶¶121-131, 144, defendants knew but failed to disclose that before and during the Class Period, customers were complaining to Level 3 about delays due to the Company's failure to provision and fulfill customer orders on a timely basis. In July 2007, Level 3 had transferred flawed network inventory data from the Progress and Looking Glass legacy systems onto Granite, resulting in increased data inaccuracies and thus additional delays in fulfilling major customer orders.  *See* ¶¶~~53-55~~¶¶118-121.  As of September 2007, the quantity of orders placed with Level 3 sales personnel still exceeded the available network capacity, resulting in a significant percentage of orders being delayed. *See* ¶~~74~~¶146.  For example, in August 2007 the Collier School District in Florida placed a $20,000 order which was to be installed by early December 2007.  Because Level 3 engineers could not ascertain which networks had to be accessed to provision the order, fulfillment of the order was delayed until beyond the deadline.  *See* ¶~~64~~¶130.

(d)    As detailed in ¶56¶122, defendants' July and September 2007 statements that customer order backlog had stabilized were misleading because defendants knew but failed to disclose the true reason for the stabilization of customer order backlog – Level 3 sales were being intentionally constrained to align with the Company's actual ability to provision orders.

94.    Defendants had actual knowledge of or recklessly disregarded the fact that their statements between July and September 2007 informing investors Level 3 made significant progress integrating the acquired companies' networks, were false and misleading when made.  In addition to defendants' own assurances during Level 3's July 26, 2007, earnings conference call that "most importantly . . . the issues that we're dealing with are under our control," the recurring reports defendants used to track the status of the network integration monitored the operational status of integrating the acquired companies' physical networks – including transport interconnects and route integration – as well as the capital expenditures and budget set for each network integration task.

95.    118.On October 15, 2007, Level 3 issued a press release announcing that it was beginning a search for a new CFO to replace defendant Patel.  In the press release, Crowe stated "we believe we need a CFO with skills and experience which emphasize both operational and financial management."  This announcement caused a decline in Level 3's stock price, from a closing price of $4.90 on October 12, 2007 to a closing price of $4.36 on October 15, 2007.  Level 3's stock price continued to decline over the next two trading days, to a close of $4.20 on October 17, 2007, as the market absorbed the news regarding the search for a new CFO more in tune with the operational aspects of integrating the acquired businesses.

**DEFENDANTS DISCLOSE THAT THE COMPANY IS LOWERING GUIDANCE ~~FOR 4Q07~~ FOR 4Q07 AND FY08 DUE TO ITS INABILITY TO PROVISION ORDERS**

96.     ~~119.~~On October 23, 2007, defendants hosted a conference call for analysts and investors and announced they were sharply reducing adjusted earnings before income taxes depreciation and amortization ("EBITDA") guidance for FY07 from a range of $860 to $920 million to a range of $813 to $833 million and for FY08 from a range of $1.15 to $1.3 billion to $950 million to $1.1 billion.  During the call, Crowe conceded that the drop in revenue growth was directly due to Level 3's failure to provision orders during the Class Period.  During the call Crowe stated:

> During the second quarter earnings call, in addition to providing guidance for the third quarter of 2007, we reiterated guidance ranges for the full year 2007 and for adjusted EBITDA for 2008.  That time we said we were having provisioning problems, but we had strong sales and we believed we would see significant improvement in our provisioning capabilities and that we would convert already-signed orders to revenues sufficient to meet the guidance. While we did achieve third quarter '07 guidance, the improvements we saw were simply not enough. And today, we reduced guidance for adjusted EBITDA for the fourth quarter of '07 and for 2008.

> I'm very disappointed by our performance and I want to personally assure investors that we understand the seriousness of the situation.  I further want to assure our investors that we are focused on correcting the situation as quickly as we possibly can.  Toward that end, we've devoted significant time to an effort to define our problem, determine the root causes of the problem, determine why the past steps we've taken did not lead to more improvement in provisioning and why it took us longer than it should have to fully recognize the problem and its impacts.  Ensure that we have a specific measurable plan to ensure we fix the problem with a high degree of confidence and we've adjusted our guidance to be in line with our current expectations.

> . . . Simply put, our company did not increase provisioning throughput in the time frame we had planned and expected at the end of ~~——~~ second quarter of 2007~~. And~~ [and] as necessary to meet the rate of sales we had through that quarter. As a result, we've reduced revenue projections to match our current constrained provisioning capacity. In more specific terms, that means until we correct our provisioning bottlenecks, our near term core revenue growth will be

- 72 -

reduced to approximately 8 to 13% versus a previously projected near-term growth rate of 17%.  We believe we would have met or exceeded even the previously forecasted 17% growth rate if our revenue growth had kept pace with actual sales and we were not constrained by our current provisioning capabilities.  ***To be clear, we believe we are not constrained by market opportunity.  So, that means viewed as a whole, we are not taking full advantage of the market opportunity that we see***.

97.    ~~120.~~During the October 23, 2007 conference call, Crowe ~~also admitted that Project Unity was critical to increasing Level 3's provisioning capacity and~~ gave details about the Company's failed integration efforts and the resulting provisioning constraints.  During the call Crowe stated:

I'll now turn to what we view are the root causes of this problem.  Let me start with some definitional explanation.  When we talk about provisioning, we mean an end to end process starting with a signed sales order and ending with field installation, testing and activation of service necessary to begin billing.  There are several steps in between such as designing specific circuits and determining and assigning the individual network elements to be used.  When several services in several different locations are ordered by a customer, the provisioning process can require considerable effort and expertise to accomplish effectively and at scale.  Level 3 in each of the six network companies we acquired in 2006 and 2007 had the same general process but the specifics differed among the companies.

For quite some time, we've had a plan to move all sales and service to one unified set of processes and systems called Unity.  The Unity program developed and started in 2006 and is well along.  We expect to realize the benefits of this new system over the course of the next three to four quarters.  A significant amount of our integration spending this year is on the Unity effort, and we expect better provisioning throughput and significantly lower unit costs as we move forward.  In the interim, we plan to increase the throughput of the seven legacy sales and service activation systems, in part by developing temporary process in systems that made using those individual systems simpler, and in part by assigning more people and other resources than would be needed by a more efficient system.

Successfully increasing our provisioning throughput was key to achieving our fourth quarter '07 and 2008 financial targets.  As we reported through the second quarter, ongoing sales and existing orders in hand were sufficient to meet targets.  This was important since, at the time, we believed that if we were to have problems meeting our financial goals, sales, not operations, would be the likely cause.  And given the complexity of working with multiple systems, we expected some problems to arise but we believed we could quickly resolve those issues.  There was nothing

fundamentally wrong with this approach.  However, we made several decisions which, while reasonable at the time, when viewed in retrospect today made achieving our provisioning targets more difficult.

98.     ~~121.~~During the October 23, 2007 conference call, defendants admitted that the provisioning constraints were caused in part by laying off "subject matter experts" (*i.e.*, people familiar with the acquired businesses' processes) whose expertise was necessary to meet the Company's provisioning targets ~~and that defendants failed to monitor operational metrics as they should have~~.  During the call defendant Crowe stated:

> *As part of realizing synergies, we then laid off people familiar with each of these individual order entry systems, inventory, provisioning and other systems, before we had assured we could meet our provisioning* ~~*targets*~~.  ~~And while we paid close attention to sales and integration cost targets,~~ *we did not monitor detailed operational metrics as closely as we should have.*  ~~targets. . . .~~The result is that while growth in the rate of installs has been slightly positive, it has been significantly below our expectations.  This has required us to revise our projections of sales and resulting revenue to what we ~~. . .~~we [sic] are able to provision rather than to what our customers might wish to purchase.

99.     ~~122.~~During the October 23, 2007 conference call, defendant Crowe also admitted responsibility for the Company's inability to provision orders, stating:

> *In summary, both the root cause of the problem and the reason we* ~~. . .~~we [sic] *remained optimistic for too long is because at the executive level, we took our eye off the detailed essential work of end to end provisioning that is critical to provisioning success*.

100.     ~~123.~~During the October 23, 2007 conference call, defendant O'Hara responded to analysts' questions regarding customer reaction to the extended installation times and conceded that provisioning constraints were impacting both new and existing orders, stating:

> We've got two issues that we're working our way through, John, which are quite separate.  One is establishing revised expectations with customers for new business to make sure that we're not – the customers are coming in without an unrealistic expectation about what we can deliver.  The second is for orders that had been accepted previously.  Previously being 60 days or longer behind.  We're circling

back on a customer by customer, order by order basis and working those orders through the process separately.  Again, we haven't seen it manifest itself in any material pickup in cancellations.  That's not to say that as we go forward, as we reset expectations of some of the older orders, that we may not see that.  We believe that's all factored into the guidance that Jim and Sunit have addressed.

101.     ~~124.~~During the October 23, 2007 conference call, O'Hara also responded to analysts' questions about the appointment of Raouf Abdel to align Level 3's service marketing and new sales to match the services Level 3 could actually provision, and conceded that the ~~current system~~ Company was unable to provision services that customers were demanding, particularly where orders had to be fulfilled across multiple legacy networks.  During the call O'Hara stated:

> In terms of the alignment that Jim mentioned with regard to Raouf, it is not necessarily where we're seeing the greatest traction, but where the current constraint provisioning capabilities and the needs in the marketplace best aligned.  Specifically, there are some services that might be attractive in a marketplace, in fact, some that are attractive in the marketplace that are ***particularly hard to provision in this environment, particularly services that cross multiple legacy networks and to rely on multiple databases where the rationalization of those has not been completed yet***.  What we're making sure is that what our sales folks sell and the appropriate entrance criteria to make those orders fully actionable is what is making it to the factory.  And in some cases, the information that's required to provision similar services across different systems, the information required to complete that work is quite different.
>
> So, we're going back and we're really making sure that the product criteria, the entrance criteria from sales into the factory and the ability of the factory broadly to execute against all of those orders are more tightly aligned.  The sales folks have been having a good year.  They've been doing good stuff.  But in some cases, the information that's been getting into the systems was not sufficient to make the orders actionable, not because our sales people did anything wrong, but it was relying on an underlying system, that perhaps what they had previously been working on, it caused rework and contributed to the issue.  So, it's that broader stepping back beyond just the operational factory, if you will, that Raouf is really attempting to take on.  Sunit?

102.     ~~125.~~During the October 23, 2007 conference call, O'Hara admitted that service delivery and service management were the root of Level 3's provisioning difficulties, stating:

[ANALYST: – ] Just following on a little bit more.  In terms of the provisioning issues affecting different parts of the businesses.  Are there some parts that have been relatively unaffected at all?  And then secondly, clearly provisioning systems has been a big issue on the merger integration front.  If we set that aside, where are we in terms of merger integration for everything else in terms of people, networks, et cetera?

[O'HARA: – ] Yes, the last part is easy.  The integration is going well in all of the other areas.  ***The really complicated stuff, though, is the service delivery and service management, those two are related because of their reliance in underlying systems***.  So, the physical network integration, the real estate integration, all of the people side of things are all progressing well.

[ANALYST: – ] Do you have a time line for that?  Are we 50% of the way through?  Or is there a point where you expect we'll be done with that?

[O'HARA: – ] There's a long tail in some of those items.  I think we said all along that the financial benefit of that, the great majority of it is realized this year and we continue to track towards that.  In terms of segments of the business, it is not segments that create complications.  It is much more about the services themselves.  Transport products that cut across multiple of the legacy networks are the number one source of complication, they're also the number one opportunity for us as we present an end to end offering out into the market place.  Simply put, if you were to provision a service that was originally originated on one particular company's network, that then was carried over, say the Level 3 inner city network and terminated on a third company's network, that is where the complication comes in that you have to rely on very different databases, three different provisioning systems, three different, in many cases, three different a lot of things in order to provide that end to end.  And it's that complication that we are trying to sort out, particularly acute at the transport – in the transport product set.

103.      ~~126.~~The October 23, 2007 disclosures caused a dramatic decline in Level 3's stock price, from a closing price of $4.32 per share on October 22, 2007 to $3.28 per share on October 23, 2007, for a total one-day decline of 24%.  As the market absorbed defendants' October 23, 2007 announcements, the stock further declined on the next day's trading to close at $3.18 per share on October 24, 2007.  Thus, during these two days of trading, the Company lost approximately $1.76 billion in market capitalization.

104.   ~~127.~~Securities analysts reacted harshly to defendants' October 23, 2007 revelations and questioned management's credibility because of assurances management gave investors and securities analysts in prior conference calls regarding the integration of the acquired businesses.  For example, on October 23, 2007, Deutsche Bank reported:

> With the report of the 3Q07, investors' worst fears appear to have been met with a significant reduction to 4Q07 and full year 2008 guidance. As many had speculated in the last few weeks, it seems that integration problems with the multiple acquisitions Level 3 has made have continued well beyond management's expectations. ***Although the company has now suggested that its revised guidance range should represent the low end of expectations for 4Q07 and all of 2008 because it is predicated upon the company's current ability to provision customer requests, we note that less than 90 days ago it was confident that the range of guidance for 2007 could be met as well. Accordingly, we are not overly surprised to witness the near free fall action in the company's share price when results and lowered expectations were revealed***, and we would not expect a significant change in investor sentiment until it becomes clear that the company has obtained control of the issues with the acquired properties. . . .   Level 3 integration problems are likely significantly greater than Time Warner Telecom: . . . Unfortunately, the sheer number of companies Level 3 has acquired combined with the fact that they all likely had very different provisioning processes will likely result in Level 3 taking significantly longer than Time Warner Telecom to turn things around.

105.   ~~128.~~On October 23, 2007, JP Morgan issued a similar report stating:

> [The company] cut '07 and '08 guidance, blaming provisioning issues and poor growth in usage services. The company now expected full-year '07 organic revenue growth of 9-12% (prior 17%) and EBITDA of $813-$833MM (below the low end of prior guidance).  In addition, '08 EBITDA guidance was lowered to $950MM-$1.1BN, also below the low end of prior guidance.

> . . . The company stated that things might not start to improve until the second half of '08, which is substantially longer than management indicated after a poor 2Q performance.

> . . . ***How could management state that they are comfortable with guidance and progress on integration issues in September and then cut guidance so substantially in October.***

106.   ~~129.~~On October 23 and 24, 2007, several other securities analysts commented on the nature of Level 3's provisioning problems and confirmed that the Company's lowered guidance was a direct result of the Company's failure to unify the acquired businesses as they stated they had during the Class Period:

- On October 23, 2007, Jefferies & Company, Inc. stated: Level 3 management "***again highlighted provisioning issues as the primary stumbling block in its ability to deliver on its prior 07 and 08 guidance. We are disappointed, given [management's] prior comments signaling improvements on this front.***"

- On October 23, 2007, The Buckingham Research Group stated: "It is hard to put a silver lining on LVLT's 3Q press release from this morning. The company's EBITDA came in at the low end of guidance, and would have missed if not for some one-time benefits. The company also lowered guidance for the full year, and admitted that its original projections were now looking overly optimistic given lingering integration challenges associated with its various acquisitions from the last two years."

- On October 23, 2007, Credit Suisse stated: "Part of the problem was that management took certain processes that were centralized and split them up among the company's customer facing groups, which made identifying and fixing throughput issues more difficult. As a result, the company's provisioning capacity is below what is needed to efficiently convert its backlog of orders to sales. To address the issues, the company has reorganized all end-to-end provisioning authority and responsibility under Neil Hobbs, president of Global Network services and appointed Raouf Abdel, president of Business Markets Group, to work with Mr. Hobbs to align sales activity with provision capabilities. The company is also continuing with the development and implementation of Project Unity."

- ~~On October 23, 2007, The Buckingham Research Group stated: "It is hard to put a silver lining on LVLT's 3Q press release from this morning. The company's EBITDA came in at the low end of guidance, and would have missed if not for some one-time benefits. The company also lowered guidance for the full year, and admitted that its original projections were now looking overly optimistic given lingering integration challenges associated with its various acquisitions from the last two years."~~

- ~~On October 23, 2007, Jefferies & Company, Inc. stated: Level 3 management "*again highlighted provisioning issues as the primary stumbling block in its ability to deliver on its prior 07 and 08 guidance. We are disappointed, given [management's] prior comments signaling improvements on this front.*"~~

- On October 24, 2007, Deutsche Bank stated: *"**Several employees were let go to achieve integration synergies before replacements knew how to cover their positions**. As a result, LVLT could not fill orders that were in its pipeline. While this became evident in 2Q07, management appeared confident in overcoming such obstacles in the third quarter, which only proved to have more breadth than originally expected. Consequently, guidance for FY07 and FY08 has been revised downward."*

## TRUE FACTS

### The Network Integration Process

107.   With respect to each acquisition at issue in this action, Level 3 had a multi-step procedure in place to facilitate the combination of the acquired businesses' physical network with that of Level 3's then existing assets.  This phased procedure was referred to internally at Level 3 as "Network Integration" (or "NI").  With respect to each acquisition, before and during the Class Period, members of the NI Steering Committee closely monitored the status of NI through each stage of the process.  According to the Company's former Director of Network Integration, the Company's Network Integration followed these steps before and during the Class Period:

- **Physical Network Analysis:**  during this phase of the process Level 3 determined where network "circuits" were physically located, the design of circuits, what equipment had been utilized to "light" circuits, and which circuits were leased or owned and, if leased, identified the lessor.[4]  During the due diligence period for each of the acquired businesses, Level 3 performed some of Physical Network Analysis by reviewing inventory listings of network elements.

  Level 3 did not, however, conduct in-depth physical confirmation of the existence of each network element during due diligence phase of each acquisition.  After each

---

[4]      "Circuit" is an industry reference to a piece of fiber-optic cable that originates at a physical location (*e.g.*, Denver, Colorado) and terminates at another location (*e.g.*, New York, New York), which may include the electronic equipment attached to each end of the fiber for purposes of transporting data.  A "lit" circuit (or a "lit" fiber) is a fiber-optic cable with electronic equipment attached to it and capable of transporting information.  A "dark" circuit (or "dark" fiber) is a fiber-optic cable with no electronic equipment attached to it.

business was actually acquired, Level 3 would perform this detailed in-depth network analysis, which included physically confirming the existence of each network element.

- **Identification of Network Efficiencies:**  During this phase of the NI process, Level 3 merely identified where redundant network elements existed and might be later targeted for elimination.  The actual physical work of eliminating redundant capacity, however, is done ***after*** transport network interconnects and circuits are completed (*see* below).

- **Network Design:**  After identifying sources of potential network redundancies and efficiencies, the NI then would proceed with designing the combined network.  The objective of this step is to design the most optimal and efficient combined network.

  According to the former Director of Network Integration, Identification of Network Inefficiencies and Network Design were completed in fairly short order as they were not capital or labor intensive.  The next step in the NI process – ***Building Interconnects and Capacity*** – however, was a completely different story.

- **Building Interconnects and Capacity:**  After Level 3 designed the combined network, the Company began the process of actually doing the transport layer network interconnects and building capacity.  According to Level 3's Director of Network Integration, the building of interconnects and capacity was the single most time intensive and challenging NI phase.  Further, because of the labor-intensive procedures and equipment costs associated with building interconnects and capacity, the phase of NI was a large part of the capital expenditures Level 3 made to complete its NI projects.

  "Interconnection" at the transport layer of the network is the process of physically joining elements of the network, such as long-haul network circuits to long-haul network circuits (*e.g.*, when combining WilTel's and Level 3's networks) and long-haul network circuits to metropolitan ring networks (*e.g.*, connecting Broadcom's circuits to those of Looking Glass).  Building capacity, for example, includes connecting dark fiber to laser equipment to create operating circuits.

  According to the Company's Director of Network Integration, the completion of this phase of NI is dependent upon the completion of Physical Network Analysis (*i.e.*, the first phase referenced above).  Without complete and accurate network element inventory data, it is impossible to determine if actual, tangible network elements exist that may be utilized to build the actual physical interconnects and circuits.  Level 3's Director of Network Integration added that Level 3's failure to complete Physical Network Analysis of WilTel's assets during due diligence stage led to delays in completing transport layer interconnects of WilTel well into 2007.

- 80 -

**Route Integration** – Once the difficult and time intensive Interconnect and Capacity builds are complete, network redundancies identified earlier at the nascent stages of the NI are then physically decommissioned and customers can be moved onto new, more cost-efficient network infrastructure in a process known in the industry as customer "grooming."

**Interaction Between NI and IT Integration During the Class Period**

108.    A key and recurring integration problem that existed at Level 3 throughout the Class Period included discovering that equipment and capacity that was believed to exist in the various network element databases, but did not actually exist.  NI personnel were responsible for ensuring that network interconnects and capacity were operationally ready so that Level 3's provisioning personnel could assign these assets to customer orders.  As alleged above, unless Level 3 NI personnel had physically confirmed that network elements actually existed, Level 3 risked the fact that may sell capacity and services to customers that could not be provisioned.  In November 2006, for example, NI personnel discovered that WilTel's network inventory data was highly flawed and inaccurate, which led to material delays in building of network interconnects and capacity, which, in turn caused material delays in provisioning of those products and services to Level 3's customers.

109.    The inaccuracy of network element inventory data equally affected the NI and IT integration teams.  Specifically, NI could not complete its interconnects and circuit builds without knowing what assets actually existed.  IT integration teams, in turn, were unable to provide accurate network element data to the operational employees responsible for provisioning services to Level 3 customers.  As repeatedly stated by former Level 3 employees with first-hand knowledge of the facts, rather than Level 3 being the "logical consolidator with proven integration experience," the integrations of the acquired businesses were an unmitigated disaster.  According to the numerous confidential sources:  (1) the NI team could not complete Steps 1 and 4 of the NI process because

each acquired business' network inventory data was highly inaccurate; (2) the IT integration teams were months and, in some cases, years late in transferring network inventory to Level 3's legacy or interim operating systems; and, as a result (3) operations employees complained on a daily basis to the NI and IT integration teams that they could not provision products and services utilizing inaccurate network inventory data.

**The Reality on the Ground:  WilTel and the "Metro Business" Integration Efforts Are an Unmitigated Disaster**

110.    Defendants deliberately misled the market regarding Level 3's successful integration of WilTel (a large fiber optic backbone company like Broadwing) and the metro ring acquisitions so as to falsely convince the market that Level 3 was capable of utilizing their "proven integration experience" in acquiring and integrating Broadwing.  Defendants' statements that the WilTel integration was complete and the metro ring acquisitions were on track were blatantly false and were purposefully designed to mislead the market into believing Level 3 was a successful integrator of both backbone and metro ring companies.  The Individual Defendants were so eager to acquire the revenue generated by WilTel and the metro ring companies, and at the same time show the market Level 3 was achieving synergies by slashing costs and reducing head count, they ended up firing the wrong legacy employees from the acquired businesses.  The Individual Defendants' cost-cutting measures backfired as Level 3 terminated the most knowledgeable legacy employees from the acquired companies.  According to numerous confidential witnesses ("CW#____"), at each of the acquired businesses, Level 3 quickly terminated nearly every "subject matter expert" – *i.e.*, the individuals with the most knowledge of the acquired businesses' legacy systems – which had the direct effect of materially delaying the process of integrating critical network inventory and provisioning systems.  Further, subject matter experts were necessary to determine what portions of

the legacy networks were redundant and could therefore be decommissioned, how to effectively map and migrate network data to Level 3's system and the extent to which customer data became inaccurate before it was taken from the acquired companies' legacy network systems and transferred to Level 3.

111.    According to CW#2, during the Progress integration, which began shortly after March 2006, Level 3 IT management encountered major difficulties in understanding the functionality of the Progress MetaSolve provisioning system because most, if not all, of Progress' provisioning employees had been terminated by Level 3 after the acquisition but prior to the Class Period.  CW#2 added that prior to the acquisition of Looking Glass by Level 3 in 2006, Looking Glass was able to provision its on-network customers with their network circuits within 48 to 72 hours.  Throughout 2007, as a result of defendants' premature termination of the target businesses' subject matter experts, the remaining Level 3 provisioners worked in a state of "chaos," having to work with disparate provisioning systems causing most customer order fulfillment times to extend to three weeks versus the three day provisioning time Level 3 customers enjoyed before the acquisitions.  According to CW#13, a former TelCove Order Specialist, this chaos was only made worse by the fact that he was assigned responsibilities for provisioning services on the Progress network, whose network elements and functions CW#13 had absolutely no knowledge of at the time.

112.    The Individual Defendants exacerbated the problems caused by their overzealous efforts to terminate the legacy employees most knowledgeable about the acquired businesses' networks and by also failing to provide adequate training to the remaining Level 3 employees.  As a result, the remaining employees were unable to actually sell, provision and activate customer service orders – the three steps necessary for new orders to start generating revenue.  In short, disaster

ensued because although Level 3 initially continued to sell customer orders, it could not fulfill them. Because the Individual Defendants – who, according to their statements, were in charge of, closely monitored and were quite good at integrating acquired companies – botched the integrations of WilTel and the metro ring companies in 2006 and compounded their integration mistakes in 2007 with Broadwing, provisioning and activation delays became unbearable for Level 3's customers. Because customer dissatisfaction became such a huge problem, Level 3 was forced to completely stop selling certain products.  Consequently, Level 3's customers were forced to turn to the Company's competitors, a problem which is still adversely impacting Level 3's sales to this day.

113.    The adverse ramifications of firing the most knowledgeable subject matter experts were felt by Level 3 with the first acquisition, WilTel.  According to CW#6, because Level 3 terminated virtually all WilTel employees familiar with how WilTel's legacy inventory control and provisioning systems functioned, the Company failed to complete the integration process of WilTel's data and network onto Level 3's systems prior to the end of calendar year 2008.  CW#6 added that WilTel's network inventory control and provisioning system, known as "openCI," was to be migrated over to Level 3's network inventory control and provisioning systems, known as "Network Engineer" and "Granite."  Contrary to defendants' Class Period statements that the WilTel integration was virtually complete, CW#6 noted that Level 3's original plan to migrate the openCI network inventory data onto Network Engineer was not scheduled to be finished until *the end of 2007*.  Indeed, Level 3 did not even initiate this transfer process until 2Q07.  CW#6 described that by May 2008, the data mapping portion of the inventory control and provisioning integration had been completed, but Level 3 had still not commenced the migration of the actual data from openCI to Network Engineer or Granite.  CW#6 stated that as a direct result of Level 3's failure to begin the

physical integration of WilTel's inventory control and provisioning systems until the end of 2008, the amount of time it took for Level 3 to provision services to many of its wholesale transport customers during the Class Period increased by 50% to 75%.

114.    According to CW#2, in late 2005, defendants launched a plan – coined "Project Unity" (or "Unity") to manage the integration of the acquired businesses by transferring all the complex business systems utilized by the acquired businesses (referred to as "legacy" systems) onto a common operating platform.  CW#5 noted that according to Level 3's original plan, Project Unity was to be completed by the end of 2007.  CW#5 added that although Level 3 initiated Project Unity in 2005 and the platform was to be completed by the end of 2007, the data migration from the acquired businesses' legacy systems, other than WilTel, onto the Unity platform did not even begin until 2008.

115.    CW#5 also noted that like many other objectives, prior to and during the Class Period, Project Unity milestones were missed by a wide margin.  For instance, in 2006, Level 3 ran a small-scale pilot of a single component of the Unity platform – the "front-end" quoting function for transport services – which was a success.  The next step, however, was to actually build the unified quoting and order management platform to deal directly with actual and potential sales orders. CW#5 said that this step took defendants the entire first half of calendar year 2007 to complete. CW#5 added that immediately after its completion, Level 3 management realized the platform had been designed with severe defects, which precluded the possibility of adding quoting tools for other key Level 3 products and services such as high-speed Internet and colocation services.  As a result, Level 3 decided to scrap the entire Unity platform around June 2007 and rebuild it from scratch. Notably, Level 3's attempt to create a new and different design for the quoting tool portion of Unity

- 85 -

did not recommence until the end of 2007, according to CW#5.  Likewise, this build resulted in a design that was barely operational.  CW#5 stated that it took numerous members of the Unity integration team, including Hart, considerable time and effort to work through the remaining problems and the preliminary components of the Unity operations platform were not complete until March 2008.

116.     By March 2006, according to CW#3, the order fulfillment and provisioning issues that plagued Level 3 shortly after the WilTel acquisition made it impossible for Level 3 to provision certain transport products and services, including "optical waves" or "lit IRUs" in a timely fashion.  CW#3 stated that beginning in March 2006, legacy WilTel product managers experienced at least a doubling of provisioning times for lit IRUs, from 30 days to at least 2 months, because the product managers were forced to work with multiple legacy networks instead of a unified network inventory control and provisioning system.  According to CW#15, during the Class Period, Customer Project Managers found that it took twice as long to provision customer orders because, in addition to tracking order status on multiple databases, the orders also had to be provisioned on multiple legacy systems.  CW16 added that "network grooms," the part of the provisioning process where network circuits are moved and/or re-designed according to customer specifications, took twice the time to complete immediately after the WilTel acquisition.

117.     According to CW#12, the integration of the WilTel call center, from St. Louis, Missouri to Tulsa, Oklahoma, was also an abysmal failure.  This portion of the WilTel integration was commenced in late 2006.  CW#12 added that while the call center integration was supposedly complete by February 2007, so many core and experienced WilTel voice technicians had been terminated that customer assistance waiting times – *i.e.*, the amount of time Level 3's customers

waiting to have their complaints responded to by Level 3 customer service representatives – increased from an average of 3 minutes to 20 minutes, or nearly 700%.

118.     The Company's experience with many of the other acquisitions, including the metro ring businesses, fared no better and in many ways was worse.  In early 2006, when Level 3 began its acquisitions of the metro ring businesses – *i.e.*, Progress, ICG, TelCove and Looking Glass – the Company had limited experience in providing metropolitan access-related services.  Level 3 had primarily been a long-haul network provider.  For this reason it was unreasonable and irresponsible for Level 3 to create a final integration plan for the metro businesses' inventory and provisioning systems without first having a strong understanding of the operations processes or, at minimum, consulting with the legacy employees working for the businesses before terminating their employment.

119.     In fall 2006, according to CW#7, Level 3 sent several senior Looking Glass employees, including circuit designers, to participate and oversee the integration of both the Progress and Looking Glass network inventory control and provisioning systems onto Level 3's platform.  CW#7 noted that the critical "middle" stage – *i.e.*, the "heavy lifting" – of this integration work was the migration of network inventory data for Progress and Looking Glass onto Level 3's supposedly superior Granite inventory management system.  CW#7 added that defendants' original plan called for this work to be completed by July to September 2007.

120.     Before this crucial network integration work could proceed, however, CW#7 noted it was necessary for Level 3 to ensure that network inventory data was complete and accurate.  In other words, Level 3 had to ensure that it knew what network elements actually existed on the Looking

Glass and Progress networks.  Likewise, according to CW#7, Level 3 had to ensure it knew which network elements actually existed and were being utilized by Looking Glass and Progress.

121.    Critically, Level 3 senior circuit designers, including CW#7, were fully aware they could not determine what Looking Glass and Progress inventory existed or which elements or portions of elements were already in use.  Nonetheless, CW#7 stated that Level 3 transferred the flawed and inaccurate circuit data onto Level 3's Granite system in July 2007.  As a consequence, Level 3's inventory data became infected with inaccuracies.  CW#7 added that as a direct consequence, Level 3 experienced material delays in fulfilling orders for major customers because Granite now contained data regarding network elements that did not exist.  In particular, throughout 2007, CW#7 noted that the integration failures led to horrific customer provisioning delays for Level 3's largest customers such as Verizon Wireless and NuVox.  Likewise, by July 2007, Level 3 had failed to integrate the network inventory of ICG onto Granite.  By the end of calendar year 2008, according to CW#7, Level 3 still had not completed this critical integration work.

122.    As of July 2007, Level 3 began to constrain customer orders to meet its capacity to provision and fulfill orders.  This strategy had the effect of Level 3 appearing to have stabilized customer order backlogs.

123.    Contrary to defendants' assurances that integration efforts were on schedule, CW#8 stated that TelCove literally operated as a separate company from Level 3 throughout the Class Period.  In fact, according to CW#7, Level 3 failed to migrate TelCove's inventory management systems to Level 3's systems by the end of 2008, in large part because Level 3's senior provisioners and circuit designers found TelCove's existing inventory control data to be unmanageable at the time of the acquisition.  CW#8 added that TelCove's legacy provisioning platform, called Access

- 88 -

Request, was also plagued with problems. Although Level 3 began planning for the integration of Access Request onto Level 3's system in early 2007, circuit design engineers continued to utilize only the Access Request system through calendar year 2008 because of migration problems. These migration difficulties, according to CW#9, in combination with the abysmal state of TelCove's network inventory management system, caused a four-fold increase in service times to new and existing customers. CW#9 added that prior to the TelCove acquisition in July 2006, TelCove customer orders were typically filled in ten days. After the merger and throughout the Class Period, however, most orders took a minimum of 45 days to install.

124.    Notably, during the Class Period, Level 3 Customer Project Managers such as CW#10 witnessed first hand how the Company's failure to integrate the acquired businesses' legacy networks onto its own caused severe delays in provisioning and filling customers' orders. Customer Project Managers served as intermediaries between Level 3's provisioners and its customers. According to CW#10, certain Customer Project Managers, prior to January 2007, coordinated the fulfillment of five to six orders a month. CW#10 added that after January 2007, one Customer Project Manager handled only eight orders in an entire year because to fulfill a customer order, several legacy networks of the different acquired businesses had to be utilized because they had not been integrated by Level 3. CW#10 personally observed that beginning in January 2007 and throughout the remainder of the Class Period, as a direct result of the lack of cohesion among the acquired businesses' and Level 3's networks, average order installation times ballooned from 30 days to at least 90 days.

125.    CW#10 added that beginning in January 2007, and continuing through and after the Class Period, the failed integration caused Customer Project Managers to continuously encounter

network inquiry problems because they could not determine what portions of the network still existed.  Because inventory previously held by the acquired businesses had not yet been accurately identified and accounted for, according to CW#10, provisioners were unable to fulfill or provision customers' orders for services using transport circuits that appeared to be available in the provisioning sub-systems.  CW#10 added that, in reality, these network circuits were non-existent or had been decommissioned.

126.    Even when an order was able to be provisioned, according to CW#10, field technicians and circuit designers encountered problems when attempting to actually connect the circuits.  Compounding these problems, Level 3 also failed to adequately train its Customer Project Managers to work within the numerous order tracking and provisioning systems that were now used at Level 3 to fill a customer's order.

127.    CW#15 stated that the most problematic orders – resulting in the delay or inability to provision customer orders – were those that required utilization of various legacy Level 3 or acquired companies' networks.  These are known as "hybrid" orders.  Shortly after the Broadwing acquisition in January 2007, CW#15 noted, it took at least twice as long to get customers' orders ready for delivery because the provisioning process for these orders had to go through multiple "cross network" systems.  First, orders had to be entered into the order tracking systems of both Level 3 and the acquired businesses.  CW#15 added that if fulfilling an order required Broadwing network inventory, throughout the Class Period, Customer Project Managers were forced to enter the order on Clarify, Level 3's system, and IQONS, Broadwing's order tracking system.  Then, circuit designers and provisioners were forced to design the circuit in Broadwing's Circuit Vision provisioning system and then in Level 3's Fusion system.  CW#15 noted that before Level 3

acquired Broadwing, these orders were completely filled at Broadwing in approximately 12 days. However, following the acquisition, it took 24 days to provision the order, including the time it took to initially enter the order into the system, as well as the time it took to get the order installed in the field.  As a result, not a single IRU circuit involving the network backbone acquired from Broadwing was installed on time during the Class Period.

128.    According to CW#11, beginning in summer 2006, one of Level 3's customers, British Telecom, put a freeze on ordering new IP data services.  British Telecom halted all new orders because Level 3 was wholly unable to install its orders for various optical services, including a "10 gig back-boom," in summer 2006.  CW#11 added that the Company informed British Telecom that the installation would not be completed for another six months.  As a consequence, Level 3 was forced to offer cost concessions just to retain British Telecom as a customer.  CW#11 personally observed that provisioning systems problems became so pervasive at Level 3 that by September 2007, the Company was forced to stop selling certain intercity Ethernet services because the Company could not fix the network.

129.    During the Class Period, major Level 3 customers experienced voice and data outages as a result of Level 3's haphazard decommissioning and consolidation of its networks during the integration of network inventory control and provisioning systems.  According to CW#12, during this process, major telecommunications carriers and customers, including AT&T, lost telephone and data services because Level 3's order tracking and customer management systems could not accurately determine which customers had service on which networks.  Because of the poor order tracking and customer management systems, CW#12 added, Level 3 was decommissioning networks that still had active customers, resulting in service outages.

130.     One particular customer order that was delayed as a result of Level 3's failure to adequately integrate its legacy systems was placed in late August 2007.  At that time, according to CW#10, the Collier County School District in Florida placed a $20,000 order that had to be filled and installed by early December 2007, prior to the holiday break, so that it could "go live" when school was back in session in January 2008.  Because sales engineers attempting to fill the order were unable to discern which legacy network (among Level 3 and the acquired companies) had to be accessed to provision the order, CW#10 observed, the school district's order was delayed beyond the original installation date promised by Level 3.  CW#10 added that the school district was so angered with the delay that it placed a call to senior management, including Crowe, to express its frustration.

131.     CW#9 noted that Level 3's order "backlog" represented the value of various customer orders that had been placed but had not been provisioned.  During the Class Period, the Company's backlog materially increased because of defendants' failure to integrate the acquired businesses' provisioning systems throughout 2006 and 2007.  As an illustration, CW#9 was present when Level 3's Vice President of Sales, Jeff Bettaker, spoke to Level 3 employees, including sales engineers, about the Company's order backlog at a sales conference in Dallas in February 2007.  During this discussion, Mr. Bettaker acknowledged this backlog was a major problem at Level 3, and promised conference attendees that Level 3 would hire more Customer Project Managers to deal with the problem.

**The Botched Integration of WilTel and the Metro Ring Companies**
**Is Compounded by the Broadwing Acquisition**

132.     Defendants' failure to integrate WilTel and the metro ring companies during 2006 made it impossible for Level 3 to successfully integrate Broadwing.  In fact, the Individual Defendants compounded their mistakes made during the botched integrations during 2006 when

Level 3 acquired Broadwing.  According to CW#16, immediately following the Broadwing acquisition in January 2007, Level 3 dismantled Broadwing's entire IT department and transferred its functions to contractors overseas.  Following the termination of this department, CW#16 added, no technical support existed for Broadwing's systems.  CW#14 added that between February 2007 and May 2007, Level 3 began the process of attempting to integrate Broadwing's physical network onto Level 3's.  One significant objective was to decommission Broadwing's network fiber that overlapped with or was duplicative of Level 3's fiber holdings.  CW#14 stated that Level 3 operations employees were required to analyze Broadwing's legacy order-tracking, customer management and circuit identification computer systems to determine where Broadwing had customers on specific network elements.  CW#14 added that because most Broadwing subject matter experts on these systems had been terminated by Level 3, the customer data had become inaccurate and Level 3 employees did not know how to make network inquiries.  As a result, when Level 3 began decommissioning network elements, CW#14 stated the Company discovered that current customers remained on the decommissioned networks.

133.   The integration of the Broadwing legacy billing systems onto a system called "Kenan" had been scheduled to be completed by October 2007.  However, by April 2007, this integration had not yet begun.  As such, and as a result of the combined effects of massive integration delays at Level 3, the billing system integration was not complete by October 2008.  This integration program suffered delays in part because of the enormous data that had to be transferred. The delay in the billing system integration further compounded delays in Level 3's ability to earn revenue from new orders.  The billing system integration project status was reported to senior

management, including the Individual Defendants, on at least monthly and at times a bi-weekly basis.

134.    In addition, Level 3 failed to integrate or convert any of the legacy Broadwing networks onto Level 3's system prior to end of the Class Period.  By October 2007, Level 3 was just beginning to identify Broadwing legacy network data requirements for the purposes of mapping the data transfer onto Level 3's system.

**Internal Company Reports Showed Defendants Knew Their Class Period Statements Were False When Made**

135.    Defendants knew their Class Period statements touting the progress toward Level 3's integration of the acquired companies' networks were false and misleading when made because internal Company reports prepared for Level 3's senior executives tracked each operational metric, capital expenditure, and budget for the integration.   These reports showed Level 3's network integration of the acquired companies was both underfunded and far behind schedule throughout the Class Period.

136.    As of December 2006, the Network Integration 2007-2009 CAPEX Costs and Synergies Projections report showed Level 3 had utilized less than half - $12.8 million out of $30.2 million – of the capital that had been allocated to completing the transport interconnects and route integration for WilTel.  Defendants also knew by December 2006 that $30.2 million was not enough capital to complete these crucial physical network integration components of WilTel, as this Network Integration 2007-2009 CAPEX Costs and Synergies Projections report indicated Level 3 committed additional capital to complete the WilTel transport interconnects and route integration during 2007 and even into 2008.

137.     As of mid-January 2007, defendants knew they had not committed enough capital to achieve the network integration of WilTel and that major work on transport interconnects and route integration remained unfinished.  A Network Integration Capex & Synergy Review report prepared for the Company's senior executives in mid-January 2007 showed Level 3 had increased the capital devoted to completing the WilTel physical network integration tasks of transport interconnects and route integration to $4 million and $7 million for 2007, respectively – an increase of over $4.3 million compared to just one month earlier.  This increase capital was needed, in part, to complete the WilTel transport interconnects in Las Vegas, Stamford, Hartford, and San Luis Obispo markets, as well as to integrate the WilTel routes from Cleveland to New York, Jacksonville to Miami, Chicago to Minneapolis, and Omaha to Dayton.

138.     As of early April 2007, defendants knew via a Network Integration Weekly Operations Review report that Level 3 had yet to complete transport interconnects in 17 major WilTel markets and had integrated less than one-fifth of WilTel route into Level 3's network.

139.     As of mid-October 2007, defendants knew based upon a Network Integration Program Review report that a mere 7% of the route integration of the acquired companies had been completed – only 3,818 of 54,980 route miles.  This report confirmed WilTel alone had over 20,000 unique route miles that needed to be integrated into Level 3's network.

140.     The network integration metrics known to defendants by virtue of these specific reports, beginning in January 2007 and extending throughout the Class Period, confirm it was impossible for Level 3 to have completed 85%-90%, or even a majority, of the WilTel network integration when defendants were assuring the market it was substantially done in October and December 2006.

**Status of the Integrations of the Acquired Businesses Was Directly Monitored by Defendants**

141.    Defendants closely monitored the integration status and were intimately aware of and involved in attempts to resolve customer complaints.  According to CW#1, at the same time Project Unity was launched, Level 3 established the Integration Steering Committee (also referred to as the NI Steering Committee) to govern and oversee all Unity-related projects.  With its inception, defendants vested the Integration Steering Committee with final approval authority for all Unity-related tasks and objectives.  At all relevant times, according to CW#1, the Integration Steering Committee was comprised of Level 3 executive level managers, including O'Hara and Level 3's Chief Information Officer ("CIO") Kevin Hart ("Hart").  Prior to and throughout the Class Period, the Integration Steering Committee met on a regular basis to discuss the status and scheduling of network integration as well as Unity projects.  Hart was responsible for the day-to-day management of Project Unity.  At all relevant times, according to CW#1, Hart reported directly to O'Hara the status of Project Unity objectives and milestones.  Throughout the Class Period, O'Hara directly reported the status of all the acquired businesses' integrations to Level 3's senior management, including defendants Crowe, Miller and Scott.

142.    CW#2 noted that the Integration Steering Committee supervised the various teams responsible for integrating the acquired businesses into Level 3.  CW#2 added that each of these integration teams was responsible for preparing weekly Integration Status Reports that were provided to Level 3 IT Project Managers.  As one example, according to CW#2, on the Looking Glass project, IT Project Managers Eric Olsen and Andy Jacobs were responsible for "rolling up" the Integration Status Reports to the Project Management Office and Level 3 senior management, including O'Hara and Hart.  Other IT Project Managers responsible for each of the acquired

- 96 -

businesses also prepared Integration Status Reports, added CW#2, all of which were published weekly on Level 3's "Dashboard." The integration reports utilized a "red-amber-green" or "RAG" format to inform management of the progress toward order fulfillment completion, meaning integration tasks currently running on time were "green" and those already passed the deadline were displayed as "red." The Individual Defendants had access to the Dashboard and these RAG integration reports via Level 3's intranet, according to CW#2.

143.    CW#3 noted that throughout the Class Period, order fulfillment delays, customer complaints, customer trouble tickets, and service quality problems that arose as a function of the botched integration of the acquired businesses were regularly reported by Product Managers to Level 3's President of Wholesale Markets, Suneet Choksi ("Choksi"). CW#3 added that Choksi, in turn, directly reported these matters to O'Hara and Crowe during regular meetings.

144.    CW#3 stated that during the Class Period, Choksi, O'Hara and Crowe met with Level 3's "high-revenue" customers in response to complaints from new and existing customers who ordered new services from Level 3. According to CW#3, the Company's failure to integrate WilTel's inventory control and provisioning systems, almost immediately following that company's acquisition by Level 3, caused a cascading series of problems which made it much more difficult for the Company to figure out what network and other services were even available for sale. The failure of this integration caused massive increases in order provisioning times because orders had to be inserted on multiple systems. The failed integration also led to widespread customer service problems and service outages, in part because the Company incorrectly decommissioned networks believed to be redundant but that were still being used to deliver service to existing customers. Defendants O'Hara and Crowe were personally involved in meetings with senior executives from

Level 3's largest customers and often traveled to the customers' locations for those meetings. For example, O'Hara met with NuVox and XO Communications to help resolve their complaints about Level 3's service and Crowe spoke directly with high level executives from Verizon during the Class Period.

145.    CW#4 personally attended a meeting in 2007, during the Broadwing integration, O'Hara met with the business' legacy employees at a former Broadwing office in Chicago. During the meeting, O'Hara informed Level 3 employees that the Company's executive management recognized and was aware of the problems the Chicago team was experiencing – namely increased order processing intervals due to having to utilize different provisioning systems. According to CW#4, although O'Hara promised to provide additional training, from the time of Broadwing's acquisition through the end of the Class Period, legacy Broadwing employees were not given adequate training to use the several new order and provisioning network systems in a remotely efficient manner.

146.    Level 3's Service Delivery Group, part of defendant O'Hara's operations organization, was responsible for the fulfillment of customer orders in terms of processing, provisioning, installing and testing. From January 2007 through the end of the Class Period, the quantity of customer orders placed with Level 3 sales personnel far exceeded the available network capacity, which inevitably resulted in a significant percentage of orders being delayed. The Service Delivery Group reported their performance, including their inability to provision orders due to a lack of network capacity, to Level 3 executives, including the Individual Defendants, on a weekly basis via what was known as the Operational Overview Deck report.

**POST-CLASS PERIOD REVELATIONS AND ADMISSIONS**

147.    ~~130.~~Following the October 23, 2007 disclosure, defendants revealed to investors what they previously knew about the details of the Company's provisioning problems and the failed integration process during the Class Period.

148.    ~~131.~~In November and December 2007, defendants spoke at several analyst-hosted conferences and conceded the lowered guidance for 4Q07 and FY08 was due to provisioning constraints the Company was experiencing as a result of the failure to complete the integration process.  Defendants also conceded that although they had been working on the integration process for two years, integration was not yet complete. For example, during a November 16, 2007 conference call hosted by Credit Suisse, defendant Patel stated:

> Let me now talk about what we are doing on the processes and system side. So we believe that the effort to improve our legacy systems, as we put in place the end state integrated processes and systems that puts everything on one platform, we believe that the short-term effort to improve our legacy systems will show results, but clearly the bigger, longer-term benefit is expected to come from our new integrated set of processes and systems.  We've been working on this for almost two years.  The first release has just began this past month, and while it is still very early, it did go smoothly.  So we have a schedule of frequent user-tested releases that will continue through the rest of this year and through 2008 and we expect substantial deployment of all of that to be completed by late in the second half of next year.  So our goal here is quite clear.  We want to install what we can sell unconstrained by our internal processes.
>
> So the sum of what I presented is really reflected in the guidance range that we provided at the end of the third quarter.  At the low end, ***we are assuming no material improvement in our ability, current ability, to install high margin services, and that our sales will therefore be limited by that constraint.  We also assume that we will be limited this way until we substantially deploy our new integrated systems in the second half of 2008, at which point we expect sales – we assume sales and installs to gradually increase in the second half of '08.***

149.    ~~132.~~During November and December 2007, Patel and O'Hara also admitted that defendants' statements made in September 2007 regarding the stabilization of backlogged orders

were misleading.   By September 2007, backlogged orders were not stabilized because the Company's installation capability was improving.   Instead, backlogged orders were stabilizing because customers were decreasing their orders to match the Company's capabilities.  For example, during the November 14, 2007 Merrill Lynch conference call, Patel stated:

> Now, as recently as September we had said that our backlog had stabilized . . . .  The reason the backlog stabilized is, because as we got realistic with our customers, realizing the problems we had on the installation side, we communicated to our customers that our installation intervals had widened out, which then resulted in sales coming down to match the installs we have had. . . . we were incorrectly confident that we would be able to work through this by the end of the year.
>
> . . . [A]s we looked at where we were in September, we saw that what was happening is that our installation capability wasn't going up, the backlog had suddenly stabilized as we talked about in September.  ***But that was, because our sales were being constrained to hit just the level that we could install***.

150.    ~~133.~~On December 3, 2007, Bear Stearns issued an analyst report summarizing a meeting with defendants Crowe and Patel.  During the meeting, Crowe admitted that the Company "[s]tumbled in integration" and sold more services than the Company could provision.  Crowe also admitted it is "[l]ikely that 40% of [customer order] backlog is lost" and that a "[l]ack of personnel in design was a problem – [We] laid off people with network knowledge" but the Company was now "hiring some of those people back."  Defendant Patel also admitted that the acquired companies "did not have great IT systems, Level 3 changes exacerbated issues [and Level 3] lost key employee intelligence" and admitted "[e]quipment inventory systems were also not accurate."

151.    ~~134.~~During a February 7, 2008 conference call hosted by Level 3, defendants revealed the details of Level 3's inability to provision orders and again admitted that the integration of the multiple acquisitions Level 3 had made during the last 18 months were still not complete.  During the call, defendant O'Hara stated:

Our service challenges in 2007 arose from the rapid integration of the companies we acquired, and the complications associated with simultaneously trying to operate the disparate processes and systems of the acquired companies, while developing the long-term operating environment.  The service challenges fell into two broad areas - service quality and management, that is how well do our network and services perform from a quality standpoint once service has been initiated for our customer; and service delivery, the process of taking a customer order and then activating the service.  ***Our service quality and management deteriorated through the first half of 2007, but as a result of numerous organizational process and systems changes, we have generally returned to the quality levels that we enjoyed prior to beginning the integrations***, and our performance metrics are generally equal to or better than the levels that our customers were experiencing at the beginning of 2007.  An exception to this statement is certain enterprise customers on legacy networks that have not yet been fully migrated to the Level 3 network.  These quality issues are isolated to a few areas, and plans are in place to migrate the balance of services in the first half of 2008.  Despite these exceptions, overall performance for BMG customers is back to where it was prior to the integrations.

Our service delivery processes are more complex than service management, and they will take longer to fully resolve, but have made good progress during the quarter.  In order to quickly and smoothly provision new service orders, the product being sold and ordered must be clearly defined, and all required technical information must be captured and consistently delivered to the provisioning organization.  The provisioning group must then be able to activate the order with little or no rework or process fallout.  I will talk about each of these steps in more details.

During the quarter we reviewed every product in our portfolio, and assessed the completeness of all the attributes necessary to activate an order with a consistent and positive customer experience.  Since many of the products, particularly those that are sold to our BMG customers, came to Level 3 through acquisitions, the state of product readiness varied widely.  While plans had previously been in place to refine the product definitions as part of our new integrated process and systems, the variations and the amount of rework being caused by inconsistent or incomplete product definitions caused us to reprioritize this effort.  During the quarter, all definitional work was completed, more rigid entrance criteria was established, and further product and system-specific training was given to sales people, order entry and order management personnel, and our provisioners.  Sales of some products were suspended if the level of product readiness was deemed to be a source of significant operational challenges.  For the products where we temporarily suspended sales, we have now either reintroduced the product or are scheduled to introduce the majority of the remaining products by the end of the first quarter.  This step obviously reduced the level of signed orders, but this was a necessary step since we previously struggled to install those services within promised intervals, and at times had disappointed our

customers.  This action, among others, is the reason we had said we are generally meeting promised installation intervals.

Once a sale order is signed, the order must be presented to the operations group with all of the supporting technical details.  The complete list of necessary information is referred to as entrance criteria.  Entrance criteria for all products had not been established as clearly as they should have been, and in some instances the differences in legacy systems made it difficult to track compliance.  We have now established clearer entrance criteria for all products, and have the ability to track compliance.  The product definition and the entrance criteria work are critical to ensuring a smooth provisional process, but both require that our sales force conform to more rigorous sales and order process.  While it is [i]n their self-interest to adhere to these revised standards, we assume it will be a number of months before we reach our targeted performance in this area.

Our provisioning group has been mapping all interim processes and identifying process or data gaps. In addition, a resource assessment for each stage of the process has been made, and adjustments to staffing levels made in response. Some of the service delivery challenges are not process-related but are a result of network and inventory data from legacy companies that is either difficult to find or requires manual intervention to use.  We have developed some manual processes to work around these issues, but the ultimate solution will not come about until full network inventory is migrated to the unity platform.  We have rolled out the unity product catalog application to all of our business groups.  We have rolled out quoting to all of our business groups, and order entry for many products to all of our groups. The order entry consolidation was a critical step necessary to simplify the front end of the service delivery process.  All new customer orders for these products can now go through the new system.  However, changes to existing services and customers still go through the legacy systems and will continue to go through those systems until we migrate the existing customer and service data to Unity.  This migration is scheduled to begin in the first quarter and continue through the year.

During the fourth quarter we established a dedicated service delivery team to work all orders in the backlog that were deemed to be aged or likely beyond the customer-desired delivery date.  By year end, we had reduced the size of this aged backlog by more than 75%.  Of the reduction, approximately half of the orders were installed and half were no longer required by the customer and were canceled.  This is consistent with what we'd expected.  We expect the remaining orders in the aged backlog to be installed during the first quarter.  We have established installation intervals that we can communicate to customers with confidence.  Some of these intervals are longer than our historic intervals, and some are longer than our customers'[] desires.  Our goal is to return to industry-leading intervals for delivering on-net service and match industry standards for off-net services.

For four of the last five months, we have installed more service than we have sold.  This is partly due to the improvements I just discussed, but it is largely due to the fact that our level of sales over this period decreased in response to the previous quality issues, reduced product set and longer intervals.  We believe that today, we could install a higher volume of orders than we did during the fourth quarter. In order to do this, we need to increase the level of sales we experienced during the quarter.  We have historically tracked qualified sales opportunities in a sales funnel, and could assess with reasonable accuracy what near-term sales are likely to be as a percentage of that funnel, and we could tell with a reasonable degree of accuracy what future installations would be based on previous sales levels.

Since the best leading indicator of sales performance, and thus installs, is the health of the funnel, we have been spending a fair amount of time in this area.  As our service issues grew throughout 2007, the size of our funnel generally remained constant, but the rate at which we converted opportunities to signed orders dropped off.  By late in the third quarter, we were still seeing strong demand but our sales force was reducing their near-term outlook based on customer feedback and, as a result, our funnel started to decline.  Reduced levels of sales typically lagged the decline in funnel by 30 days, and installs lagged by another 45.  A large part of the reduction in sales was due to the fact that during the third and fourth quarters, a number of existing customers simply bought less incremental services from us and turned to alternatives.  However, as a result of the improvements outlined above, our funnel has grown for the last few months and sales for WMG, our most impacted group, increased in December and then again in January.  While sales have improved and our funnel health is improving, absolute levels of sales are not yet back to where we were this time last year.

152.     ~~135.~~The Company's February 7, 2008 disclosure caused a decline in Level 3's stock price, from a closing price of $3.14 on February 6, 2008 to $3.00 on February 7, 2008.

153.     ~~136.~~On March 3, 2008, during a conference call hosted by Raymond James, O'Hara admitted that Level 3's service activation issues stemmed from simultaneously using multiple legacy provisioning systems from the acquired businesses during the Class Period.  O'Hara also presented a slide show to analysts and investors outlining the actions taken by the Company post-Class Period to fix the problems defendants knew about during the Class Period, which included: 1) fixing the admitted service activation bottlenecks; 2) the hiring of expert consultants to review the entire service activation process; 3) increased human resources, including sales people; 4) work to improve

- 103 -

synchronization of product definitions; and 5) creating sales incentives to make up for lost business due to the installation problems.

154.   ~~137.~~On March 10, 2008, the Company issued a press release announcing that defendant O'Hara was stepping down effective immediately and that the Company was terminating its previously-announced search for a new CFO and that defendant Patel would continue in the CFO role.  The announcement caused a decline in Level 3's stock price, from a closing price of $2.18 per share on March 9, 2008 to a closing price of $1.87 per share on March 10, 2008.  Following the announcement, securities analysts following Level 3 commented that the difficulties in bringing together six acquisitions from an operational standpoint were most likely behind O'Hara's resignation and that the management shake-up demonstrated continuing operational problems for Level 3.

155.   ~~138.~~On March 13, 2008, XChange, an Internet publication, posted a story about defendant O'Hara's departure and the integration debacle.  In the publication, Raouf Abdel, President of Level 3's Business Markets Group, disclosed that the Company was still working on the Telcove and Broadwing integrations and that the integration was far from complete, stating "'[w]e are not done by any means.  '08 is another big integration year for us to really get to the point were we have one cohesive network, one back-office platform and a common set of processes.'"

156.   ~~139.~~On March 14, 2008, during a conference call hosted by Lehman Brothers, Robin E. Grey, Level 3's Senior Vice President and Corporate Treasurer, admitted that by at least January 2007 the Company was experiencing significant installation backlog.  In some cases installation delays were up to ten months and Grey conceded customers could not wait that long.  During the conference call, Grey stated:

If you think about backlog going back to, say for example, January 2007 in large cases, carriers or customers of ours couldn't wait 10 months to get that capacity.

157.    ~~140.~~During an April 23, 2008 conference call with analysts and investors, defendants updated the market on Level 3's efforts to increase provisioning capacity and admitted that the "bottlenecks" in service activation during the Class Period could and should have been prevented. During the call, defendant Crowe stated:

> As we have said repeatedly, our problem was not caused by market demand, pricing or our inability to market and sell our services, but, rather to bottlenecks in our service activation processes, ***which we could and should have prevented***.

158.    ~~141.~~During the same conference call, Crowe also admitted that the Company was still using the "less-efficient" process and systems of the acquired businesses to provision orders and that migration over to Unity would not begin until the end of the year:

> [W]e are still largely utilizing the less-efficient processes and systems that were employed by the companies we acquired over the last 18 months or so. At the same time we are on track to migrate to our Unity processes and systems over the course of this year. Unity is our integrated set of business processes and systems that we have developed over the period of the last two years and are deploying as we speak. . . .
>
>      . . . We currently expect that by year end two-thirds of our high-margin, core network services revenue will be handled by the Unity platform. This is a key development, since we believe that we can further increase sales, increase margins and improve our customers' experience as Unity is deployed.

159.    ~~142.~~During a July 24, 2008 conference call with investors and analysts, defendant Crowe made additional disclosures about the provisioning problems, stating:

> Our business markets group contributes about 25% of our core services revenue, and represents at least in the short-term, a very large market opportunity. This unit was probably most affected by our previous provisioning problems and by our deliberate repositioning of our sales force, which I will discuss more in a bit. We expect to see accelerating growth from this group, both our normal seasonal increases which we experience each year, and as newly hired sales people become more productive.

\*      \*      \*

The improvement in provisioning I described on the last call and a number of other forums has occurred within our current legacy processes.  That is, those processes that we, at Level 3, and our acquired companies have used for a period of time.  And with some exceptions, we are largely utilizing these processes and systems today.  At the same time, we are on track to migrate to our unity processes and systems over the course of this year.  As indicated last quarter, we expect that by year end more than two-thirds of our high margin core network services revenue will be handled by this platform, and we are on track to achieve this goal.  This is an important development since we believe that we can further increase sales, increase margins, and improve our customer experience as unity is deployed.

\*      \*      \*

Our goal is to get back to where we were before we began acquiring companies, which is industry leading. I think our customers, well I know our customers would tell you one of the reasons they purchased from Level 3 was the highest level of service quality delivered on a predictable and industry leading interval.  That is a shorter interval than comparable companies.  Today, I would say we are at parody with our large competitors.  We are not better than our large competitors.  We will get better.  That's our goal and we plan to do that over the course of the balance of the year.

160.   ~~143.~~During an October 23, 2008 conference call with investors and analysts, defendants announced that they ended 3Q08 with 450 "quota bearing" sales people and that 50 more positions were expected to be filled.  Defendants also conceded that Project Unity was still in the testing phase and migration would not be complete until sometime in 2009.  During the call, defendant Crowe stated:

I've said in a number of forums that our operational goal for this year was to increase sales and installation rates to match previously demonstrated demand for our services. Earlier this year I reported that we believe we created additional provisioning capacity and that we were increasing our salesforce to take advantage of this fact.  We ended 2007 with about 400 quota bearing sales reps.  We ended the quarter with about 450 quota bearing salespeople and have open requisitions for about 50 more.  It does take some time for new sales reps to achieve full productivity, but we do expect that over time, sales will increase proportionately to headcount increases.

The operational improvements I've described have generally occurred within the current legacy processes and systems.  By that I mean until recently, we were utilizing less than efficient processes and systems that were employed by the companies we acquired over the last 18 to 24 months.  So for several quarters we've been testing and deploying a unified set of processes and systems we refer to as Unity.  We're on track to migrate to our Unity processes and systems over the course of this year and over the early part of next year.

*     *     *

Late last year when we reported difficulties, we had issues with customer experience.  And if you wanted a metric that many customers were pointing to specifically, it was the increase and install intervals which grew in some cases to double what they should have been. On average, they were up 50% to 60% above what they should have been, unacceptable performance.  We said earlier this year that install intervals had returned to the levels so that we were meeting our promises to customers although at a lower install level than we could have and should have achieved, as demonstrated by the kind of sales we had last year but were unable to install.

161.    ~~144.~~Recently, during an April 28, 2009 conference call with investors and analysts, defendant Patel disclosed that Level 3's sales are still plagued by "integration issues and the customer experience issues that we have created for ourselves."

## CONFIDENTIAL WITNESSES

162.    Plaintiffs make the allegations herein, except as to allegations specifically pertaining to plaintiffs and their counsel, based upon the investigation undertaken by Lead Plaintiff's counsel, which investigation included analysis of publicly available news articles and reports, public filings, securities analysts' reports and advisories about Level 3, interviews of former employees of Level 3, press releases and other public statements issued by the Company, and media reports about the Company.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

163.    Moreover, the allegations made herein are supported by the first-hand knowledge of 16 confidential witnesses.  These individuals are former employees of Level 3, and provided facts

relevant to the alleged fraud.  As detailed below, each of the CWs worked in positions at Level 3 that provided them with first-hand knowledge of the information they are alleged to possess.

164.   CW#1 is a former Senior Director of Network Integration for Level 3.  CW#1 obtained the position as Senior Director in November 2006 and served previously at the Company in various network planning positions in the years leading up to the Class Period.  CW#1 served as Senior Director from November 2006 through the end of the Class Period.  As Senior Director of Network Integration, CW#1 was primarily responsible for managing the integration of the networks Level 3 acquired as alleged herein, including WilTel.  CW #1 began working for Level 3 in 2000, and filled various network planning and circuit engineering roles until becoming Senior Director in 2006.

(a)   CW#1 is the source of the allegations set forth at ¶¶107-109, 135-140;

(b)   When CW#1 obtained the position of Senior Director of Network Integration in November 2006, Level 3 was at the earliest stages of Step 4 of NI process of WilTel – the most time intensive and difficult step in the NI process – and was in the process of building network interconnects and capacity;

(c)   During the due diligence of WilTel, Level 3 believed that WilTel maintained an exceptional circuit database inventory and that the integrity of that data was "first-in-class."  At the time CW#1 obtained the position of Senior Director in November 2006, it became immediately apparent that the WilTel network inventory data was, in fact, highly inaccurate and was even more flawed than Level 3's network inventory data.  Because of the highly inaccurate nature of the WilTel and Level 3 network element inventory data as of November 2006, the completion of Steps 1 and 4

of the NI integration process were behind schedule as of November 2006 and throughout the Class Period;

(d)    As a direct result of the delays in Steps 1 and 4 of the NI process with regard to WilTel, Level 3 was unable to timely provision orders for many of its customers throughout the Class Period, including important customers such as Citibank.  Provisioning problems caused by integration difficulties experienced by Level 3 were widely known throughout the Company, including by defendants Crowe and O'Hara.  These problems were apparent in November 2006 and only grew worse during the Class Period;

(e)    As a direct result of the delays in Steps 1 and 4 of the NI process, throughout the Class Period, Level 3 consistently missed Network Expenses ("NetEx" reductions, as budgeted by senior management, including the Individual Defendants) by millions of dollars on a monthly basis, as well as monthly recurring revenue targets by millions of dollars;

(f)    Defendant O'Hara was responsible for the oversight of NI procedures during the Class Period.  As part of Level 3's strict "metric-based" performance culture, defendant O'Hara set quantifiable, objective performance criteria and measured performance of the NI organization against those criteria during the Class Period.  Key metrics measured by Level 3 included NI status, NetEx and capital budgets.  Defendant O'Hara participated in integration status review meetings with the NI team and had full knowledge of the delayed status of NI and customer provisioning issues Level 3 suffered throughout the Class Period;

(g)    There were numerous Steering Committees at Level 3, including the Unity Steering Committee and the NI Steering Committee.  The Unity Steering Committee was headed by defendant O'Hara.  The NI Steering Committee was headed by Level 3's Chief Technology Officer,

Jack Waters, and Level 3's VP of Integration and Development Services, Kevin Paul.  The NI Steering Committee directly reported to defendant O'Hara; and

(h)      Defendant O'Hara conducted daily meetings concerning the customer complaints concerning delayed provisioning Level 3 was suffering as a result of NI delays throughout the Class Period.  CW#1 attended numerous daily meetings where O'Hara was present throughout the Class Period.  CW#1 confirmed that defendant O'Hara had direct knowledge of the integration and provisioning problems at Level 3 during the Class Period based on CW#1's personal knowledge of the reporting processes and status review meetings involving O'Hara, as well as the content of the reports presented, or rolled up, to O'Hara.  CW#1 provided NetEx reports to the NI Steering Committee and summary level integration status Gantt charts (or "crawl charts") were presented during the Committee's meetings.

165.      CW#2 is a former Senior IT Manager for Software Applications.  CW#2 previously worked for Looking Glass and obtained the position as Senior IT Manager for Software Applications in August 2006, when Level 3 acquired Looking Glass.  CW#2 left Level 3 in September 2007 because of the chaotic environment that pervaded the Company with respect to the integration of the acquired businesses.  As Senior IT Manager for Software Applications, CW#2 was primarily responsible for managing the integrating of Looking Glass' legacy IT systems onto Level 3's Unity System.  CW #2 began working for Looking Glass in 2001, and held various positions in the IT Department, including Director of Operation Support Applications, before becoming Senior IT Manager for Software Applications in 2006.

(a)      With the exception of Looking Glass, Level 3 immediately terminated nearly every "subject matter expert" – *i.e.*, the individuals with the most knowledge of the acquired

businesses' legacy systems – working for each acquired business.  This strategy materially delayed the process of integrating the acquired businesses' IT platforms and network element inventory data because of loss of people most knowledgeable of these systems.  CW#2 was often tasked by the Level 3 IT Department to take on the responsibilities of the terminated subject matter experts from the other acquired businesses;

(b)     Despite constant warnings and reminders to the Level 3 IT Department that CW#2's IT integration team would need time to actually learn and understand the other acquired businesses' IT platforms, whether they were similar to those of Looking Glass or not, Level 3 refused to allow sufficient time for CW#2's IT integration team to properly understand numerous unique systems, such as NetCracker, Granite, MetaSolve, Cramer, Cygent and Remedy; and

(c)     Throughout 2007, and as a result of defendants' choice of immediately terminating the acquired businesses' subject-matter experts, Level 3 product and service provisioners worked in a state of "chaos."  This "chaos" was a symptom of the immediate termination – forcing Level 3 employees to work with disparate provisioning systems causing provisioning times to often extend to 3 weeks versus the 3 day provisioning time Level 3 enjoyed.  CW#2 repeatedly discussed the chaotic state of Level 3's provisioning systems with Level 3's Director of Provisioning.

(d)     Before CW#2's employment started with Level 3, the Company launched "Project Unity" to manage the progress of the integration of the acquired businesses.  The purpose of Project Unity was to transition all of the individual IT systems utilized by the acquired businesses ("legacy" systems) onto Level 3 common operating platforms;

(e)     With respect to Project Unity, the integration teams tasked with the transition of the acquired businesses to Level 3 systems were responsible for creating weekly "Integration

Status Reports."   After the reports were completed, they were rolled up to Level 3 IT Project Managers;

(f)     With regard to the Looking Glass IT integration project, Level 3 IT Project Managers Eric Olsen and Andy Jacobs rolled up the Integration Status Reports to the Project Management Office and Level 3 senior management, including O'Hara and Hart.  The Integration Status Reports were published weekly on Level 3's "Dashboard."  Each Dashboard was available to each of the Individual Defendants *via* Level 3's intranet.  The reports were in "red-yellow-green" or "RYG" format, meaning that integration tasks on time with little risk of delayed deadlines would be "green" or on track, and task of higher risk of completion by set deadlines would be "red" or "yellow."

166.   CW#3 is a former Transport Product Manager at Level 3.  CW#3 previously worked for WilTel and obtained the position as Transport Product Manager in December 2005, when Level 3 acquired WilTel.  CW#3's employment with Level 3 as a Transport Product Manager extended beyond the end of the Class Period.  As Transport Product Manager at Level 3, CW#3 was primarily responsible for the profit and loss for Level 3's "Optical Wave" product, including tracking sales, revenue and issue resolution.  CW #3 began working for WilTel in 2000, and performed various job functions relating to optical transport technology before becoming Transport Product Manager in 2005.

(a)     Throughout the Class Period, order fulfillment delays, customer complaints, customer trouble tickets, and service quality problems that arose during the integration process were regularly reported by Product Managers to Level 3's President of Wholesale Markets, Choksi.  Choksi, in turn, directly reported these matters to O'Hara and Crowe.  During the Class Period,

507036_1

Choksi, O'Hara and Crowe also met with several Level 3's "high-revenue" customers in response to complaints regarding pervasive order fulfillment delays caused by the failure to integrate WilTel inventory control and provisioning systems and these meetings transpired at the customers' premises;

(b)     Order fulfillment and provisioning problems began to occur immediately after the WilTel acquisition in March 2006.  CW#3 confirmed and corroborated that order fulfillment and provisioning problems increased in severity with each acquisition subsequent to WilTel.  As each business was brought on board by Level 3, transport products and services, including "Optical Waves" or "lit IRUs", only grew worse and more pronounced;

(c)     Beginning in March 2006, product managers of WilTel experienced at least a doubling of provisioning times for active IRUs, from 30 days to at least two months, because product managers were forced to work with multiple legacy network inventory control and provisioning systems;

(d)     Throughout the Class Period, order fulfillment delays, customer complaints, customer trouble tickets, and service quality problems that arose during the integration of the acquired businesses were reported by Product Managers to Level 3's President of Wholesale Markets, Choksi.  Choksi, in turn, directly reported these matters to O'Hara and Crowe; and

(e)     By the time CW#3 left Level 3 in May 2008, the Company's new Unity-based order management and provisioning systems were neither in place nor operational.

167.    CW#4 is a former Customer Project Manager at Level 3.  CW#4 previously worked for Broadwing and as a Customer Project Manager and maintained this position when Level 3 acquired Broadwing.  CW#4's employment with Level 3 as a Customer Project Manager extended

beyond the end of the Class Period.  As Customer Project Manager at Level 3, CW#4 was primarily responsible for customer orders and handling inquiries of customers that included 20 Fortune 1000 companies.

       (a)     In 2007, during the Broadwing integration, O'Hara met with the business' legacy at a former Broadwing office in Chicago.  During the meeting, O'Hara informed Level 3 employees that the Company's executive management recognized and were aware of the problems the Chicago team was experiencing – namely increased order processing intervals due to having to utilize new provisioning systems; and

       (b)     Although O'Hara promised to provide additional training, from the time of Broadwing's acquisition through the end of the Class Period, legacy Broadwing employees were not given adequate training to use the several new order and provisioning network systems in a remotely efficient manner.

168.    CW#5 is a former Director of Sales Enablement at Level 3.  CW#5 worked for Level 3's sales organization since 1999, and held the position of Director of Sales Enablement during and after the end of the Class Period.  As Director of Sales Enablement at Level 3, CW#5 was primarily responsible for integrating the sales functions of the acquired businesses immediately after each business was actually acquired.  CW#5's experience with integrating these functions for Level 3 stretches as far back as the 2003 Genuity, Inc. acquisition.  CW#5 has over a decade's worth of experience of sales support for Level 3's products and services.

       (a)     The actual, physical data migration from the acquired businesses' legacy IT systems into Unity did not commence until 2008.  Level 3's original plan called for Unity system to be completely finished by the end of 2007;

- 114 -

(b)      In 2006, Level 3 successfully ran a small-scale pilot of a single component to the Unity platform – the "front-end" quoting function for transport services.  The next step in the process was to build the unified quoting and order management platform for actual and potential sales orders.  Level 3 failed to complete this step until mid-2007.  Immediately after completing this step Level 3 management realized that Unity had been designed with severe defects, which precluded the possibility of adding quoting tools for other key Level 3 products and services such as high-speed Internet and colocation services;

(c)      Around June 2007, Level 3 decided to scrap the entire Unity platform and rebuild it from scratch; and

(d)      Level 3's initial efforts to create a new and different design for the quoting tool portion of Unity did not recommence until the end of 2007.  This build also resulted in a design that was barely operational, if at all.  Level 3 did not complete this narrow build of Unity until March 2008.

169.      CW#6 is a former Senior Software Analyst at Level 3.  CW#6 previously worked for WilTel and began working for Level 3 as an IT Developer I in December 2005, when the Company acquired WilTel.  CW#6 became Senior Software Analyst during the middle of 2007 and remained in this position beyond the end of the Class Period.  While employed by Level 3, CW#6 was primarily responsible for system support and development activities related to WilTel's legacy network inventory and provisioning systems.  CW#6 began working for WilTel in 1999, and held various Analyst and Developer positions in the IT organization until becoming Senior Software Analyst in 2007.

(a)     CW#6 confirmed and corroborated that Level 3 terminated virtually all of the subject-matter experts with knowledge about how WilTel's legacy inventory control and provisioning systems operated prior to WilTel being fully integrated;

(b)     Level 3 failed to complete the data migration process of WilTel's network inventory and provisioning system prior to May 2008.  WilTel's network inventory control and provisioning system was called "openCI." Level 3's integration plan required openCI to be migrated over to Level 3's network inventory control and provisioning systems, known as "Network Engineer" and "Granite" by the end of 2007.  Level 3 did not start the project until 2Q07; and

(c)     As of 2Q07, network engineers and IT workers concluded that 6 months time was not sufficient to complete the process because of the enormous amount of data on the openCI system.  By May 2008, the data mapping portion of the inventory control and provisioning integration was completed.  However, at that time, Level 3 had not yet begun the process of migrating the actual data from openCI to Network Engineer or Granite.

170.    CW#7 is a former Senior Provisioner/Circuit Designer at Level 3.  CW#7 previously worked for Looking Glass and began working for Level 3 as a Senior Provisioner/Circuit Designer in March 2006, when the Company acquired Looking Glass.   CW#7 served as a Senior Provisioner/Circuit Designer for Level 3 beyond the end of the Class Period.   As a Senior Provisioner/Circuit Designer, CW#7 was primarily responsible for taking product and service order specifications and determining how to fulfill those orders based on the network inventory available on Level 3's network and dedicating or assigning particular network elements associated with the orders.  CW#7 held positions related to provisioning and circuit design at various companies for

several years leading up to the class period.  CW#7 characterized Level 3's integration processes during the Class Period as a complete "cluster-f!@#."

       (a)     CW#7 confirmed and corroborated that Level 3's migration of Looking Glass' and Progress' network inventory data and provisioning systems during the Class Period was just as big of a mess as the processes related to the WilTel acquisition, and likely worse;

       (b)     CW#7 confirmed and corroborated that Level 3 fired too many subject-matter experts before the Company was ready to dispense with the knowledge and experience those personnel possessed and could bring to bear to ensure reasonably smooth integration efforts;

       (c)     During fall 2006, Level 3 sent several senior Looking Glass employees, including CW#7 and several other circuit designers, to participate and oversee the integration of both the Looking Glass and Progress network inventory control and provisioning systems.  The critical "middle" stage – *i.e.*, the "heavy lifting" – of this integration work was the migration of network inventory data for Progress and Looking Glass onto Level 3's supposedly superior inventory management system know as "Granite."  Defendants planned that this work was to be completed the third quarter of 2007;

       (d)     Before migrating the network and systems data of Progress and Looking Glass, however, it was necessary for Level 3 to ensure that network inventory data was as complete and accurate before transferring it to Level 3 systems.  Level 3 first had to ensure that it knew what network elements, in fact, existed on the Looking Glass and Progress networks;

       (e)     As of July 2007, the Level 3 senior circuit designers were fully aware that they did not know what Looking Glass and Progress inventory existed or which elements or portions of elements were in use;

(f)      Level 3 proceeded to transfer, however, all the flawed and inaccurate Looking Glass and Progress circuit data onto the Granite system in July 2007.  As a consequence, Level 3's inventory of network elements became infected with inaccuracies.  As a direct consequence, Level 3 experienced material delays in fulfilling orders for major customers because the Granite system now contained data regarding network elements that had no physical existence;

(g)      Throughout 2007, integration failures lead to delayed customer provisioning (referred to as "horrific" within Level 3) for customers such as Verizon Wireless and NuVox.  As of July 2007, Level 3 had failed to integrate the network inventory systems of ICG onto the Granite system;

(h)      Level 3 failed to migrate TelCove's inventory management systems by the end of 2008, because Level 3's TelCove's existing inventory and inventory control systems data was an unmanageable "rat's nest" at the time of the acquisition; and

(i)      By December 2008, Level 3 had still not completed the work of transferring network inventory data, which had been confirmed to exist in the physical world, from the acquired businesses.

171.      CW#8 is a former Circuit Design Engineer at Level 3.  CW#8 previously worked for TelCove and began working for Level 3 as a Circuit Engineer March 2006, when the Company acquired TelCove.  CW#8 served as a Circuit Engineer for Level 3 beyond the end of the Class Period.  As a Senior Circuit Engineer, CW#8 was primarily responsible for designing circuits, which CW#8 described as part of the provisioning process.  CW#8 has more than a decade of experience in circuit design and engineering, having worked since 1999 at Hyperion Communications, Adelphia Business Solutions, and TelCove.

507036_1

(a)      TelCove's IT systems were not integrated with Level 3's during the Class Period and TelCove literally operated as a separate company from the Company at all relevant times;

(b)      TelCove's legacy provisioning platform was called Access Request, a combination of the provisioning systems called Remedy and Aurora.  Level 3 began planning for the integration of Access Request into Level 3's Unity system in early 2007, but Level 3 failed to migrate the Access Request inventory network data to Level 3's system; and

(c)      As a result of Level 3's failure to integrate any of TelCove's provisioning systems during the Class Period, circuit design engineers were forced to use only the Access Request system to provision TelCove products and services throughout calendar 2008.

172.    CW#9 is a former Sales Engineer at Level 3.  CW#9 previously worked for TelCove and began working for Level 3 as a Sales Engineer in March 2006, when the Company acquired TelCove.  CW#9 served as a Sales Engineer for Level 3 beyond the end of the Class Period.  As a Sales Engineer, CW#9 was primarily responsible for following the circuit design process as carried out by the provisioners and ensuring that the provisioners and field technicians were installing sales orders on time.  CW#9 began working at TelCove in 1995, and held the position of Sales Engineer for over a decade before becoming an employees of Level 3 in 2006.

(a)      Difficulties in migrating the Access Request system onto Level 3's Unity system, in combination with the abysmal sate of TelCove's network element inventory, caused a 400% increase in service times to customers, both current and new.  Prior to the TelCove and Level 3 merger in July 2006, TelCove customer orders were typically filled in 10 days.  After the merger and throughout the Class Period, most of TelCove's orders took a minimum of 45 days to install; and

(b)     Level 3's order "backlog" represented the value of various customer orders that had been placed, but had not been provisioned.  During the Class Period, the Company's backlog materially increased because of defendants' failure to integrate the acquired businesses' provisioning systems throughout 2006 and 2007.  In February 2007, Level 3's Vice President of Sales, Jeff Bettaker, spoke to Level 3 employees, including sales engineers, about the Company's order backlog at a sales conference in Dallas, Texas.  Mr. Bettaker acknowledged in February 2007 that the order backlog was a major problem at Level 3, and promised conference attendees that Level 3 would hire more Customer Project Managers to address the matter.

173.    CW#10 is a former Customer Project Manager at Level 3.  CW#10 previously worked for TelCove and began working for Level 3 as a Customer Project Manager in March 2006, when the Company acquired TelCove.  CW#10 served as a Customer Project Manager for Level 3 beyond the end of the Class Period.  As a Customer Project Manager, CW#10 was primarily responsible for serving as the point of contact between Level 3's customers and the Company's provisioners.

(a)     During the Class Period, Customer Project Managers throughout the Level 3 organization witnessed first-hand how the Company's failure to integrate the acquired businesses' legacy network systems into its own caused severe delays in provisioning and filling customers' orders;

(b)     For instance, certain Project Managers, prior to January 2007, coordinated the fulfillment of five to six orders a month.  After January 2007, one Project Manager handled only eight orders in an entire year because several legacy network systems of the different acquired businesses had not been timely integrated by Level 3; and

(c)     Beginning in January 2007 and throughout the remainder of the Class Period, as a direct result of the lack of cohesion among network systems, average order installation times for the orders CW#10 dealt with ballooned from 30 days to at least 90 days.

174.     CW#11 is a former Proposal Manager at Level 3.  CW#11 previously worked for WilTel and began working for Level 3 as a Proposal Manager in December 2005, when the Company acquired WilTel.  CW#11 served as a Proposal Manager for Level 3 beyond the end of the Class Period.  As a Proposal Manager, CW#10 was primarily responsible for putting together requests for proposals for major customers, such as government agencies and telecommunications services providers.  CW#11 began working for WilTel as a Proposal Manager in 1999, and remained in that position when Level 3 acquired WilTel in 2005.

(a)     During summer 2006, British Telecom put a complete freeze on ordering new IP data services from Level 3 because the Company was unable to provision the order.  British Telecom halted all new orders because Level 3 was wholly unable to install its orders for various optical services, including a "10 gig back-boom";

(b)     During summer 2006, the Company informed British Telecom that the installation would not be able to be completed for another 6 months.  As a consequence, Level 3 was forced to pay concessions to British Telecom because of the installation delays and in order to retain British Telecom as a customer;

(c)     Throughout the Class Period, another large Level 3 customer, AT&T, was cancelling portions of SBC's business with Level 3 due to AT&T's dissatisfaction with voice and data outages associated with Level 3's network; and

(d)     CW#11 corroborated and confirmed that AT&T was cancelling portions of its business with Level 3 because of repeated service outages on Level 3's network.

175.    CW#12 is a former Proposal Manager at Level 3.  CW#12 began employment with Level 3 prior to the Class Period and worked at the Company beyond the Class Period.  While employed by Level 3, CW#12 maintained the position of Voice Technician/Call Center Shift Lead and during the summer of 2007, became a Customer Project Manager.  In both of these positions, CW#12 became knowledgeable about service complaints made by one of Level 3's largest customers, AT&T.

(a)     Around June 2006, AT&T became so angry and impatient with the Company's level of voice service that AT&T cancelled more business with Level 3 than Level 3 had previously disclosed was being transferred to the SBC network in connection with the WilTel acquisition;

(b)     Voice and data outages occurred as a result of Level 3's haphazard decommissioning and consolidation of its networks during the integration of network inventory control and provisioning systems for the WilTel acquisition.  During this process, networks and customers, including AT&T, lost telephone and data services because Level 3's order tracking and customer management systems could not accurately determine which customers had service on which networks; and

(c)     Because of the poor order tracking and customer management systems, Level 3 was decommissioning networks that still had active customers, resulting in service outages.

176.    CW#13 is a former Provisioner at Level 3.  CW#13 previously worked for TelCove and began working for Level 3 as a Provisioner in March 2006, when the Company acquired

- 122 -

TelCove.  CW#13 served as an Order Specialist for Level 3 beyond the end of the Class Period.  As an Order Specialist, CW#13 was primarily responsible for putting together orders to complete the "last leg" needed to connect Level 3's infrastructure to those of incumbent local exchange carriers, such as Verizon, Sprint and BellSouth.  CW#13 had worked for almost seven years at TelCove prior to Level 3's acquisition of TelCove, serving as an Order Specialist – very similar to Provisioner.

     (a)    CW#13 confirmed and corroborated that during the Class Period, Level 3 engaged in a practice of terminating virtually all subject-matter experts with knowledge about network inventory control and provisioning systems of the businesses acquired by Level 3; and

     (b)    As a result, CW#13 was given Order Specialist responsibilities for Progress networks, which CW#13 had absolutely no knowledge about at the time of the assignment.

177.    CW#14 is a former Executive Assistant, Customer Project Manager and Billing Analyst at Level 3.  CW#14 previously worked for Broadwing beginning in 2000 and began working for Level 3 as an Executive Assistant, when the Company acquired Broadwing.  CW#14 served as a Billing Analyst for Level 3 beyond the end of the Class Period.  As a Customer Project Manager and Billing Analyst, CW#14 was primarily responsible for tracking customer problems and billing disputes.

     (a)    CW#14 confirmed and corroborated that during the Class Period, Level 3 engaged in a practice of terminating virtually all subject-matter experts with knowledge about network inventory control and provisioning systems of the businesses acquired by Level 3, including those subject matter experts at Broadwing;

507036_1

(b)      Those Broadwing employees most knowledgeable about the customer data resident in Broadwing's network inventory control and provisioning systems were fired and were not available to confirm what data had grown stale and inaccurate; and

(c)      As a consequence, Level 3 began decommissioning Broadwing network elements only to learn that there were customers on the networks decommissioned.

178.    CW#15 is a former Customer Project Manager at Level 3.  CW#15 previously worked for Broadwing and began working for Level 3 as a Customer Project Manager when the Company acquired Broadwing.  CW#15 served as a Customer Project Manager for Level 3 beyond the end of the Class Period.  As a Customer Project Manager and Billing Analyst, CW#15 was primarily responsible for addressing customer order issues, particularly provisioning delays.

(a)      During the Class Period, and immediately upon the acquisition of Broadwing, Customer Project Managers experienced a doubling of provisioning times for customer orders because, in addition to tracking order status on multiple software systems, the orders were being provisioned on multiple legacy systems;

(b)      In particular, if fulfilling an order required Broadwing network inventory, Customer Project Managers were forced throughout the Class Period to enter the order on "Clarify," Level 3's system, and IQONS, Broadwing's order tracking systems.  Then, the circuit designers and provisioners were forced to design the circuit in Broadwing's Circuit Vision provisioning system and then in Level 3's Fusion system;

(c)      Prior to Level 3 acquiring Broadwing, the order-to-provision process took 12 days.  After the acquisition, and as a result of the failure to integrate the disparate inventory control and provisioning systems, the process stretched to 24 days; and

(d)    The doubling of provisioning times only grew worse as Level 3 purchased additional businesses or attempted to work with additional legacy systems.

179.    CW#16 is a former Circuit Design Engineer at Level 3.  CW#16 previously worked for Broadwing and began working for Level 3 as a Circuit Design Engineer in October 2006, when the Company acquired Broadwing.  CW#16 served as a Circuit Design Engineer for Level 3 beyond the end of the Class Period.  As a Circuit Design Engineer, CW#16 was primarily responsible for "network grooms", which is the process of redesigning existing circuits within Level 3's networks for the purposes of increasing efficiency and reducing costs.

(a)    Immediately after the Broadwing acquisition closed in January 2007, Level 3 dismantled Broadwing's entire IT department and transferred its functions to contractors overseas. Following this dismantling, no technical support existed for Broadwing's systems;

(b)    CW#16 noted that she was forced to utilize WilTel's inefficient provisioning system beginning in November 2006 and, as a consequence, that it took twice the amount of time that it normally took to complete network grooms utilizing the inefficient WilTel provisioning system.

## ADDITIONAL ALLEGATIONS OF SCIENTER

**Defendants' Knowledge of the Fraud Through Internal Reports and Meetings**

180.    Throughout the Class Period, the Individual Defendants were intimately involved in and continuously kept informed of all aspects of Level 3's network integration of WilTel, the metro ring companies, and Broadwing.  The Individual Defendants followed the status of this integration through several different recurring reports:

(a)     A "Level 3 Integrations Weekly Executive Report" was prepared each week, and showed the exact number of transport interconnects that were complete and that remained incomplete. The Integration Weekly Executive Reports also reflected the total intercity route miles that were duplicative or not duplicative (referred to as "unique"), and that needed to either be darkened (if duplicative) or remain lit (if unique) in order to complete the route integration.

(b)     "Executive Integration Bi-weekly Update" reports were also distributed, which reflected the status of the various components of integrating the acquired companies' networks onto Level 3's – including the network inventory platform and data conversion program (utilizing the Granite/Network Engineer system), order entry programs (utilizing the Siebel system), customer orders and network order management programs (utilizing the Savvion system).  The Executive Integration Bi-weekly Update reports also included the completion metrics for the acquired companies' transport interconnects, specifically noting which local service offices and user buildings were not yet activated due to installation delays.  These reports set forth the number of miles of intercity route integration yet to be completed.  An "Operation Integration Program Dashboard" was included in the reports, which detailed the status of certain operational aspects of the integration.

(c)     "Network Integration Program Review" reports tracked the transport interconnect completion metrics for the acquired companies, including a breakdown of planned versus actual progress toward completion.  The Network Integration Program Reviews also kept the Individual Defendants apprised of the total route miles, broken down by acquired company, that still needed to be integrated into Level 3's network.

(d)      "Major Integration Project Schedule" reports tracked in detail which transport interconnects were complete and when, as well as how many still needed to be completed.  The Major Integration Project Schedules also set forth which resources were required – *i.e.*, architecture, engineering, planning, circuit design, and field operations – to complete the route integration.  The network redundancies that still needed to be eliminated were shown in miles.  Furthermore, the Major Integration Project Schedules listed the capital that would be needed to continue working on integrating the acquired companies' networks in 2008.

(e)      "Network Integration Weekly Operations Review" reports contained details regarding the status of the integration of the acquired companies' transport interconnects, including transport interconnect completion metrics on a planned versus actual basis.  Within these reports, the market risk detail and market interconnect RAG ("Red-Amber-Green") trends[5] showed the significant delays in completing the integration of the transport interconnects, including those specifically servicing cities on the WilTel network.  Network Integration Weekly Operations Review reports further specified the total route miles, broken down by acquired company, that needed to either be decommissioned or remain lit in order to complete the route integration portion of the physical network integration, as well as the budget for completing the route integration.

(f)      "Network Integration Overview" reports also detailed the status of integrating the transport interconnects for the acquired companies and the miles that remained for route

---

[5]      This "RAG" or "Red-Amber-Green" format showed integration tasks currently running on schedule as "Green" and those already past the deadline for completion as "Red."

integration to be completed.  These reports set forth the number of transport network elements that had been decommissioned and how many still needed to be darkened to eliminate redundancies.

(g)     "Network Integration Prioritization Recommendation" reports detailed ongoing integration projects that were either recommended priorities or de-prioritized.  These reports showed defendants' first priority for network integration projects switched from cost reduction to network quality at the end of 2007.  The Network Integration Prioritization Recommendations also identified the status of the market interconnects and the long haul route integration.

(h)     "Network Integration Monthly Budget Update" reports set forth the network integration capital expenditure budget on a planned versus actual and monthly basis.  The Network Integration Monthly Budget Updates also specified the primary variance drivers of these capital expenditures.  Most importantly, these reports set forth a detailed view of the integration capital expenditures budget for all of the acquired companies, which included the baseline budget for the cost of WilTel integration activities for 2007, including work yet to be done on transport interconnects, transport route integrations and transport network element removal.

(i)     "Network Integration CAPEX & Synergy Review" reports for the years 2007 through 2009 specifically outlined the cost of completing transport interconnects and route integration.  These reports set forth in detail the amount of capital defendants anticipated would be needed for tasks related to the integration of each acquired company, including the expenses needed to continue working on the WilTel, monitoring, and Broadwing transport interconnects and route integration.

(j)     Throughout the Class Period defendants also tracked the approval of capital each expenditure request to fund integration activities – including transport interconnect, route

507036_1

integration, and transport network element removal – in reports entitled "Integration CAPEX Approval Tracker," "Monthly and Cumulative CAPEX Approvals by Program," "Integration CAPEX by Program Code," and "Integration CAPEX by Program."

181. Level 3's Integration Steering Committee , comprised of Level 3 executive level managers including O'Hara and Hart, oversaw and had final approval authority over all Unity-related integration-related projects. The Integration Steering Committee was comprised of the Company's executive level managers, including defendant O'Hara and Level 3's CIO Hart. Prior to and throughout the Class Period, the Integration Steering Committee met on a regular basis to discuss Unity's the status and schedule of the integration of the acquired companies. During the Class Period, O'Hara directly reported the status of the integration of the acquisitions, as well as the Integration Steering Committee's observations and conclusions about the network integration, to the remainder of Level 3's senior management, including defendants Crowe, Miller and Scott. Various The Integration Steering Committee supervised the various integration teams tasked with the transition of responsible for transferring the acquired businesses companies to Level 3's network and systems created. Each of these integration teams was responsible for preparing weekly Integration Status Reports, which that were produced provided to Level 3 IT Project Managers. These reports IT Project Managers prepared Weekly Integration Status Reports, which tracked the status of the integration of the acquired companies, were also published weekly on Level 3's "Dashboard" and were available to each Individual Defendant on the Company's intranet. The reports were in "red-yellow-green" or "RYG" format, which is analogous to the "RAG" or "Red-Amber-Green" format contained in the Network Integration Weekly Operations Review reports.

182.   ~~meaning integration tasks currently running on time were "green," and those already past the deadline were displayed as "red." Als~~Furthermore, throughout the Class Period, order fulfillment delays, customer complaints and trouble tickets, and service quality problems resulting from the faulty integration process were regularly reported by IT Product Managers to Level 3's President of Wholesale Markets, ~~Sureel~~ Choksi.  Choksi, in turn, directly reported these matters to defendants O'Hara and Crowe during frequent recurring meetings.~~Level 3 executives, including the Individual Defendants, were updated regarding the Service Delivery Group's inability to provision orders due to a lack of network capacity on a weekly basis via Operational Overview Deck reports.~~

183.   At a Level 3 sales conference in Dallas in February 2007, the Company's Vice President of Sales, Jeff Bettaker, acknowledged Level 3's order backlog was a major problem.  This order backlog represented the value of customer orders that had been placed, but had not been provisioned, which materially increased during the Class Period as a result of defendants' failure to integrate the acquired businesses' provisioning systems.

**Customer Complaints**

184.   ~~146.~~Throughout the Class Period, defendants were aware of the customer complaints stemming from the order provisioning problems.  For example, Level 3's President of Wholesale Markets, ~~Sureel~~ Choksi, along with defendants O'Hara and Crowe, met with the Company's "high-revenue" customers during the Class Period in response to complaints regarding pervasive order fulfillment delays caused by the failure to integrate WilTel inventory control and provisioning systems.  These meetings occurred on customers' premises.  Also, O'Hara specifically met with customers NuVox and XO Communications in an attempt to address their complaints about Level 3's delay in fulfilling orders.  AT&T, one of Level 3's largest customers, was consistently

507036_1

dissatisfied with Level 3's service in late 2006 and 2007 because of the massive delays in the fulfillment of its orders and service outage. During the Class Period, Crowe received complaint calls from its customers' executives, including Verizon Wireless. One Level 3 customer, British Telecom, halted all new IP data service orders beginning in summer 2006 because the Company was unable to install the customer's optical service orders for at least another six months. Level 3 was forced to pay cost concessions just to keep British Telecom as a customer. Similarly, in the fall of 2007, Level 3 senior management, including Crowe, participated in numerous conference calls among themselves and with angered customer Collier Community School District in Florida due to the Company's failure to fulfill its $20,000 order in a timely manner. By September 2007, Level 3 stopped providing intercity Ethernet services to some parts of the East Coast because it could not fix the network.

**Defendants as Self-Proclaimed Integration Specialists**

185. ~~147.~~Prior to and throughout the Class Period, defendants emphasized that Level 3 and its executives and senior management were proficient in integrating acquired businesses and focused on ensuring successful integrations. On May 1, 2006, O'Hara stated in a press release: "'[w]ith our experience and expertise in integration activities . . . we are well positioned for a smooth integration process.'" On an October 24, 2006 earnings conference call, Crowe stated "[w]e have [been] working on integration tasks and it's . . . one we take seriously and one we think we are developing pretty good skills in." On April 26, 2007, O'Hara assured investors and analysts during a conference call: "[t]he overall integration effort . . . is an area that we are monitoring closely . . . and [we] will be monitoring our performance in this area closely." During the same conference call, Crowe expanded upon O'Hara's pledge to the market: "[w]e understand that [integrating acquisitions] is

our operational challenge and our opportunity and it is job #1, and we are determined to insure that Level 3 ends 2007 with one network platform, one set of business processes, and most importantly, with an organization with one set of common values."  Less than a month later, during a Morgan Stanley Communications conference hosted by defendants, Patel stated: "So this year is really focused on integration and getting the synergies from all those acquisitions.  So that is really our top priority."  Even as defendants partially disclosed their failure to successfully integrate the acquired businesses during Level 3's July 26, 2007 2Q07 ~~earning~~ earnings conference call, O'Hara falsely reassured analysts and investors:  "We've also been focused on ensuring that the excellent reputation that Level 3 has earned over the years for customer service does not get degraded. . . . Perhaps most importantly, the challenges we're wrestling with are within our control . . . ."  Crowe echoed this sentiment during the same conference call:  "We are confident, to go right to the point, because all of the issues that we're dealing with are under our control.  All of us. Sunit [Patel], Kevin [O'Hara], myself, have been involved with dozens of integrations over the last 20 years . . . ."

**Admissions of Knowledge at the End of the Class Period and After the Class Period**

186.     ~~148.~~ On the last day of the Class Period, and until at least April 2009, defendants repeatedly admitted they were aware during the Class Period that Level 3 was failing to integrate the acquired businesses, in contrast to what they were representing to investors.  During Level 3's 3Q07 earnings conference call on October 23, 2007, Crowe stated:

> As part of realizing synergies, we then laid off people familiar with each of these individual order entry systems, inventory, provisioning and other systems, before we had assured we could meet our provisioning targets.  And while we paid close attention to sales and integration cost targets, we did not monitor detailed operational metrics as closely as we should have. . . . we took our eye off the detailed essential work of end to end provisioning that is critical to provisioning success.

187.    ~~149.~~Defendants continued to admit they had knowledge of the fraud during the Class Period months after the Class Period ended.  For example, during a November 14, 2007 Merrill Lynch conference call, Patel acknowledged that order backlog was not stabilizing due to defendants fixing the integration problems as they had represented in July and September 2007, and rather, it was leveling out "because our sales were being constrained to hit just the level that we could install." On a February 7, 2008 conference call hosted by Level 3, O'Hara admitted the Company's "service quality and management, that is how well do our network and services perform from a quality standpoint once service has been initiated for our customer; and service delivery, the process of taking a customer order and then activating the service . . . deteriorated through the first half of 2007."  During that call, O'Hara also admitted that the Company's massive provisioning and product definition problems caused sales of products to be completely suspended, stating  "In order to quickly and smoothly provision new service orders, the product being sold and ordered must be clearly defined, and all required technical information must be captured and consistently delivered to the provisioning organization. . . . Sales of some products were suspended if the level of product readiness was deemed to be a source of significant operational challenges."

188.    ~~150.~~Despite defendants' assurances to the market during the Class Period that the integration of acquired businesses was right on track, on March 13, 2008, Level 3's President of Business Markets Group, Raouf Abdel, revealed the TelCore and Broadwing acquisitions were far from complete, stating: "'We are not done by any means.'"  During an April 23, 2008 conference call with analysts and investors, Crowe admitted:  "As we have said repeatedly, our problem was not caused by market demand, pricing or our inability to market and sell our services, but, rather to bottlenecks in our service activation processes, which we could and should have prevented."  As

recently as April 28, 2009, during a conference call with investors and analysts, Patel disclosed Level 3's sales are still plagued by "integration issues and the customer experience issues that we have created for ourselves."

**Broadwing Acquisition and Credit Facilities**

189.    ~~151.~~During the Class Period, defendants misrepresented the integration status of WilTel and the other acquired businesses in order to: 1) complete the Broadwing acquisition on more favorable terms, *i.e.*, using less stock than it would have had the truth about the integration status been known to investors; and 2) refinance millions in existing debt at more favorable interest rates, which was necessary to reduce Level 3's cash interest payments on outstanding debt.

190.    ~~152.~~On October 16, 2006, Level 3 announced a definitive deal to purchase Broadwing for a combination of Level 3 stock and cash.  On October 17, 2006, immediately following this announcement, Fitch Credit Rating Agency announced that it viewed the Broadwing acquisition as a credit positive and stated: "[T]he Broadwing acquisition along with the previously announced TelCove acquisition gives Level 3 a firm path, if successfully integrated, toward de-leveraging its credit profile and achieving positive free cash flow in 2008."  During 2007, the combination of the Broadwing acquisition and defendants' false statements about the integration provided an opportunity for the Company to refinance existing debt allowing the Company to beneficially move debt maturity dates out in the future and lower interest rates associated with the debt.  Level 3's ability to refinance its debt at more favorable rates during 2007 improved the Company's cash flow, earnings and earnings per share because the Company lowered the cash interest it paid on a quarterly basis and reduced the quarterly recorded interest expense associated with the debt.

507036_1

191.    ~~153.~~ Level 3 officially acquired Broadwing on January 3, 2007 using a combination of cash and 123 million shares of its common stock that was artificially inflated to $5.59 per share by defendants' false representations about the successful integration of WilTel and Level 3's newly acquired businesses.  Approximately two months after the Broadwing acquisition, on March 14, 2007, Level 3 refinanced the amount of senior secured debt from $730 million to $1.4 billion, its largest credit facility ever at the time, reduced the interest rate of that debt from the London Interbank Offering Rate ("LIBOR") plus 3% to LIBOR plus 2.25% and extended the final maturity of the debt from 2011 to 2014.  Level 3 used the $1.4 billion in proceeds to repay the existing $730 million debt due 2011 and to fund the purchase of other existing debt securities.

**Executive Compensation**

192.    ~~154.~~ Defendants Crowe, O'Hara, Patel and Miller were highly motivated by the terms of Level 3's incentive compensation plans, which tied large portions of their compensation directly to the successful integration of WilTel and the acquired businesses and the performance of the Company's stock price.  The personal wealth of each of these Individual Defendants was dramatically enhanced by the reported business performance of Level 3, as well as the Company's stock price and market capitalization, all of which were inflated by the misstatements and material omissions alleged herein.  In addition to their base salary during FY06 and FY07, defendants received incentive compensation in the form of cash bonuses and equity.  Defendant Crowe alone pocketed more than $19 million in salary and compensation tied to Level 3's performance during FY06 and FY07.  Defendants Miller and Patel each pocketed $5.2 million, and defendant O'Hara took in over $8.1 million.  In total, defendants Crowe, O'Hara, Patel and Miller took in more than $38 million in salary and incentive-based annual compensation during FY06 and FY07, while

deceiving the investing public about the very performance measures on which they were being rewarded.

193.   ~~155.~~Pursuant to Level 3's FY06 and FY07 definitive proxy statements filed with the SEC on April 18, 2007 and April 4, 2008 respectively, the Company established fixed guidelines relating to the cash bonuses awards paid to defendants.  The guidelines included the success of the WilTel integration as well as the acquisition of the other acquired businesses, including Broadwing. In particular, these Individual Defendants were to successfully implement an interim process for selling Level 3's services, including those of the acquired businesses, across all of Level 3's legacy networks.  Crowe, O'Hara, Patel and Miller received nearly $10 million in executive cash bonus compensation during FY06 for their purported success in integrating WilTel and the acquired businesses.

194.   ~~156.~~After the Class Period, however, Level 3 announced that defendants did not receive cash bonuses under the executive bonus compensation plan in 2007 because Level 3's performance in connection with the integration was unacceptable.  Level 3's 2007 Proxy Statement, filed with the SEC on April 4, 2008, gave further details as to why bonuses were not awarded to defendants in 2007, stating:

> Also during the second and third quarters of 2007, the interval over which we activate services that we have sold increased. ***This increase in service activation cycle time had a negative effect on our service installation intervals and the rate of Core Communications Services revenue growth during the second, third and fourth quarters of 2007. During this same period, we also experienced challenges in our service management processes that resulted in longer response times to resolve customers' network service issues***.  As a result of consolidating key operational functions and organizations as part of the integration effort, our operating environment had become more complex in the first half of 2007.

507036_1

195.   ~~157.~~Level 3's long-term incentive or LTI program provided for two types of equity awards to senior management which also motivated defendants to engage in the fraudulent scheme. The first type of equity vehicle was a stock-indexed security referred to as an outperform stock appreciation unit or OSO.  The second type of equity award was restricted stock units or RSUs, the restrictions on which lapse over a period of years.  The Company utilized this blended long-term incentive equity program that combined the use of OSOs and RSUs which allowed it to accomplish several of its compensation philosophy objectives, including providing an "outperformance" element, through the OSO grants that was balanced by the retention element provided by RSUs. Pursuant to Level 3's LTI program, Crowe, O'Hara, Patel and Miller were awarded RSUs and OSOs valued in the millions as compensation based upon Level 3's performance, including its stock price.

196.   ~~158.~~Accordingly, Crowe, O'Hara, Patel and Miller were motivated to maintain and increase their total compensation by engaging in the financial misstatements and omissions alleged herein and, in fact, obtained concrete and personal benefits as a result of their fraud.  The following tables illustrate the total compensation for defendants Crowe, O'Hara, Patel and Miller:

### James Q. Crowe

| Year | Salary | Bonus Awarded | RSU ($s) | Options (Value Realized) | Other Compensation | Total |
|---|---|---|---|---|---|---|
| FY07 | $790,385 | $0 | $5,093,629 | $4,764,284 | $22,250 | $10,670,548 |
| FY06 | $706,731 | $4,000,000 | $1,418,594 | $2,578,290 | $21,600 | $8,725,215 |
| Total | $1,497,116 | $4,000,000 | $6,512,223 | $7,342,574 | $43,850 | $19,395,763 |

### Kevin O'Hara

| Year | Salary | Bonus Awarded | RSU ($s) | Options (Value Realized) | Other Compensation | Total |
|---|---|---|---|---|---|---|
| FY07 | $566,154 | $0 | $1,180,883 | $1,188,564 | $22,250 | $2,957,851 |
| FY06 | $529,231 | $2,500,000 | $690,160 | $1,465,554 | $24,503 | $5,209,448 |
| Total | $1,497,116 | $2,500,000 | $1,871,043 | $2,654,118 | $46,753 | $8,167,299 |

**Sunit S. Patel**

| Year | Salary | Bonus Awarded | RSU ($s) | Options (Value Realized) | Other Compensation | Total |
|------|--------|---------------|----------|--------------------------|--------------------|-------|
| FY07 | $412,115 | $0 | $698,526 | $689,357 | $22,250 | $1,822,248 |
| FY06 | $389,616 | $1,700,000 | $402,662 | $896,392 | $21,600 | $3,410,270 |
| Total | $801,731 | $1,700,000 | $1,101,188 | $1,585,749 | $43,850 | $5,232,518 |

**Charles "Buddy" C. Miller, III**

| Year | Salary | Bonus Awarded | RSU ($s) | Options (Value Realized) | Other Compensation | Total |
|------|--------|---------------|----------|--------------------------|--------------------|-------|
| FY07 | $412,115 | $0 | $698,526 | $689,357 | $22,250 | $1,822,248 |
| FY06 | $389,616 | $1,700,000 | $402,662 | $896,392 | $21,600 | $3,410,270 |
| Total | $801,731 | $1,700,000 | $1,101,188 | $1,585,749 | $43,850 | $5,232,518 |

**Insider Trading**

197.    159. As detailed herein, defendants acted with scienter during the Class Period in that they knew, based on their high level positions at Level 3, participation in meetings, knowledge of customer complaints, cancelled orders and order backlog, that the integration of WilTel and the metro companies was not complete at the same time they were assuring investors otherwise. Defendants failed to disclose the truth, that WilTel's and the acquired businesses' inventory controls and provisioning systems were not integrated onto a unified platform and as a result Level 3 was unable to provision customer orders and the Company's rate of revenue growth was dramatically declining. In addition, the botched integration also hampered Level 3's ability to operate its network for existing customers and respond to service quality problems raised via customer complaints. In addition to their orchestration of the fraudulent scheme, defendants' scienter is evidenced by their coordinated sale of over 308,000 shares of Level 3 stock for nearly $1.7 million in insider trading proceeds. In addition to defendants, other high level officers and directors sold Level 3 shares at coordinated times with defendants, making the total insider trading during the Class Period over 726,000 shares and in excess of $3.9 million in proceeds.

198.   ~~160.~~While issuing the false and misleading statements identified in ~~¶¶88-118~~¶¶54-95, defendants Crowe, O'Hara, Patel and Miller (the "Insider Defendants") sold their shares of Level 3 stock at prices as high as $6.67 per share.  Moreover, the Insider Defendants' sales were highly coordinated, with nearly 65% of the sales occurring in July and October 2007, shortly before Level 3's July ~~25~~26, 2007 and October 23, 2007 disclosures about the Company's provisioning problems (~~¶¶112~~¶¶87, ~~118-125~~96-102) and the remainder occurring on May 1, 2007, just days following the Company's announcement of its 1Q07 results (~~¶¶104-105~~¶¶79-80).  The Insider Defendants were remarkably successful in timing their trades, capturing peak prices when selling.  The average trading price for Level 3 stock in the 90 days after defendants' fraud was revealed was only $3.11 per share.  In sharp contrast, the Insider Defendants unloaded their stock during the Class Period at an average of over $5.29 per share.

199.   ~~161.~~Notwithstanding the Insider Defendants' knowledge that the integration was not complete, the Insider Defendants personally profited from the artificial inflation in Level 3's stock price which their fraudulent scheme created, as follows:

| LAST NAME | FIRST NAME | DATE | SHARES | PRICE | PROCEEDS |
|---|---|---|---|---|---|
| CROWE | JAMES | 7/2/2007 | 60,979 | $5.82 | $354,898 |
| | | 10/2/2007 | 12,306 | $4.67 | $57,469 |
| | | | 73,285 | | $412,367 |
| | | | | | |
| MILLER | CHARLES | 5/1/2007 | 46,713 | $5.36 | $250,382 |
| | | 7/2/2007 | 25,205 | $5.82 | $146,693 |
| | | 10/2/2007 | 5,089 | $4.67 | $23,766 |
| | | | 77,007 | | $420,840 |
| | | | | | |
| OHARA | KEVIN | 5/1/2007 | 30,300 | $5.32 | $161,196 |
| | | 5/1/2007 | 11,550 | $5.30 | $61,215 |
| | | 5/1/2007 | 10,985 | $5.29 | $58,111 |
| | | 5/1/2007 | 4,600 | $5.31 | $24,426 |
| | | 7/2/2007 | 21,362 | $5.82 | $124,327 |
| | | 7/2/2007 | 13,300 | $5.83 | $77,539 |

| LAST NAME | FIRST NAME | DATE | SHARES | PRICE | PROCEEDS |
|-----------|-----------|------|--------|-------|----------|
|  |  | 10/2/2007 | 6,997 | $4.67 | $32,676 |
|  |  |  | 99,094 |  | $539,489 |
|  |  |  |  |  |  |
| PATEL | SUNIT | 5/1/2007 | 35,380 | $5.32 | $188,222 |
|  |  | 5/1/2007 | 131 | $5.29 | $693 |
|  |  | 7/2/2007 | 19,899 | $5.82 | $115,812 |
|  |  | 10/2/2007 | 4,019 | $4.67 | $18,769 |
|  |  |  | 59,429 |  | $323,496 |

200.   During the Class Period, each Insider Defendant was under a duty to abstain from selling their Level 3 stock or disclose the adverse material information concerning the status of the integrations of the acquired businesses as alleged herein.  Each Insider Defendant failed in this duty.

201.   162.During the 22 months prior to the Class Period, the Insider Defendants sold no shares of their Level 3 stock.  During the Class Period, however, they engaged in a selling spree of over 308,000 shares of their Level 3 stock for proceeds of over $1.7 million.

202.   163.In addition to the Insider Defendants, numerous other Level 3 officers with sales at coordinated times with defendants, dumped the Company's stock during the Class Period and before the truth about the failed integration and provisioning problems were disclosed.  Class Period stock sales for just those senior Level 3 officers, other than defendants, required to report their stock transactions to the SEC totaled more than 410,000 shares sold for proceeds of over $2.2 million.  Among those selling during the Class Period were Level 3 directors James Ellis ($150,858 in Level 3 stock sales) and Michael Yanney ($185,310 in Level 3 stock sales), Level 3 officers Raouf Abdel ($111,872 in Level 3 stock sales), John Hobbs ($394,561 in Level 3 stock sales), Brady Rafuse ($648,624 in Level 3 stock sales), Thomas Stortz ($359,896 in Level 3 stock sales) and Eric Mortensen ($40,377 in Level 3 stock sales).  Sureel Choksi, Level 3's President of Wholesale Markets, who during the Class Period attended meetings with O'Hara and Crowe where fulfillment

- 140 -

problems, customer complaints, trouble tickets and service quality problems were discussed in detail (¶71(¶143), sold 66,572 shares of Level 3 stock, for a profit of $359,844, at coordinated times with the Individual Defendants.

## PROXIMATE LOSS CAUSATION/ECONOMIC LOSS

203.   164.During the Class Period, as detailed herein, defendants engaged in a scheme to deceive investors and the market and engaged in a course of conduct that artificially inflated Level 3's stock price and operated as a fraud or deceit on the Class Period purchasers and acquirers of Level 3's publicly traded securities.  Defendants' scheme was achieved by misrepresenting and omitting material information about the true status of the integration of the acquired businesses ,  inventory control and provisionary systems on to a unified platform and the resulting provisionary constraints which substantially impacted Level 3's revenue.  As defendants' fraud was disclosed and it became apparent to the market that Level 3's integration efforts had failed, and as a result the Company was unable to convert its sales into revenues, the price of Level 3's securities declined as the prior artificial inflation was removed from their prices.  As a result of their purchases and acquisitions of Level 3 securities during the Class Period, Lead Plaintiff and other members of the Class, as defined in ¶117¶216, suffered economic loss, *i.e.*, damages, under the federal securities laws.

204.   165.Throughout the Class Period defendants falsely and misleadingly informed investors that they were "complete" and "on plan" with the integration of the acquired businesses rather than truthfully disclosing.  However, defendants failed to disclose that Level 3's business performance was being threatened because integration of the acquired businesses was materially behind schedule and riddled with complications and that the Company had laid off subject matter

experts before defendants were assured that the provisioning targets were met. Instead, defendants publicly reported great success in the assimilation of the acquired businesses, stating: "We . . . have now completed the majority of integration efforts from WilTel, and we have completed these activities under budget"; "We continue to run ahead of plan on the WilTel integration . . . . This work has been completed ahead of schedule and under budget"; "You are right on WilTel, we have generally done, substantially done, by that I mean 85%, 90% done with those efforts"; and "Most of the physical integration of WilTel is now complete." ¶¶88, 92, 98, 100¶¶55, 58, 64, 72.

205.    166.Analysts covering Level 3 repeated defendants' false and misleading statements and espoused the importance of timely integrating the acquired businesses. For instance, in November 2006, an equity analyst reported to investors after meeting with defendants that "[o]ur meeting reinforced our confidence level in LVLT's ability to rapidly integrate [Broadwing] in 2007, setting the stage for a likely strong 2008." In May 2007, after meeting with Level 3 executives, Bear Stearns reported the Company was on track with no surprises, stating "product integration is done [and that the] physical network integration [is] largely done . . . except Broadwing, which should be complete within [the] next two months."

206.    167.Defendants' false statements and omissions had the intended effect and caused Level 3 stock to trade at artificially inflated levels of up to $6.75 per share during the Class Period as reflected in the following chart:



207.   ~~168.~~On July 26, 2007, defendants announced that Level 3 was suffering from "increase[s] in service activation times" and as a result lowered its Core Communications Services revenue growth.  Defendants admitted the increase in service activation times was a direct result of Level 3's "continue[d] . . . use [of] multiple order entry and provisioning processes ~~and systems~~ that were operated by the acquired companies."  ~~¶23~~¶21; *see also* ~~¶¶112-113~~¶¶87-88.  In response to defendants' partial disclosure, the price of Level 3's stock declined from the prior day's close of $5.72 per share to $5.03, on over 150 million shares traded.  As identified in the chart below, the July 26, 2007 drop partially removed the inflation from Level 3's stock price, causing real economic loss to investors who had purchased the stock during the Class Period.  However, the stock remained artificially inflated as defendants continued to assure the market that they had a well-developed plan to improve the processes throughout 2007.

- 143 -



### Level 3 Communications, Inc.

**July 2, 2007 to August 14, 2007**

7/26/07  Level 3's stock price declined from a close of $6.72 on 7/25/0 to $5.03 on 7/26/07 when defendants disclosed that the Company was suffering from "increase[s] in service activation times" as a consequence of Level 3's "continue[d] . use [of] multiple order entry and provisioning processes and systems that were operated by the acquired companies."

208.   ~~169.~~On October 15, 2007, defendants revealed that Level 3 was beginning a search for a new CFO to replace Patel because the Company needed a CFO with both operational and financial expertise.  In response to defendants' partial disclosure, the price of Level 3 stock declined from a close of $4.90 per share on October 12, 2007 to $4.36 per share on October 15, 2007.  Then, on October 23, 2007, defendants disclosed that they were lowering guidance for FY07 and 2008 due to difficulties ~~"~~"provisioning orders for its services.~~"~~"  ~~Defendants told investors that the service providing difficulties were the direct result of Level 3's failure to unify the acquired businesses' provisioning systems during integration.~~   ¶97.  Defendants also publically admitted that the provisioning constraints were caused by laying off subject matter experts before defendants were

assured that provisioning targets could be met.  ¶98.  In response to defendants' pre-market closing disclosure on October 23, 2007, the Company's stock slid from a close of $4.32 per share on October 22, 2007 to a close of $3.28 per share on October 23, 2007.  As identified in the chart below, the October 15 and 23, 2007 drops removed the inflation from Level 3's common stock price, causing real economic loss to investors who had purchased the stock during the Class Period.



209.   ~~170.~~The declines in the price of Level 3's securities during and at the end of the Class Period were a direct result of the nature and extent of defendants' prior false statements and omissions concerning the status of the Company's integration of the acquired businesses being revealed to investors and the market.  The timing and magnitude of Level 3's securities' declines

507036_1

negate any inference that the losses suffered by Lead Plaintiff and other Class members were caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.  In fact, the S&P 500 IT Index, which defendants used to compare Level 3's stock performance, significantly outperformed the Company's equity returns both during and after the Class Period.  The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other members of the Class, was a direct result of defendants' fraudulent scheme to artificially inflate the price of Level 3's securities and maintain the price at artificially inflated levels and the subsequent significant decline in the value of Level 3's stock when defendants' prior misrepresentations and omissions were revealed.

## NO SAFE HARBOR

210. ~~171.~~The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, or the forward-looking statement was authorized or approved by an executive officer of Level 3 who knew that those statements were false when made.

507036_1

## FRAUD-ON-THE-MARKET PRESUMPTION

211.   ~~172.~~Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine.  This presumption provides, *inter alia*:

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   The omissions and misrepresentations were material;

(c)   The Company's securities traded in efficient markets;

(d)   The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)   Lead Plaintiff and other members of the Class purchased Level 3 securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

212.   ~~173.~~At all relevant times, the market for Level 3 securities was efficient for the following reasons, among others:

(a)   Level 3 common stock met the requirements for listing, and was listed and actively traded, on the NASDAQ;

(b)   Level 3 common stock was regularly followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and customers of their respective brokerage firms; and

(c)   Level 3 regularly communicated with the public and investors via established market communication mechanisms, including via regular dissemination of press releases on major

news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

213.    ~~174.~~As a consequence, the markets for Level 3 securities digested current information with respect to Level 3 from publicly available sources and reflected such information in the price of Level 3's securities.  Under these circumstances, all purchasers or acquirers of Level 3 securities during the Class Period suffered similar injury through their purchase of securities at artificially inflated prices and, thus, a presumption of reliance applies.

## CLASS ALLEGATIONS

214.    ~~175.~~Before, during and after the Class Period, defendants regularly communicated with the public and investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

215.    ~~176.~~As a result, the market for Level 3 securities digested current information with respect to Level 3 from publicly available sources and reflected such information in the price of Level 3's securities.  Under these circumstances, all purchasers or acquirers of Level 3 securities during the Class Period suffered similar injury through their purchase of securities at artificially inflated prices and a presumption of reliance applies.

216.    ~~177.~~Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of purchasers and acquirers of Level 3 securities during the Class Period (the "Class") between October 17, 2006 and October 23, 2007. Excluded from the Class are defendants, the officers and directors of the Company, members of their

immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

217.   ~~178.~~The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Level 3's securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Level 3 or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

218.   ~~179.~~Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

219.   ~~180.~~Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

220.   ~~181.~~Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)   Whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

(b)      Whether statements made by defendants to the investing public during the Class Period misrepresented and omitted material facts about the business and operations of Level 3; and

(c)      To what extent the members of the Class have sustained damages and the proper measure of damages.

221.    ~~182.~~A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

**Violation of §10(b) of the Exchange Act and Rule 10b-5**
**Promulgated ~~Thereunder Against~~**
**<u>Thereunder Against</u>**
**All Defendants**

222.    ~~183.~~Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

223.    ~~184.~~During the Class Period, Level 3 and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Lead Plaintiff and other members of the Class, regarding Level 3's business, operations, financial prospects and the intrinsic value of Level 3's publicly traded securities; (b) artificially inflate and maintain the market price of Level 3's securities; and (c) cause Lead Plaintiff and other members of the Class to purchase Level 3's securities at artificially

inflated prices and, as a result, suffer economic losses when the truth and impact about defendants' fraud was revealed.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

224.   ~~185.~~Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers or acquirors of the Company's publicly traded securities in an effort to maintain artificially high market prices for Level 3's publicly traded securities in violation of §10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

225.   ~~186.~~Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business and its operations as specified herein.

226.   ~~187.~~These defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, non-public information and engaged in acts, practices and a course of conduct as alleged herein in an effort to assure investors of Level 3's value and performance and continued growth, which included the making of, or the participation in the making of, untrue statements of material fact and omitting to state material facts necessary in order to make the statements made about Level 3 and the integration of acquired businesses in light of the circumstances under which they were made, not misleading, as set forth more particularly herein,

and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers or acquirors of Level 3's publicly traded securities during the Class Period.

227.   188.Each of the Individual Defendant's primary liability, and controlling person liability, arises from the following facts: (a) the Individual Defendants were high level executives and, in certain circumstances, directors at the Company during the Class Period and members of the Company's senior management team; (b) each of these defendants, by virtue of his or her responsibilities and activities as a senior officer and director of the Company, was privy to and participated in the analysis of the Company's integration efforts and reporting regarding Level 3's financial performance and condition; (c) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's integration efforts, at all relevant times; and (d) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading and omitted material information.

228.   189.In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X, 17 C.F.R. §210.01 *et seq*., and Regulation S-K, 17 C.F.R. §229.10 *et seq*., and other SEC regulations, including accurate and truthful information about the status of the Company's integration efforts so that the market price of the Company's securities would be based on truthful, complete and accurate information.

229. ~~190.~~The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  As such, defendants' material misrepresentations and/or omissions were made knowingly or with a reckless disregard for the truth and for the purpose and effect of material information about the integration of the acquired businesses and supporting the artificially inflated prices of the Company's publicly traded securities.

230. ~~191.~~As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Level 3's publicly traded securities were artificially inflated during the Class Period.  In ignorance of the fact that the market price of Level 3's publicly traded securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the markets in which the securities trade and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired Level 3 publicly traded securities during the Class Period at artificially inflated prices and were damaged when the artificial inflation came out of the securities.

231. ~~192.~~At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff, the other members of the Class and the marketplace known the truth regarding the integration of the acquired businesses and the true condition of Level 3's business operations and prospects, which were not disclosed by defendants, they would not have purchased or otherwise

acquired their Level 3 publicly traded securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

232.    ~~193.~~By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

233.    ~~194.~~As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's publicly traded securities during the Class Period.

## COUNT II

### Violation of §20(a) of the Exchange Act
### Against All Defendants

234.    ~~195.~~Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

235.    ~~196.~~The Individual Defendants acted as controlling persons of Level 3 within the meaning of §20(a) of the Exchange Act as alleged herein.  Level 3 controlled all of its employees and each of the Individual Defendants.  By virtue of their high level positions, and their ownership and contractual rights, participation in and awareness of the Company's operations and intimate knowledge of the false statements and omissions made by the Company and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading.  The Individual Defendants participated in conference calls with investors and were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements, alleged by Lead Plaintiff to be misleading, prior to and/or shortly after these statements

were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

236. ~~197.~~In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

237. ~~198.~~As set forth above, Level 3 and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's publicly traded securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff respectfully prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, and certifying Lead Plaintiff as class representative under Federal Rule of Civil Procedure 23;

B.     Awarding compensatory damages in favor of Lead Plaintiff and the other members of the Class against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

     D.       Such equitable, injunctive or other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

     Lead Plaintiff hereby demands a trial by jury.

DATED: ~~June 29, 2009~~         COUGHLIN STOIA GELLER
                         RUDMAN & ROBBINS LLP
                      HENRY ROSEN
                      TRIG R. SMITH
                      LAURIE L. LARGENT
                      JULIE A. KEARNS

                      ~~s/ HENRY ROSEN~~
--------------------------------------------------------
                      HENRY ROSEN
                      ~~HENRY ROSEN~~

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

JOHNSON BOTTINI, LLP
FRANCIS A. BOTTINI, JR.
655 West Broadway, Suite 1400
San Diego, CA  92101
Telephone:  619/230-0063
619/233-5535 (fax)

Co-Lead Counsel for Plaintiffs

DYER & BERENS LLP
ROBERT J. DYER
JEFFREY A. ~~BERENS682 Grant StreetDenver~~
BERENS
303 East 17th Avenue
, ~~CO  80203-3507Telephone~~
Suite 300
Denver, CO  80203
Telephone
:  303/861-1764
303/395-0393 (fax)
bob@dyerberens.com
jeff@dyerberens.com

Liaison Counsel

Document2

~~CERTIFICATE OF SERVICE~~

~~I hereby certify that on June 29, 2009, I electronically filed the foregoing with the Clerk of~~
~~the Court using the CM/ECF system which will send notification of such filing to the e-mail~~
~~addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have~~
~~mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF~~
~~participants indicated on the attached Manual Notice List.~~

~~I certify under penalty of perjury under the laws of the United States of America that the~~
~~foregoing is true and correct.  Executed on June 29, 2009.~~

~~s/ HENRY ROSEN~~
~~HENRY ROSEN~~

~~COUGHLIN STOIA GELLER~~
~~RUDMAN & ROBBINS LLP~~
~~655 West Broadway, Suite 1900~~
~~San Diego, CA  92101-3301~~
~~Telephone:  619/231-1058~~
~~619/231-7423 (fax)~~

E-mail: henryr@csgrr.com

## <u>DECLARATION OF SERVICE BY E-MAIL</u>

I, Diana L. Houck, not a party to the within action, hereby declare that on March 23, 2010, I served the attached **Redline of the AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND JURY DEMAND** on the parties in the within action by e-mail addressed as follows:

<u>**COUNSEL FOR PLAINTIFFS**</u>:

| NAME | FIRM | EMAIL |
|---|---|---|
| Steven M. Kaufmann | Morrison & Foerster LLP | skaufmann@mofo.com |
| Brian N. Hoffman | Morrison & Foerster LLP | bhoffman@mofo.com |
| | | |
| | | |
| | | |
| | | |
| | | |

s/ DIANA L. HOUCK
DIANA L. HOUCK